Case No. 22-5459

# United States Court Of Appeals
## FOR THE SIXTH CIRCUIT

### UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

### RICARDO ALVARADO,

Defendant-Appellant.

**On Appeal from the United States District Court
for the Eastern District of Tennessee, No. 3:20-cr-00114-1**

### BRIEF OF RICARDO ALVARADO

Nathan L. Colvin
THE SIXTH CIRCUIT CLINIC
University of Cincinnati College
 of Law & Chase College of Law
2925 Campus Green Dr.
Cincinnati, Ohio 45221
Tel: (513) 313-7344
nathan.colvin@gmail.com

Colter L. Paulson
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Tel: (513) 361-1200
colter.paulson@squirepb.com

*Attorneys for Appellant Ricardo Alvarado*

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................vi

INTRODUCTION ......................................................................1

JURISDICTIONAL STATEMENT .................................................2

STATEMENT OF THE ISSUES....................................................2

STATEMENT OF THE CASE......................................................2

    A.   Mr. Alvarado Is Arrested For Possessing A Gun. ....................3

    B.   Mr. Alvarado Receives A Four-Point Addition For Reckless Endangerment. ................................................7

SUMMARY OF THE ARGUMENT ..............................................9

ARGUMENT ..........................................................................10

    I.   Mr. Alvarado's Conviction Under 18 U.S.C. § 922(g)(1) is Unconstitutional. ..........................................................10

    A.   Standard of Review..........................................................10

    B.   *Bruen* Abrogated This Court's Prior Precedents Upholding the Constitutionality of 18 U.S.C. § 922(g)(1).....11

    C.   The Application of 18 U.S.C. § 922(g)(1) to a Nonviolent Felon Like Mr. Alvarado is Unconstitutional.........................15

        1.   A Blanket Prohibition Against Firearm Possession by Nonviolent Felons Has No Historical Support.........16

        2.   Other Founding Era Sources Similarly Support a Finding that 922(g)(1) is Unconstitutional as Applied to a Nonviolent Felon. ...................................20

            a.   The Founders rejected proposals to prevent persons that had committed crimes from bearing arms. ...................................................20

i

        b.     Founding-era restrictions on the right to bear arms founded in racism or fear of insurrection do not inform the analysis. ..............22

    D.    Mr. Alvarado Has No Convictions for Violent Crime. ...........25

II.    This Court Should Reverse the Four-Point Enhancement For Reckless Endangerment with a Firearm...........................................266

    A.    Standard of Review...............................................................277

    B.    Tennessee law on reckless endangerment requires proof that an individual was in the "zone of danger" from the gunshots. ..................................................................................27

    C.    The Government did not provide any evidence that Mr. Alvarado placed anyone in danger by firing the rifle. ............29

CONCLUSION ....................................................................................................32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

**Cases**                                                           **Pages**

*District of Columbia v. Heller*,
554 U.S. 570 (2008)......................................................................*passim*

*Folajtar v. Attorney General of the United States*
980 F.3d 897 (3d Cir. 2020) ...............................................17, 18

*Johnson v. United States*,
520 U.S. 461 (1997).......................................................................11

*Kanter v. Barr*,
919 F.3d 437 (2019).................................................................*passim*

*New York State Rifle & Pistol Association v. Bruen*,
142 S. Ct. 2111 (2022)..............................................................*passim*

*Range v. Attorney General of the United States*
980 F.3d 897 (3d Cir. 2020) ...............................................17

*State v. Fox*,
947 S.W.2d 865 (Tenn. Crim. App. 1996) ..........................26, 27, 30

*State v. Goodwin*,
143 S.W.3d 771 (Tenn. 2004) ....................................................31

*State v. Payne*,
7 S.W.3d 25 (Tenn. 1999)............................................................28, 30

*Thorpe v. Housing Authority of Durham*,
393 U.S. 268 (1969)......................................................................11

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*
837 F.3d 678 (6th Cir. 2016) .....................................................12, 14

*United States v. Barton*,
633 F.3d 168 (3d Cir.2011) .......................................................14, 16

*United States v. Carey*,
602 F.3d 738 (6th Cir. 2010) ....................................................12

*United States v. Goolsby*,
  Case No. 21-3087, 2022 WL 670137 (6th Cir. March 7, 2022).........................14

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ........................................................................10, 13

*United States v. Khami*,
  362 F. App'x 501 (6th Cir. 2010) ...............................................................11, 12

*United States v. Maxon*,
  250 F. App'x 129 (6th Cir. 2007)................................................................28, 32

*United States v. Mukes*,
  980 F.3d 526 (6th Cir. 2020) ...........................................................26, 27, 28, 31

## Statutes & Guidelines

18 U.S.C. § 922(g)(1)...........................................................................*passim*

18 U.S.C. § 922(g)(4).......................................................................................12

28 U.S.C. § 1291 ................................................................................................2

28 U.S.C. § 3231 ................................................................................................2

Tenn. Code Ann. § 39-13-103 ..............................................................7, 26, 27, 28

U.S.S.G. § 2K2.1(b)(6)(B)......................................................................3, 7, 25, 32

## Other Authorities & Historical Documents

Thurlow Weed, *Journals of the Provincial Congress, Provincial
  Convention, Committee of Safety and Council of Safety of the State
  of New York*, 1775-1776-1777 Volume 1, Part 1 (1842)...................................24

*Archives of Maryland: Proceedings and Acts of the General Assembly
  of Maryland*, Vol. 50 (J. Pleasants ed., 1933) ...................................................23

*Archives of Maryland: Proceedings of the Council of Maryland*,
  August 10, 1753-March 20, 1761, Vol. 31 (William Browne ed.,
  1911) ................................................................................................................23

*Backgrounds of Selective Service*, *Military Obligation: An American Tradition*, S. Monograph 1, Vol. II, Part 3, p. 2-3 (Arthur Vollmer ed., 1947) .............................................................................23

Bernard Schwartz, *The Bill of Rights: A Documentary History*, Vol. 2, (1971) .............................................................................21

*Calendar of State Papers of the Reign of Charles II, 1684-1685*, Domestic Series, Vol. 27 (1938) ...........................................24

S. Cornell & N. DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004). ..................................................................................19, 24

Federal Firearms Act, ch. 850 (1938) ...............................................16

*Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Thirty-Fifth Annual Meeting*, (1926) ...............................................................................19

Jonathan Elliott, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, Vol. 1 (2d ed. 1891) ...............21

*The Works of Thomas Jefferson*, Vol. 3 (H. Washington ed., 1884) ......................24

William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia*, Vol. 1 (1809) ...............................................23

William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia*, Vol. 4 (1820) ...............................................23

William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia*, Vol. 7 (1820) ...............................................23

C. Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009) ...........................................................19

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant-Appellant Ricardo Alvarado respectfully requests oral argument as this case presents a fact-intensive record from a jury trial as well as complex and unresolved legal issues. In addition, this case was taken under the Criminal Justice Act and in connection with the Sixth Circuit Clinic at the University of Cincinnati College of Law. Under the direction of the undersigned, law students research the record, draft the briefs, and, when possible, do the oral argument. Accepting oral argument on this case will therefore also serve pedagogical purposes.

## INTRODUCTION

Mr. Alvarado has never been convicted of a crime of violence, but now faces over eight years in prison for the possession of a gun—a right guaranteed by the Second Amendment.  Compounding matters, he received a four-point enhancement for reckless endangerment with the gun because people heard gunshots, despite no evidence supporting the predicate requirement that an individual be in danger from the firearm.  This Court should correct these errors.

After judgement was entered in this case, the Supreme Court held that laws burdening Second Amendment rights must have an equivalent restriction from the time of the founding.  *See New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2126-27 (2022) (need to show "the regulation is consistent with this Nation's historical tradition of firearm regulation").  Because no founding-era law would have restricted Mr. Alvarado from owning a firearm, the application of 18 U.S.C. § 922(g)(1) in this case is unconstitutional.  Mr. Alvarado's prior felonies – drunk driving and possession of marijuana – were not the kind of crimes that might have resulted in disarmament when the Second Amendment was passed.  His conviction as a felon in possession therefore contradicts the Second Amendment.

Mr. Alvarado's sentence also must be reversed.  Mr. Alvarado received a four-point enhancement for the Tennessee offense of reckless endangerment with a firearm, which requires that a person be within the "zone of danger" of any gunshots.

1

There was no evidence regarding where the shots were fired, or in what direction the gun was pointed, or that anyone was in any danger at all from the gunshots. The fact that his wife and neighbors were scared by the noise from the gunshots does not satisfy the "zone of danger" requirement under Tennessee law, which requires actual recklessness with the firearm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 3231 and entered its final judgment and sentence on May 27, 2022. R.89. Mr. Alvarado entered his appeal on that same day. R.91. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Does the Second Amendment allow Mr. Alvarado to possess a firearm even though he was previously convicted of felony possession of marijuana and drunk driving.

2.     Did the district court err in applying a four-point enhancement for reckless endangerment with a firearm under Tennessee law when there was no evidence that anyone was in danger from the gunshots.

## STATEMENT OF THE CASE

Mr. Ricardo Alvarado appeals his conviction and sentence under 18 U.S.C. § 922(g)(1), as a felon in possession of a firearm. Mr. Alvarado is a father of five residing in Louisville, Tennessee with, Ms. Maria Martinez. PSR, R.86 at 4, 11;

Sentencing Memorandum, R.73-1, PageID869.  Mr. Alvarado has no convictions for violence; his only previous felony convictions were for possession of marijuana and drunk driving with a minor in the car—both many years ago.  PSR, R.86 at 6-8.  The court gave Mr. Alvarado a four-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B) for use of a firearm while committing felony reckless endangerment under Tennessee law.  The court ultimately sentenced Mr. Alvarado to 104 months in prison. Sentencing Tr., R.112, PageID1638.

### A.    Mr. Alvarado Is Arrested For Possessing A Gun.

After a report of a breaking and entering in progress by a man armed with a "machine gun," police responded to Mr. Alvarado's neighborhood.[1]   Trial Tr., R.107, PageID1283, 1284, 1313, 1344.  Mr. Alvarado lived in a small trailer park, with a half-dozen homes in a rough line between an open field by the road in the front and a forested area behind.  R.107, PageID1277; R.109, PageID1492-93; Sentencing Exhibits #9, #11.[2]  An officer testified that he saw Mr. Alvarado holding a rifle together with a rifle bag, and ordered him to drop the gun and get on the ground.   R.107, PageID1286-90.   The officer testified that Mr. Alvarado "immediately" complied, with his gun dropping into the mud.   *Id.*   The officer

---

[1] The Government never claimed that Mr. Alvarado had anything to do with the breaking and entering.

[2] Mr. Alvarado submitted the Government's Exhibits Nos. 1, 2, 3, 9, and 11, admitted during the sentencing hearing on May 26, 2022, to the Clerk of Court on April 11, 2023, concurrent with the filing of this brief.

testified that Ms. Martinez and her young child were also nearby. *Id.*, PageID1288, 1289.

The officer then saw another individual going "around behind" one of the homes. Trial Tr., R.107, PageID1288. He admitted that he worried about whether this other individual was dangerous and so took cover behind a large tree until his backup arrived. *Id.*, 1289-90. This person was never identified, though another witness also stated that he had seen a different individual armed with a gun. R.108, PageID1414. Mr. Alvarado and his wife testified that the Government's witnesses was mistaken about who had been holding the weapon. R.78, PageID979-80 (Mr. Alvarado); R.78, PageID934-35 (Ms. Martinez).

After arresting Mr. Alvarado, the officers questioned his neighbors. Trial Tr., R.107, Page ID1298. None of them accused Mr. Alvarado of the reported breaking and entering, and none of them testified that they saw Mr. Alvarado actually fire a gun. *Id.* The Government's first witness, Caleb Smith, testified that he was away at a store with a friend buying a drink when the shots were fired. Trial Tr., R.108, PageID1371. He only learned that shots had been fired when a friend's mother called while he was in the store. *Id.* The Government's only other witness as to the gunshots, Angela Hufflin, testified that she was watching television inside her home when she heard the gunshots. R.108, PageID1396. She did not see who fired the shots. *Id.* She testified to waiting a few seconds, running to her backdoor, and then

4

falling down trying to bring her dog inside.  At that time, she saw Mr. Alvarado and Ms. Martinez running down Little Dug Gap Road with their child, with Mr. Alvarado carrying a gun.  *Id.*; R.108, PageID1420-21, PageID1425.  In addition to not testifying that they saw Mr. Alvarado fire the rifle, none of the witnesses testified as to how many shots they heard or the direction of any shots.

An officer interrogated Mr. Alvarado's wife, who explained that she heard the gunshots but did not know where (or at what) the shots were fired:

| | |
|---|---|
| Officer: | It's that trailer up there?  Up there on the hill? |
| Ms. Rodridguez: | Cause he said don't say anything. |
| Officer: | That happens with domestic violence offenders.  They try to manip… |
| Ms. Rodridguez: | I don't want to put charges. |
| Officer: | You don't have to, I am. |
| Ms. Rodridguez: | I was praying so hard. |
| Officer: | The State does that for a reason.  Scared you, didn't he? |
| Ms. Rodridguez: | I had left already, yesterday.  My stuff is not there.  My baby not there, too.  But… |
| Officer: | He scared you, didn't he? |
| Ms. Rodridguez: | He scared me and I had to come back.  I drove seven hours and then seven hours back. |
| Officer: | Were you afraid he was going to hurt you and your baby? |
| Ms. Rodridguez: | I don't think him.  But me.  But his daughter is like, no he won't do anything.  But what if he does? |
| Officer: | He's already shooting that rifle.  Did you see him point it at you? |
| Ms. Rodridguez: | No, I like, went like that; covered his ears [gestures to indicate the baby she is holding].  Cause I heard "bee."  I was like, he probably messed up his ear. |
| Officer: | Ok. |
| Ms. Rodridguez: | But, no, I don't think so because [gestures to indicate baby's ears are not hurt].  **I guess he was outside, I don't know where he was.**  He was probably in the … [the rest |

> of the sentence is cut off by the officer's radio and is
> unintelligible].

Sentencing Exhibit #1, body camera footage of Officer York, starting at 2:25 on the video (transcription provided by undersigned counsel).

The officers also testified to recovering two spent and two live rounds of .233 ammunition from the back porch of Mr. Alvarado's home.  Trial Tr., R.107, PageID1299, 1301-02.  The Government argued that the two spent rounds came from Mr. Alvarodo's rifle.  Sentencing Tr., R.112, PageID1609.  But the Government did not offer evidence (1) that the spent rounds were fired by the rifle in Mr. Alvarado's possession, (2) that the rifle had been recently fired; (3) when the loose rounds had been fired; (4) whether Mr. Alvarado's fingerprints were on the rounds, or (5) whether there was gunpowder residue on Mr. Alvarado.  *Id.*, PageID1604 ("We don't know when they were fired, but we know there's at least two fired.").  The Government did not offer any evidence as to the direction of any gunshots that were fired.  Instead, it offered evidence that the rifle and magazines (which in the gun bag) had "numerous rounds of ammunition."  R.107, PageID1294.

After a jury trial in which various officers, two neighbors, Ms. Martinez, and Mr. Alvarado and testified, Mr. Alvarado was convicted of violating 18 U.S.C. § 922(g)(1) as a felon in possession of a firearm.  Sentencing Tr., R.112, PageID1565-66, 1599, 1612.

**B.     Mr. Alvarado Receives A Four-Point Addition For Reckless Endangerment.**

At sentencing, Mr. Alvarado objected to the addition of four criminal history points under U.S.S.G. Section 2K2.1(b)(6)(B) for felony reckless endangerment under Tennessee law, Tenn. Code Ann. § 39-13-103(b)(2).  R.110, PageID1568; *see also* PSR, R.86 at 5.  The Government relied on the evidence from trial regarding Mr. Alvarado's possession of the rifle, trial testimony from witnesses that they were scared when they heard gunshots, and a video of Ms. Martinez saying that she was generally scared of Mr. Alvarado.  Sentencing Tr., R.112, PageID1600.  Sentencing Tr., R.112, PageID1601-1610.  The Government offered no evidence regarding the direction any shots were fired, not did it offer evidence that someone was in the zone of danger from such shots.

The sentencing judge credited Ms. Martinez' statements in the body cam footage that she was scared of Mr. Alvarado, but she did not indicate in the video that she was ever in danger from Mr. Alvarado's rifle.  *See* Sentencing Exhibit #1 (starting at 2:25 on the video).  As explained above, the interrogating officer repeatedly brought up allegations of domestic violence and Ms. Martinez stated that he had scared her, but she did not state that Mr. Alvarado had threatened her with the rifle or fired it in her presence.  *Id.*  In fact, Ms. Martinez did not know where Mr. Alvarado was when the rifle was fired, and she implied that she was inside their

7

home while the shots were fired somewhere outside. *Id.* She did not state where the rifle was pointed, or whether it put anyone in danger. *Id.*

In applying the four-point enhancement, the judge emphasized that neighborhood residents and Ms. Martinez were scared when they heard the two gunshots, and then held that scaring others by firing a gun within a trailer park was sufficient to show reckless endangerment:

> The evidence demonstrated that Mr. Alvarado discharged the Ruger AR rifle from a trailer or the patio of that trailer in the vicinity of several residences at the trailer complex placing those other residents in imminent danger of serious bodily harm. Caleb Smith who we saw in the video and Angela Hufflin lived in that complex near where Mr. Alvarado discharged the AR. They heard the nearby gun shots and testified to being scared, alarmed, and stressed as a result of Mr. Alvarado's conduct; and given their proximity in the immediate vicinity of the shots, it was reasonable to fear death or serious bodily injury from Mr. Alvarado's reckless AR shots.

> The government's exhibits confirmed that the residents of the trailer park heard the shots, were nearby, and feared for their safety and property. Ms. Hufflin specifically stated that based on what she heard, she thought the shots were fired near or toward her trailer and her dog. Further evidence at the scene shortly after the incident demonstrates that Mr. Alvarado's reckless conduct shooting the Ruger AR in the trailer that he was in with Ms. Martinez and/or the patio of that trailer placed Ms. Martinez in imminent danger of serious bodily harm.

R.112, PageID1614-15. The Court ultimately sentenced Mr. Alvarado to 104 months in prison, though he had expressed misgivings about the quality of the Government's evidence. *Id.*, PageID1638; R.109, pageID1471 ("I think there are going to be a lot of issues, potential issues, on appeal here. This case has been

8

presented in a less than clear fashion.  So I anticipate there might very well be an appeal and the Sixth Circuit might take a good look at it.").

## SUMMARY OF THE ARGUMENT

Mr. Alvarado raises two independent errors:

1.      Mr. Alvarado's conviction under 18 U.S.C. § 922(g)(1) violates the Second Amendment under the standard set forth by the Supreme Court in *Bruen*. Mr. Alvarado's prior felonies, drunk driving and marijuana possession – were non-violent. Because a person similarly situated with Mr. Alvarado at the time of the founding would not be barred from ever again possessing firearms, Mr. Alvarado's rights cannot be any less.  Mr. Alvarado's conviction is unconstitutional.

2.      This Court should also remand for resentencing without the four-point enhancement for the Tennessee offense of reckless endangerment with a firearm. Tennessee law requires that a person be within the "zone of danger" from the gunshots, but the Government failed to provide any evidence regarding where or in what direction the gun was pointed, or that anyone was in any danger at all from the gunshots.  The fact that Mr. Alvarado's wife and neighbors were scared by the noise from the gunshots does not satisfy the "zone of danger" requirement under Tennessee law, which requires actual recklessness with the firearm.

**ARGUMENT**

**I.    Mr. Alvarado's Conviction Under 18 U.S.C. § 922(g)(1) is Unconstitutional.**

Mr. Alvarado's conviction as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) is unconstitutional under the test announced by the Supreme Court in *New York State Rifle & Pistol Association*, 142 S. Ct. at 2126-27. *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively* protects that conduct." *Id*. (emphasis added).  If a modern firearms regulation does not have an analogous law that existed "at the time of the founding," it is unconstitutional. *Id*. at 2130, 2142.

Mr. Alvarado has never been convicted of a felony of violence.  And the Government cannot meet its burden to show that an analogous ban on firearm possession by nonviolent felons existed at the time of the founding.  The application of 18 U.S.C. § 922(g)(1) to Mr. Alvarado, therefore, is unconstitutional under *Bruen*.

**A.    Standard of Review**

Mr. Alvarado did not challenge the constitutionality of his conviction because at the time he was convicted, this Circuit's settled law was that 18 U.S.C. § 922(g)(1) is constitutional under the two-step test for Second Amendment challenges used by this and other courts. *See United States v. Greeno,* 679 F.3d 510, 517 (6th Cir. 2012) (explaining circuit law "to reject Second Amendment challenges to federal felon-in-possession of a firearm convictions").  As is explained below, however, the Supreme

Court's subsequent decision in *Bruen* changed the Second Amendment landscape and gives this Court cause to reexamine its prior precedents. As such, Mr. Alvarado is permitted to challenge his conviction under the plain error standard. *See Johnson v. United States*, 520 U.S. 461, 468 (1997) ("Where the law at the time of trial was settled and clearly contrary to the law at the time of appeal it is sufficient enough that an error be plain at the time of appellate consideration."); *see also Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 281 (1969) ("[The general rule … is that an appellate court must apply the law in effect at the time it renders its decision.").

### B.    *Bruen* Abrogated This Court's Prior Precedents Upholding the Constitutionality of 18 U.S.C. § 922(g)(1).

In the wake of the Supreme Court's decision in *Bruen*, this Court should consider Mr. Alvarado's as-applied challenge to Section 922(g)(1) with fresh eyes for at least three reasons.

First, *Bruen* rendered this Court's prior reliance on *dicta* from *District of Columbia v. Heller*, 554 U.S. 570 (2008) untenable. While *Heller* recognized an individual right to bear arms under the Second Amendment, it also contained *dicta* stating it should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" among others. *Id*. at 626-27. This Court, like many others, embraced *Heller's dicta* and rejected the initial challenges to Section 922(g)(1) and similar regulations with little to no separate

analysis.  *See United States v. Khami*, 362 F. App'x 501, 508 (6th Cir. 2010) ("Since *Heller* indicates that its holding does not bring into question the constitutionality of § 922(g)(1), and this Court has not been presented with any convincing argument that its dicta should not be very persuasive in this case, the district court did not err in denying Defendant's motion to dismiss Count IV."); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) ("In short, *Heller* states that the Second Amendment right is not unlimited, and, in fact, it is specifically *limited* in the case of felon prohibitions.").

*Heller's dicta* should not carry such weight.  This Court recognized as much several years later in *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, where it held *en banc* the plaintiff stated a viable as-applied challenge to the constitutionality of 18 U.S.C. § 922(g)(4) and its prohibition on the possession of firearms by those who have been previously committed to a mental institution despite *Heller's* dicta to the contrary. *See* 837 F.3d 678, 681 (6th Cir. 2016) (en banc).  In doing so, the Court stated *Heller's dicta* "did not invite courts onto an analytical off-ramp to avoid constitutional analysis."  *Id*. at 686.  Yet, the Court (and others) had used that off-ramp when rejecting earlier challenges in *Khami* and *Carey*.  That approach downgraded the Second Amendment to "a second class right."  *Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill

12

of Rights guarantees.'") (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)).    Indeed, *Bruen* explained that while *Heller* noted that the Second Amendment is subject to certain historical limits, *Heller* "cautioned that [it] was not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment" and moved on to considering the constitutionality of the District of Columbia's handgun ban."  142 S. Ct. at 2128.  *Heller* itself left open challenges to the listed prohibitions.  554 U.S. at 635 ("And there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").

Second, starting in 2012, this Court joined other courts in applying a two-step test to Second Amendment challenges.  *See United States v. Greeno*, 679 F.3d at 518 (adopting the approach taken by the Third, Fourth, Seventh, and Tenth Circuits). "Under the first prong, the court asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood."  *Id*. (citation omitted).  And if the Government does not meet this burden, the court proceeds to the second prong, which is an inquiry into the strength of the Government's justification for restricting Second Amendment rights.  *See id*. (citation omitted).  *Bruen* cited *Greeno* (and other courts) and rejected this approach: "Despite the popularity of this two-step approach, it is one step too many."  *Bruen*, 142 S. Ct. at 2127.  Now, "the government must affirmatively prove that its firearms

13

regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg*, 366 U.S. at 50, n. 10). This Court, however, has never determined whether a ban on possession of firearms by felons meets this standard. Indeed, just a few months before *Bruen* was decided, this Court rejected a Second Amendment challenge to Section 922(g)(1) as foreclosed by Circuit precedent. In doing so, the Court noted that the prior precedents "emphasized the government's 'compelling' interest in 'protecting the community' by 'keep[ing] firearms out of the hands of presumptively risky people.'" *United States v. Goolsby*, Case No. 21-3087, 2022 WL 670137, at *2 (6th Cir. March 7, 2022) (quoting *Tyler*, 837 F.3d at 693–94 (6th Cir. 2016). *Bruen* makes clear this emphasis on the Government's compelling interest is no longer valid. *See* 142 S. Ct. at 2131 ("But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here.").

Third, it appears this Court has never considered an as-applied challenge to Section 922(g)(1) by a nonviolent felon such as Mr. Alvarado. The Court's prior Second Amendment precedent noted that, at best, the *Heller dicta* "only established a presumption that such bans were lawful." *Tyler*, 837 F.3d at 686. "A presumption implies 'that there must exist the possibility that the ban could be unconstitutional

in the face of an as-applied challenge.'" *Id.* (quoting *United States v. Williams*, 616, F.3d 685, 692 (7th Cir. 2010); *see also United States v. Barton,* 633 F.3d 168, 172–73 (3d Cir.2011) (explaining that "*Heller's* statement regarding the presumptive validity of felon gun dispossession statutes does not foreclose *Barton*'s as-applied challenge" because "the Supreme Court implied that the presumption may be rebutted").

The Court should therefore consider Mr. Alvarado's facial challenge to the constitutionality of § 922(g)(1) under the new framework established by *Bruen*.

### C.  The Application of 18 U.S.C. § 922(g)(1) to a Nonviolent Felon Like Mr. Alvarado is Unconstitutional.

In *Heller*, the Supreme Court recognized that the Second Amendment secures "an individual right to keep and bear arms."  554 U.S. at 577, 595.  After *Bruen*, it is now clear that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2129-30.  Because Mr. Alvarado's possession of a firearm was plainly covered by the text of the Second Amendment, the Government can only sustain a § 922(g)(1) conviction if it can "demonstrat[e] that it is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.  The Government cannot meet this burden because there was no analogue ban of nonviolent felons at the time of the Founding.

### 1.     A Blanket Prohibition Against Firearm Possession by Nonviolent Felons has no Historical Support.

*Bruen* explained that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  142 S. Ct. at 2131.  Crime and gun violence certainly existed at the time of the Founding, yet there are no historical regulations similar to Section 922(g)(1).

As an initial matter, it is worth noting that there was no federal ban on possession of firearms by felons until 1938.  *See* Federal Firearms Act (FFA), ch. 850, § 1(6), 52 Stat. 1250, 1251 (1938).  Even then, only those convicted of a "crime of violence" were so banned.  *Id.*  The statute defined "crime of violence" as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," as well as certain varieties of assault: "assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year."  *Id.*  "Congress did not bar non-violent felons from possessing guns until 1961."  *United States v. Barton*, 633 F.3d 168, 173 (3d Cir. 2011) (citing An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961)).

The prohibition against nonviolent felons possessing firearms at the local level is also a recent development.  Notably, then-Judge Barrett demonstrated this in

dissent in *Kanter v. Barr*, where she would have held § 922(g)(1) unconstitutional as applied to nonviolent felons because it lacks a founding-era analogue.  919 F.3d 437, 451-69 (7th Cir. 2019).[3]  Similarly, in *Folajtar v. Attorney General of the United States*, Judge Stephanos Bibas found the same in dissent.  980 F.3d 897, 914 (3d Cir. 2020) ("Rather, we must analyze the history ourselves and ask:  Were all felons, dangerous and nondangerous alike, equally excluded from the Second Amendment?  No they were not.").[4]

Turning to the history, *Heller* held that the Second Amendment "was adopted with some…*enlargement* from the English Bill of Rights of 1688."  *Heller*, 554 U.S., at 616-17 (citing Thomas Cooley, *1868 Treatise on Constit. Limit.* at 270).  Judge Barrett explained that the closest historic English analogue to Section 922(g)(1) applied "only to people who *are* dangerous."  *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (citing Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)).  Judge Bibas similarly concluded that pre-founding era English laws were limited to people engaged in violence, and justified by reason of the expectation of future violence.

---

[3] The *Kanter* majority rejected the 922(g)(1) challenge by an individual convicted of mail fraud under the second step, finding the Government "met its burden of establishing that the felon dispossession statutes are substantially related to an important government interest."  *Kanter*, 919 F.3d at 439, 448.  It was thus abrogated by *Bruen*.  *See* 142 S. Ct. at 2126 & n. 4.

[4] The Third Circuit is currently revisiting this issue *en banc* in *Range v. Attorney General of the United States*.  *See* 56 F.4th 992 (3d Cir. 2023) (vacating decision rejecting challenge to Section 922(g)(1) by a nonviolent felon and granting rehearing *en banc*).

*See Folajtar*, 980 F.3d at 914 (Bibas, J., dissenting) ("And they could seize arms from and imprison 'people who [went] armed to terrify the King's subjects.'") (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)).[5]

Section 922(g)(1) also had no analogue in the colonies at the time of the Founding.  There is no record of a founding-era law prohibiting firearm possession due to a felony conviction, much less for a conviction for a nonviolent crime. Instead, there are examples of laws that disarmed certain individuals on the basis dangerousness, mostly out of a particular concern about insurrection.

For example, "[s]ome colonies, like Virginia and Massachusetts, disarmed Catholics "on the basis of allegiance, not on the basis of faith," "with the intent of preventing social upheavals" and "rebellion."  *Folajtar*, 980 F.3d at 914 (Bibas, J. dissenting) (quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) and Alexander DeConde, *Gun Violence in America* 22–23 (2001)).  But even then, "those 'willing to swear

---

[5] The *Folajtar* majority relied on a distinction between "virtuous" and "unvirtuous" citizens and whether a crime is "serious" or not.  980 F.3d at 902-03.  But Founding-era laws were aimed against organized threats to the government, not on such vague distinctions.  And tethering Second Amendment rights to virtuousness would undo *Bruen* by requiring deference to the Government on what counts as a virtuous citizen or a serious crime.  *Bruen*, 142 S. Ct. at 2131 ("is not deference that the Constitution demands here").  As explained below, the Founders debated whether to condition the right to bear arms on criminal convictions, but chose not to do so.

undivided allegiance to the sovereign' were permitted to keep their arms," showing that the prohibition was about preventing rebellion. *Kanter*, 919 F.3d at 457 (Barrett, J. dissenting) (quoting Churchill, 25 Law & Hist. Rev. at 157).

Along the same lines, there are examples of disarming those who remained loyal to England during the time of the American Revolution. *Folajtar*, 980 F.3d at 914 (Bibas, J. dissenting). But these prohibitions were about securing victory in a time of war, securing firearms for the war, and denying firearms to the opposing forces. *See id.* (citing Cornell & DeDino at 506–07 and Gilbert at 281–82); *see also Kanter*, 919 F.3d at 457-58 (Barrett, J. dissenting) (finding that colonial era prohibitions were "meant to 'deal with the potential threat coming from armed citizens who remained loyal to' another sovereign.") (quoting S. Cornell & N. DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)). Even the participants in Shay's Rebellion only lost their right to bear arms for three years after swearing allegiance to the United States. Cornell, *A Well Regulated Right*, 73 Fordham L. Rev. at 507-08.

Note also that early state gun-control laws did not generally apply to rifles: "no State banned possession of long guns based on a prior conviction." C. Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009), citing *Handbook of the National Conf. of Commissions on Uniform State Laws and Proceedings of the Thirty-Fifth Annual Meeting,* p. 862-63 (1925). While

some laws targeted easily-concealed weapons like pistols, there is little historical evidence of restrictions on rifles as they are far less likely to be useful to a criminal.

Under *Bruen*, the lack of a historical analogue at the time of the founding ought to be dispositive. 142 S. Ct. at 2131 ("[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."). The fact that very narrow firearm bans existed is at the Founding is not enough for the Government to carry its burden here—especially when those bans were focused on the specific issues of domestic insurrection or foreign threats. *See Bruen*, 142 S. Ct. at 2133 ("[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'") (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

### 2.    Other Founding Era Sources Similarly Support a Finding that 922(g)(1) is Unconstitutional as Applied to a Nonviolent Felon.

*Heller* also looked to ratification-era sources, such as debates from the ratifying conventions, to understand the historical meaning of the Second Amendment. *See* 554 U.S. at 604. Those sources further establish that the founding era disfavored categorical bans on firearm possession like § 922(g)(1).

### a.    The Founders rejected proposals to prevent persons that had committed crimes from bearing arms.

20

During ratification, the drafters of the Constitution rejected attempts to limit the right to bear arms in various ways, including by limiting the rights of criminals. For example, the Pennsylvanian anti-federalists (who voted against ratification) explicitly proposed that the right to bear arms should not apply to criminals, proposing an amendment that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals" Bernard Schwartz, *The Bill of Rights: A Documentary History*, Vol. 2, p. 662-65 (1971). Although this minority was "highly influential," their proposal was defeated in favor of a more expansive Second Amendment. *Heller*, 554 U.S. at 581, 604. Similarly, a Massachusetts delegate proposed limiting the right to bear arms to those "who are peaceable citizens." *Kanter v. Barr*, 919 F.3d 437, 454-55 (2019) (Barrett, J., dissenting) (*citing* Schwartz, *The Bill of Rights*, Vol. 2, p. 675, 681. Yet even that mild limitation was ultimately excluded from the language of the Second Amendment.

New Hampshire's constitutional convention recommended language protecting the right to bear arms for every situation short of rebellion: "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." *See* Jonathan Elliott, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, Vol. 1, p. 326 (2d ed. 1891). But even an exception as narrow "actual rebellion" did not make its way into the text of the amendment.

The fact that "none of the relevant limiting language made its way into the Second Amendment" is critical to the historical analysis. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). Despite these proposals, "similar limitations or exclusions do not appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment." *Id.* (citing Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006)). As such, "neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons." *Id.* at 458. While early legislatures exercised "the power to prohibit dangerous people from possessing guns …. that power extends only to people who are *dangerous*. Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Id.* at 451-52.

### b. Founding-era restrictions on the right to bear arms founded in racism or fear of insurrection do not inform the analysis.

This Court should not consider Founding-era disarmament laws that were based on discrimination when interpreting the Second Amendment. The Supreme Court rejected the idea that pre-ratification laws disarming racial or religious groups for discriminatory purposes should inform the analysis. *See Bruen*, 142 S. Ct. at 2149 (holding that laws targeting Blacks through "selective or pretextual enforcement" could not support "a historical tradition of restricting the right to public carry."). But even if this Court considers those discriminatory laws, in every

22

case those laws are premised on a real (or perceived) present danger of organized violence against the government.

Colonial laws often disarmed Black people and mandated that other carry arms in anticipation of violent slave revolts.[6]  Colonial-era leaders similarly disarmed Catholics based on fears they "would wash their Hands in the Blood of Protestants."[7]  Maryland's legislature ordered that "any such Quantities of Arms … be seized" from Catholic homes in 1754.[8]  A Virginia law declared "it is dangerous at this time to permit Papists to be armed," though it allowed for "such necessary weapons as shall be allowed … for the defense of his house or person."[9]  While repulsive, these laws justified disarmament based on preventing insurrection against the government.

---

[6] *See* William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia*, Vol. 1, p. 226 (1809) (statute requiring all "persons except negroes" to have "arms and ammunition); *id*., Vol. 4, p. 131 (1820) (statute stating "that no negro, mulatto, or Indian whatsoever shall hereafter presume to keep, or carry any gun, powder and shot"); *Backgrounds of Selective Service*, *Military Obligation: An American Tradition*, S. Monograph 1, Vol. II, Part 3, p. 2-3 (Arthur Vollmer ed., 1947) (Delaware statute requiring every "Freeholder and taxable Person" to be armed to prevent "Invasions of a foreign Enemy" and "Insurrections of our own Slaves").

[7] *Archives of Maryland: Proceedings and Acts of the General Assembly of Maryland*, 1752-1754, Vol. 50, p. 201 (J. Pleasants ed., 1933).

[8] *Archives of Maryland: Proceedings of the Council of Maryland*, August 10, 1753-March 20, 1761, Vol. 31, p. 47-48 (William Browne ed., 1911) at 47-48.

[9] *See* Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia*, Vol. 7, p. 35-36 (1820).

Other disarmament laws were aimed at preventing insurrections during the Revolution. Loyalists were disarmed both as potentially dangerous enemies and as a source to obtain needed arms. In New York, the legislature seized arms from loyalists and used the guns to supply its army.[10] Thomas Jefferson argued that loyalists could be disarmed based on their status as "enemies" during a war.[11] Massachusetts and Pennsylvania disarmed loyalists to prevent them from "violently protest[ing]" the patriot cause.[12] England historically took the same approach, requiring that a person not just be "dangerous" to be disarmed, but to also be "disaffected" with the government. *Calendar of State Papers of the Reign of Charles II, 1684-1685*, Domestic Series, Vol. 27, p. 26-27, 83-85 (1938).

In sum, disarmament laws at the time of the founding were premised on violence aimed at overturning the system—whether through slave revolts, supposed Catholic sympathies with the French cause, or by remaining loyal to England during the American Revolution. Such laws do not justify application of § 922(g)(1) to a

---

[10] Thurlow Weed, *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New York*, 1775-1776-1777 Volume 1, Part 1, p. 149 (1842) (A New York 1775 statute stating all arms belonging to "any person who has not signed the General Association in this Colony, shall be impressed for the use of the said Troops").

[11] Letter from Jefferson to Hammond, May 29, 1792, in *The Works of Thomas Jefferson*, Vol. 3, p. 369 (H. Washington ed., 1884) at 369 ("the state of war strictly permits a nation to seize the property of its enemies found within its own limits").

[12] Cornell, *A Well Regulated Right*, 73 Fordham L. Rev. at 506-07.

person convicted of a non-violent felony, like Mr. Alvarado.[13]  Because the Section

922(g)(1) is not "consistent with this Nation's historical tradition of firearm

regulation" as applied to Mr. Alvarado, that application is unconstitutional under

*Bruen*.  142 S. Ct. at 2126-27, 2135, 2142.

### D.    Mr. Alvarado Has No Convictions for Violent Crime.

Under these standards only those persons convicted of a violent felony, or

convicted of a felony that is often violent, should ever be subject to firearm

dispossession under 18 U.S.C. § 922(g)(1).  Applying that statute to persons

convicted of *non-violent* felonies violates the Second Amendment.  Mr. Alvarado

has been convicted of two felonies.  In 2007, he was convicted of felony drunk

driving.  PSR, R.86 at 6.  And then in 2010, he was convicted of possession of

marijuana.  *Id*. at 7.  His misdemeanor convictions are all vehicle-related with one

possession of a controlled substance, but record discloses no convictions for

violence.  *Id*. at 6-8.  Because he has never been convicted of a felony involving

violence, Section 922(g)(1)'s generalized ban on possession of firearms by all

---

[13]  Justice Barrett has rejected generalized statistics purportedly showing that
"nonviolent felons are likely to commit violent crimes" because "they lump all
nonviolent felons together—and while some nonviolent felons may be likely to
misuse firearms, the characteristics that make them risky cannot be generalized to
the whole class." *Kanter*, 919 F.3d at 467-68 (Barrett, J., dissenting).

persons convicted of a felony cannot apply to Mr. Alvarado consistent with the Constitution.[14]  This Court should therefore reverse his conviction under that statute.

## II.   This Court Should Reverse the Four-Point Enhancement For Reckless Endangerment with a Firearm.

The trial court applied a four-point enhancement under Guideline 2K2.1(b)(6)(B), which requires a defendant to use a firearm "in connection with another felony offense."  R.112, PageID1614-15.  For the felony, the trial court found that Mr. Alvarado committed the reckless endangerment with a deadly weapon under Tennessee law, which prohibits "recklessly engag[ing] in conduct that places or may place another person in imminent danger of death or serious bodily injury."  Tenn. Code Ann. § 39-13-103.  In doing so, however, the trial court committed error because Tennessee law requires evidence that a person was in the "zone of danger" of a gunshot for the action to constitute reckless endangerment. *See, e.g.*, *State v. Fox*, 947 S.W.2d 865 (Tenn. Crim. App. 1996) ("Merely discharging a gun, standing alone, is not sufficient to constitute commission of reckless endangerment.").  The Government had the burden to show that Mr. Alvarado's use of the firearm recklessly placed someone in danger[15]—but there was

---

[14] The conduct at issue in this case is irrelevant to whether Section 922(g)(1) could constitutionally bar Mr. Alvarado from bearing arms as of the date of his arrest.

[15] Because Mr. Alvarado is not challenging the sufficiency of the evidence on his felon-in-possession conviction, this brief assumes without admitting that Mr. Alvarado fired the shots that were heard by the residents of the trailer park.

no evidence as to where the rifle was pointed when it was fired, or where or why the rifle was fired. This Court should therefore remand this case for resentencing without the enhancement.

## A.    Standard of Review

This Court reviews de novo the district court's understanding of the Guidelines and the requirements of Tennessee law. *United States v. Mukes*, 980 F.3d 526, 533 (6th Cir. 2020) ("We review the district court's legal interpretation of the sentencing guidelines de novo and its factual findings under the clearly erroneous standard."). This Court applies the clearly erroneous standard to review the court's factual finding that Mr. Alvarado placed another person in imminent danger of danger or severe bodily injury when he fired the rifle.

## B.    Tennessee law on reckless endangerment requires proof that an individual was in the "zone of danger" from the gunshots.

Without knowing where and when Mr. Alvarado allegedly fired a weapon, it is impossible to conclude, consistent with Tennessee law, that he recklessly endangered another person. The Court has recognized that merely firing a weapon, on its own, does not establish guilt under Tenn. Code Ann. § 39-13-103. As this Court explained: "Tennessee law is clear: a defendant must do more than fire a gun into the air to be guilty of this felony." *Mukes*, 980 F.3d at 534. Tennessee requires evidence that individuals were within the "zone of danger" from the firearm. *Id.* In other words, reckless endangerment occurs only where firing the rifle would create

27

a reasonable probability of imminent danger of death or serious bodily injury of others. *Id.*; *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999) ("[the statute's] requirement of imminent danger mandates that an individual or class of individuals be present in the zone of danger.")

The Tennessee Court of Criminal Appeals thus reversed a reckless endangerment conviction for shooting a pistol at a tree outside of an apartment building because there was "no testimony that anyone was either in the tree being fired upon or outside the apartment building in the immediate vicinity." *Fox*, 947 S.W.2d at 865. The Tennessee Supreme Court has recognized "the potentially 'absurd' and 'unreasonable' results that may arise from permitting prosecution of one discharging a weapon under any circumstance where any other human being might possibly be present or where a stray bullet might possibly strike another person." *Payne*, 7 S.W.3d at 28. As this Court explained, when the alleged victim of reckless endangerment is the public at large (as appears here), "the government must show that *at least one person* was present within the 'zone of danger.'" *United States v. Maxon*, 250 F. App'x 129, 132 (6th Cir. 2007) (emphasis added).

This Court's decision in *Mukes* is on all fours with this one. There, the defendant allegedly fired a gun into the air immediately outside the front door of his apartment. *Mukes*, 980 F.3d at 534-35. This Court held that even assuming the defendant did fire the gun, the enhancement was improper because the Government

28

provided no evidence that anyone was in the "zone of danger" when the shots were fired. *Id.* at 533, 535. This Court concluded: "Because the record is devoid of evidence that anyone was in the vicinity when Mukes allegedly discharged the gun, he could not have violated § 39-13-103." *Id.* at 534. Mere proximity of homes or apartments is not enough to place the individuals residing *inside* within the zone of danger when shots were fired into the air *outside*. Thus, this Court reversed a sentence because there was "no evidence in the record that anyone was in the vicinity when [the defendant] allegedly fired four shots." *Id.* at 535.

### C. The Government did not provide any evidence that Mr. Alvarado placed anyone in danger by firing the rifle.

The Government failed to meet its burden to show that anyone was in danger from the rifle shots, and the district court erred by holding that testimony that neighborhood residents were scared when they heard the gunshots was sufficient to show reckless endangerment under Tennessee law. R.112, PageID1614-15. The trial court held that scaring neighbors by firing a gun was sufficient to show reckless endangerment: "The evidence demonstrated that Mr. Alvarado discharged the Ruger AR rifle from a trailer or the patio of that trailer in the vicinity of several residences at the trailer complex placing those other residents in imminent danger of serious bodily harm." R.112, PageID1614-15.

The Government's witnesses at trial, Mr. Caleb Smith and Ms. Angela Hufflin, did not testify as to Mr. Alvarado's location when the shots were fired, nor

where the rifle was pointed.   Mr. Smith was not at home when the shots were fired.

At trial, he stated that he was at the store and only learned of the gunshots when "his

[friend's] mom called him and said that she heard a gunshot."   Trial Tr. R.108,

PageID1371.   Similarly, Ms. Hufflin testified that she was *inside* her trailer home

watching television with a friend when they "hear[d] a gun go off."   Trial Tr. R.108,

PageID1396.   Neither witness saw Mr. Alvarado fire the rifle and neither testified to

the direction of any shots.

The video of the police interrogation of Ms. Martinez likewise shows that she

did not see him fire the rifle.   Like the other neighbors, she was worried by the

gunshots.   But like those neighbors, Ms. Martinez also did not see Mr. Alvarado fire

the shots, nor did she know where he was when the shots were fired:   "I guess he

was outside, I don't know where he was."   Video Exhibit, Deputy Patrick York, 6th

Cir. Dkt #37 (at 3:30 on the video).

None of these witnesses, or other persons, were within the zone of danger

because Tennessee law requires *more than being scared when hearing a gunshot*.

*See Fox*, 947 S.W.2d at 866 ("merely discharging a gun, standing alone, is not

sufficient to constitute commission of reckless endangerment.").   Tennessee law

requires "a reasonable probability of danger as opposed to a mere possibility of

danger."   *Payne*, 7 S.W.3d at 28; *Fox*, 947 S.W.2d 866 (reversing a reckless

endangerment conviction because shooting a gun into the air or at a tree "did not

'place another person in imminent danger of death or serious bodily injury.'"). No witness could not testify to the target or trajectory of the gunshots they heard.

The video footage by the police does not fill these gaps. *See* Video Exhibits, 6th Cir. Dkt #37. The police did not arrive until after the shots, so nothing on the police body cam footage reveals what was happening when the gunshots were fired. The footage does not establish where the gun was pointed, or why it was fired. The Government, indeed, admitted it could not establish when the shots were fired. R.112, PageID1604. The timing is important because the Tennessee Supreme Court recognizes zones of danger as "transitory" such that "once the defendant's actions have terminated, so has the danger." *State v. Goodwin*, 143 S.W.3d 771, 778 (Tenn. 2004). Without evidence that someone was in danger from the firearm when it was fired, the zone of danger cannot be established. Evidence of individuals in the vicinity of Mr. Alvarado's home afterwards is insufficient under *Goodwin*.

The district court's factual findings that the neighbors heard the gunshots and were scared is insufficient to show that Ms. Martinez, Mr. Smith (who was not even home), and Ms. Hufflin were in "imminent danger of death or serious bodily injury." R.112, PageID1614-15. The only factual findings the trial court made were that "residents of the trailer park heard the shots, were nearby, and feared for their safety and property." *Id.* PageID 1614. But the evidence was insufficient to show that Mr. Alvarado placed anyone in imminent danger. *Goodwin*, 143 S.W.3d at 778

31

(requiring "a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury"). Rather, as this Court held in *Mukes*, other residents or buildings in the vicinity is not enough on its own if no one was actually outside. *See* 980 F.3d at 535 (reversing a finding of reckless endangerment because the person who was previously threatened and heard the shots was not actually outside) (citing *Fox*, 947 S.W.2d at 865 for the same proposition). Without knowing the time, place, and direction the rifle was fired, it impossible to establish that anyone had an imminent risk of death or serious bodily injury.

The district court further erred by comparing this case to *Maxon*, 250 F. App'x 129. R.112, PageID1613. In that case, police officers were patrolling the apartment complex, heard the defendant fire a gun, and witnessed muzzle flashes from the gun being fired *in their direction* from the defendant's patio. *Maxon*, 250 F. App'x at 133. The police officers actually "heard bullets go over their heads before hitting a wall" and "other [residents] were outside as well." *Id*. at 133. The evidence in this case is nothing like that in *Maxon*. This court should vacate Mr. Alvarado's sentence and order that Mr. Alvarado be resentenced without the four-point enhancement under U.S.S.G. Section 2K2.1(b)(6)(B).

## CONCLUSION

This Court should vacate Mr. Alvarado's conviction or, in the alternative, should remand for resentencing.

32

Respectfully submitted,

/s/ Colter L. Paulson

Colter L. Paulson
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 361-1200
Facsimile: (513) 361-1201
colter.paulson@squirepb.com

Nathan L. Colvin
THE SIXTH CIRCUIT CLINIC
University of Cincinnati College of Law &
Chase College of Law
2925 Campus Green Dr.
Cincinnati, Ohio 45221
Tel: (513) 313-7344
nathan.colvin@gmail.com

*Attorneys for Appellant Ricardo Alvarado*

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief is written in a proportionately spaced, 14-point Times New Roman font, and contains 8,164 words, exclusive of the material not counted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

/s/ Colter L. Paulson
Colter L. Paulson

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that on April 11, 2023, the foregoing was electronically filed with the Clerk of the Court via the Court's ECF system. Counsel for Plaintiffs will be served by the ECF system.

/s/ Colter L. Paulson
Colter L. Paulson

## DESIGNATION OF DISTRICT COURT DOCUMENTS

Pursuant to Rule 28(b)(1)(A)(i), Defendant-Appellant Ricardo Alvarado designates the following documents to facilitate the Court's review:

| Record Number | Date Filed | Document | PageID |
|---|---|---|---|
| 73-1 | 1/14/11 | Sentencing Memorandum | 869 |
| 78 | 3/8/22 | Excerpt of Trial Proceedings, July 28, 2021 | 881-982 |
| 86 | 4/6/22 | Second Revised Presentence Investigation Report | |
| 89 | 5/27/22 | Judgment | 1042-1048 |
| 91 | 5/27/22 | Notice of Appeal | 1053 |
| 107 | 10/17/22 | Trial Transcript, July 27, 2021 | 1239-1348 |
| 108 | 10/17/22 | Trial Transcript, July 28, 2021 | 1349-1453 |
| 109 | 10/17/22 | Trial Transcript, July 29, 2023 | 1454-1561 |
| 110 | 10/17/22 | Sentencing Hearing Transcript, March 14, 2022 | 1562-1578 |
| 112 | 10/19/22 | Sentencing Hearing Transcript, May 26, 2022 | 1585-1643 |