No. 22-5459

# In the
# United States Court of Appeals
# for the Sixth Circuit

◆

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RICARDO ALVARADO,

*Defendant-Appellant.*

◆

**Appeal from the United States District Court
for the Eastern District of Tennessee
Case No. 3:20-cr-00114-1**

◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY
COALITION AND FPC ACTION FOUNDATION IN
SUPPORT OF APPELLANT AND REVERSAL**

◆

JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel of Record*

Counsel for *Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 22-5459 _____          Case Name: United States of America v. Alvarado _____

Name of counsel: Joseph G.S. Greenlee _____

Pursuant to 6th Cir. R. 26.1, Firearms Policy Coalition and FPC Action Foundation _____
                              *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the
    identity of the parent corporation or affiliate and the relationship between it and the named
    party:

    | No. |
    |-----|
    |     |

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
    in the outcome? If yes, list the identity of such corporation and the nature of the financial
    interest:

    | No. |
    |-----|
    |     |

---

CERTIFICATE OF SERVICE

I certify that on _____ 04/18/2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Joseph G.S. Greenlee _____

_____

_____

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................ii

STATEMENT OF *AMICI CURIAE* ...........................................................1

CONSENT TO FILE ...................................................................................1

SUMMARY OF ARGUMENT .....................................................................2

ARGUMENT ...............................................................................................3

    I.   The plain text of the Second Amendment presumptively protects all Americans, so the government must demonstrate that prohibiting firearm possession based on a DUI or marijuana possession is consistent with America's tradition of firearm regulation. ....................................................................3

    II.  Historically, firearm prohibitions applied only to dangerous persons..............................................................................................5

        A.  In colonial America, arms prohibitions were motivated by danger. ...................................................................................5

            1.  Blacks ......................................................................6

            2.  American Indians .....................................................7

            3.  Catholics ..................................................................8

            4.  Antinomians ..........................................................11

        B.  Revolutionary War loyalists were disarmed for being dangerous...........................................................................13

        C.  Ratification proposals prove the Founders' intent to protect the arms rights of peaceable persons. ......................................18

        D.  Nineteenth-century bans applied to slaves and freedmen, while lesser restrictions focused on dangerous persons. ..........23

    III. There is no tradition of disarming "unvirtuous" citizens.............26

    IV. There is no tradition of disarming individuals because the law they violated was classified as a felony. ...............................32

CONCLUSION ..........................................................................................35

CERTIFICATE OF COMPLIANCE...........................................................36

CERTIFICATE OF SERVICE....................................................................37

i

# TABLE OF AUTHORITIES

## Cases

*Binderup v. Attorney Gen. United States,*
    836 F.3d 336 (3d Cir. 2016) (en banc) ........................................... 23, 30

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................... *passim*

*Folajtar v. Attorney Gen. United States,*
    980 F.3d 897 (3d Cir. 2020) ............................................................. 30

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ............................................................ 30

*Medina v. Whitaker,*
    913 F.3d 152 (D.C. Cir. 2019) .......................................................... 30

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S. Ct. 2111 (2022) ............................................................... *passim*

*Pena-Rodriguez v. Colorado,*
    580 U.S. 206 (2017) ........................................................................ 6

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020) .................................................................... 6

*Range v. Attorney Gen. United States,*
    53 F.4th 262 (3d Cir. 2022) ......................................................... 5, 16

*State v. Hogan,*
    63 Ohio St. 202 (1900) ................................................................... 25

*United States v. Barton,*
    633 F.3d 168 (3d Cir. 2011) ............................................................ 23

*United States v. Bena,*
    664 F.3d 1180 (8th Cir. 2011) ......................................................... 29

*United States v. Carpio-Leon,*
    701 F.3d 974 (4th Cir. 2012) .......................................................... 29

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir. 2023) ................................................. 4

*United States v. Rene E.,*
   583 F.3d 8 (1st Cir. 2009) ................................................. 28

*United States v. Vongxay,*
   594 F.3d 1111 (9th Cir. 2010) ...................................... 28, 29

*United States v. Yancey,*
   621 F.3d 681 (7th Cir. 2010) ............................................. 29

## Statutes and Regulations

1 Stat. 271 (1792) ...................................................... 33, 35

1715 Md. Laws 117 ........................................................... 5

1740 S.C. Acts 168 .......................................................... 5

1777 N.J. Laws 90, ch. 40 §20 .............................................. 16

1786 Mass. Gen. Laws 265 ................................................... 34

1797 Del. Laws 104 .......................................................... 5

1799 Laws of the Miss. Terr. 113 ........................................... 5

1804 Ind. Acts 108 ......................................................... 24

1804 Miss. Laws 90 ......................................................... 24

1806 Md. Laws 45 ...................................................... 5, 7, 24

1832 Del. Laws 180-81 ....................................................... 7

1851 Ky. Acts 296 .......................................................... 24

1860–61 N.C. Sess. Laws 68 ................................................. 24

1863 Del. Laws 332 ......................................................... 24

1878 N.H. Laws 612 ......................................................... 24

1878 Vt. Laws 30, ch. 14 §3.......................................................................24

1879 R.I. Laws 110, ch. 806 §3...............................................................24

1880 Mass. Gen. Laws 232.......................................................................25

1880 Ohio Rev. St. 1654, ch. 8 §6995....................................................24

1897 Iowa Laws 1981, ch. 5 §5135.........................................................25

## Other Authorities

A CODIFICATION OF THE STATUTE LAW OF GEORGIA (William A. Hotchkiss ed., 1848)........................................................................5

A DIGEST OF THE STATUTE LAW OF THE STATE OF PENNSYLVANIA FROM THE YEAR 1700 TO 1894 (12th ed. 1894) .....................................24

*A History of the King's American Regiment, Part 1*, THE ON-LINE INSTITUTE FOR ADVANCED LOYALIST STUDIES .....................................13

AMERICAN ARCHIVES, vol. 2 (4th Ser., Peter Force ed., 1839)................14

AMERICAN ARCHIVES, vol. 2 (5th Ser., Peter Force ed., 1851)................15

AMERICAN ARCHIVES, vol. 4 (4th Ser., Peter Force ed., 1843)................14

AMERICAN ARCHIVES, vol. 5 (4th Ser., Peter Force ed., 1844)................15

AMERICAN ARCHIVES, vol. 6 (4th Ser., Peter Force ed., 1846)................15

ANNOTATED STATUTES OF WISCONSIN, CONTAINING THE GENERAL LAWS IN FORCE OCTOBER 1, 1889 (1889)..............................................25

Aptheker, Herbert, AMERICAN NEGRO SLAVE REVOLTS (1943).................7

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, APRIL, 1684–JUNE, 1692, vol. 13 (William Hand Browne ed., 1894)................................................................................35

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, 1752–1754, vol. 50 (J. Hall Pleasants ed., 1933) ...............9

ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL
    ASSEMBLY, 1755–1756, vol. 52 (William Hand Browne ed., 1935) ..... 10

BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE
    AMERICAN TRADITION, vol. 2 (Arthur Vollmer ed., 1947) ................... 32

Boatner III, Mark M., ENCYCLOPEDIA OF THE AMERICAN REVOLUTION
    (3d ed. 1994) ....................................................................................... 13

Brief for *Amicus Curiae* National African American Gun
    Association, Inc. in Support of Petitioners, July 16, 2021,
    *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 ............ 5

CATHOLICITY IN PHILADELPHIA (Joseph L. J. Kirlin ed., 1909) ......... 10, 11

Cohn, Norman, THE PURSUIT OF THE MILLENNIUM: REVOLUTIONARY
    MILLENNARIANS AND MYSTICAL ANARCHISTS OF THE MIDDLE AGES
    (1957) ................................................................................................... 13

COLLECTIONS OF THE MASSACHUSETTS HISTORICAL SOCIETY, vol. 7
    (2d ser., 1818) ...................................................................................... 12

Cooley, Thomas M., A TREATISE ON CONSTITUTIONAL
    LIMITATIONS (Boston, Little Brown & Co. 1868) ................................ 29

Cornell, Saul & DeDino, Nathan, *A Well Regulated Right: The
    Early American Origins of Gun Control*, 73 FORDHAM L. REV.
    487 (2004) ...................................................................................... 27, 29

Cornell, Saul, *"Don't Know Much about History": The Current
    Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV.
    657 (2002) ................................................................................ 27, 28, 29

Friedman, Lawrence M., CRIME AND PUNISHMENT IN AMERICAN
    HISTORY (1993) .................................................................................... 25

Greenlee, Joseph G.S., *Disarming the Dangerous: The American
    Tradition of Firearm Prohibitions*, 16 DREXEL L. REV.
    (Forthcoming 2023) ....................................................................... *passim*

Greenlee, Joseph G.S., *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO L. REV. 249 (2020) ................................................................................ 30

Hening, William Waller, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, vol. 3 (1820) ..................... 35

Hening, William Waller, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, vol. 4 (1820) ..................... 35

Hening, William Waller, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, vol. 7 (1820) .................... 11

Johnson, Nicholas et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2021) .... 6, 7, 14

Johnson, Samuel, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773) ....................................................................... 19

*Johnson's Wonder-Working Providence 1628–1651* .......................... 12, 13

Kates, Jr., Don B., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143 (1986) .................................. 26, 28, 29

Kopel, David B. & Greenlee, Joseph G.S., *The Second Amendment Rights of Young Adults*, 43 S. Ill. U.L.J. 495 (2019) .......................... 33

LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (1868) ........... 8

LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE TWENTIETH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND TEN, vol. 2 (1810) ........................................... 34

Letter from Thomas Jefferson to George Hammond, May 29, 1792, *in* THE WORKS OF THOMAS JEFFERSON, vol. 3 (H. A. Washington ed., 1884) ...................................................................... 17

Malcolm, Joyce Lee, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994) ................................................ 29, 30

Marshall, Kevin, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695 (2009) ....................................................29

MARYLAND GAZETTE, Oct. 10, 1754 .........................................................8

MARYLAND GAZETTE, Oct. 17, 1754 .........................................................8

*No. XI,* FEDERAL GAZETTE, Nov. 28, 1788 .............................................20

PENNSYLVANIA GAZETTE, June 13, 1754...................................................10

Rawle, William, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA (1825) ...................................................................22

RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 1628–1641, vol. 1 (Nathaniel B. Shurtleff ed., 1853) ........................................................................................12

Reynolds, Glenn Harlan, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461 (1995) ............................... 26, 28, 29

Shalhope, Robert E., *The Armed Citizen in the Early Republic,* 49 LAW & CONTEMP. PROBS. 125 (1986) ..............................................28

Sheridan, Thomas, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1789).......................................................................19

THE ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA (1782) ...........................................................................16

THE AMERICAN CATHOLIC HISTORICAL RESEARCHES (Martin I. J. Griffin ed., 1908) .....................................................................................9

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 2 (Merrill Jensen et al. eds., 1976) ......................20

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 5 (John P. Kaminski et al. eds., 1998).................21

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 6 (John P. Kaminski et al. eds., 2000) ..... 18, 20, 21

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE
   CONSTITUTION, vol. 8 (John P. Kaminski et al. eds., 1988) ................ 21

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE
   CONSTITUTION, vol. 28 (John Kaminski et al. eds., 2017) ................. 18

THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE
   PROVINCE OF NEW JERSEY (Aaron Leaming & Jacob Spicer eds.,
   1881) (2002 Reprint) ............................................................ 5

THE PAPERS OF THOMAS JEFFERSON, vol. 1 (Julian P. Boyd ed.,
   1950) .............................................................................. 22

THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO
   THE UNION WITH NEW HAVEN COLONY, MAY 1665 (J. Hammond
   Trumbull ed., 1850) ............................................................ 35

THE PUBLIC STATUTES AT LARGE OF THE UNITED STATES OF AMERICA,
   vol. 1 (Richard Peters ed., 1845) ........................................... 33

THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801,
   vol. 5 (WM Stanley Ray ed., 1898) ........................................ 11

THE WORKS OF JAMES WILSON, vol. 2 (James DeWitt Andrews ed.,
   1896) .............................................................................. 33

Trenchard, J. & Moyle, W., *An Argument Shewing, That a Standing
   Army Is Inconsistent with a Free Government, And Absolutely
   Destructive to the Constitution of the English Monarchy* (1697) ........ 28

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
   (1828) ............................................................................. 19

Winthrop, John, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649,
   vol. 2 (James Savage ed., 1826) ........................................... 21

Yassky, David, *The Second Amendment: Structure, History, and
   Constitutional Change*, 99 MICH. L. REV. 588 (2000) .................... 27, 29

## STATEMENT OF *AMICI CURIAE*

**Firearms Policy Coalition (FPC)** is a nonprofit organization devoted to advancing individual liberty and defending individual rights, including those protected by the Constitution. FPC accomplishes its mission through legislative, regulatory, legal, and grassroots advocacy, education, and outreach programs.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to restoring human liberty and protecting the rights enshrined in the Constitution. FPCAF conducts charitable research, education, public policy, and legal programs.

## CONSENT TO FILE

All parties consented to the filing of this brief.[1]

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. Only *Amici* and their members contributed money intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

Because all Americans are presumptively protected by the Second Amendment, the government can justify prohibiting Mr. Alvarado from possessing firearms based on a DUI or marijuana possession only by demonstrating that the prohibition is consistent with America's historical tradition of firearm regulation.

America's historical tradition of firearm regulation allows for the disarmament of dangerous persons—disaffected persons posing a threat to the government and persons with a proven proclivity for violence. But there is no tradition of disarming peaceable citizens, no tradition of disarming "unvirtuous" citizens, and no tradition of disarming citizens based on their status as felons.

The government has failed to carry its burden of proving that someone is dangerous based on a DUI or marijuana possession. It is therefore a violation of Mr. Alvarado's Second Amendment rights to prohibit him from possessing firearms.

## ARGUMENT

**I.  The plain text of the Second Amendment presumptively protects all Americans, so the government must demonstrate that prohibiting firearm possession based on a DUI or marijuana possession is consistent with America's tradition of firearm regulation.**

The Supreme Court set forth the test for all Second Amendment challenges as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022) (quotation omitted).

The Court conducted the plain text analysis of the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Analyzing "right of the people," the Court concluded with "a strong presumption that the Second Amendment right is exercised individually and belongs to *all*

Americans." *Id.* at 581 (emphasis added).[2] Analyzing "keep Arms," the Court determined that it meant to "have weapons." *Id.* at 582.

Because Mr. Alvarado is an "American[]" who wants to "have weapons" for self-defense, "the Constitution presumptively protects that conduct" and the government can justify disarming him only by demonstrating a historical tradition of such regulation. *Bruen*, 142 S. Ct. at 2130. "*Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (emphasis added).

---

[2] As the Fifth Circuit recently noted, while the Supreme Court used the terms "law-abiding, responsible citizens" and "ordinary, law-abiding citizens" to describe the plaintiffs in *Heller* and *Bruen*, this was merely "shorthand….meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023) (citing *Heller*, 554 U.S. at 627 n.26 and *Bruen*, 142 S. Ct. at 2134). The Supreme Court was not limiting the Second Amendment's protections to law-abiding, responsible, or ordinary citizens. Such an interpretation is untenable because it "risks swallowing the text of the amendment" and has "no true limiting principle." *Id.* at 453. "Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protection." *Id.*

4

## II.  Historically, firearm prohibitions applied only to dangerous persons.

### A. In colonial America, arms prohibitions were motivated by danger.

*Bruen* valued colonial laws to the extent that they informed the original understanding of the Second Amendment. 142 S. Ct. at 2142–44.

Every ban on firearm possession in colonial America was discriminatory—bans applied to Blacks, American Indians, Catholics, and Antinomians.[3] *Bruen* makes clear that discriminatory laws cannot establish a historical tradition: several historical laws required Blacks to acquire discretionary licenses to carry arms,[4] yet *Bruen* considered none

---

[3] The vacated panel opinion in *Range v. Attorney Gen. United States*, 53 F.4th 262, 276 (3d Cir. 2022), asserted that indentured servants were disarmed under the law, but this is not true. *See* Joseph Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, Part IV.C., 16 DREXEL L. REV. (Forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000.

[4] *See, e.g.*, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 340–41 (Aaron Leaming & Jacob Spicer eds., 1881) (2002 Reprint) (1694 New Jersey); 1715 Md. Laws 117; 1740 S.C. Acts 168; A CODIFICATION OF THE STATUTE LAW OF GEORGIA 812 (William Hotchkiss ed., 1848) (1768 Georgia); 1797 Del. Laws 104; 1799 Laws of the Miss. Terr. 113; 1806 Md. Laws 45; *see also* Brief for *Amicus Curiae* National African American Gun Association, Inc. in Support of Petitioners at 4–11, July 16, 2021, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 (citing racist licensing laws that *Bruen* ignored).

in analyzing New York's discretionary licensing law for carrying arms. Indeed, "th[e] Court has emphasized time and again the 'imperative to purge racial prejudice from the administration of justice.'" *Ramos v. Louisiana*, 140 S. Ct. 1390, 1418 (2020) (Kavanaugh, J., concurring) (quoting *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 221 (2017)). "Why stick by…a practice that is thoroughly racist in its origins and has continuing racially discriminatory effects?" *Id.* at 1419 (Kavanaugh, J., concurring).

In any event, even the discriminatory laws were based on danger.

### 1. Blacks

Laws preventing Blacks from keeping arms "rested upon White fears that armed Blacks, especially freemen, might conspire to carry out a slave revolt." Nicholas Johnson et al., FIREARMS LAW AND THE SECOND AMENDMENT 440 (3d ed. 2021). In addition to disarming Blacks, many colonies enacted laws designed to ensure that the community was sufficiently armed and organized to prevent or suppress slave revolts.[5] Such revolts were a constant, often paralyzing concern throughout early American history. And there were approximately 250 of them. *See*

---

[5] *See* Greenlee, *Disarming the Dangerous*, at Part IV.A.

Herbert Aptheker, AMERICAN NEGRO SLAVE REVOLTS 162 (1943). These insurrections would have been extremely deadly had the slaves been armed, and the institution of slavery itself likely would have been short-lived.

Blacks could sometimes keep arms, however, if deemed peaceable (and thus unlikely to engage in revolt). *See, e.g.*, 1806 Md. Laws 45 (allowing a "free negro or mulatto to go at large with [a] gun" with "a certificate from a justice of the peace, that he is an orderly and peacable person"); 1832 Del. Laws 180–81 (Blacks may acquire licenses for keeping arms with certificates vouching for their "fair character").

## 2. American Indians

Nearly every colonial law restricting American Indians from possessing arms restricted firearm transfers—not possession. These, too, were motivated by danger.

Laws preventing firearm transfers to American Indians were among the myriad laws preventing attacks. For the same reason, colonies regularly required arms-bearing to church, court, public assemblies, travel, and fieldwork. *See* Johnson, FIREARMS LAW, at 189–91. And every colony enacted militia laws with the stated purpose of preventing or

resisting Indian attacks. *See* Greenlee, *Disarming the Dangerous*, at Part IV.B (providing dozens of laws).

The only law banning possession was from the Dutch colony, New Netherland. It "forb[ade] the admission of any Indians with a gun…into any Houses" "to prevent such dangers of isolated murders and assassinations." LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674, at 234–35 (1868).

### 3. Catholics

Maryland, Pennsylvania, and Virginia disarmed Catholics during the French and Indian War due to widespread concern among Protestants that American Catholics would join Catholic France. *See, e.g.*, MARYLAND GAZETTE, Oct. 10, 1754 ("Popery" is "a *persecuting*, *blood shedding* Religion." The French King's followers are "blindly obedient….in America," and "we have to dread and guard against *these* our Enemies."); MARYLAND GAZETTE, Oct. 17, 1754 ("Popery is the Foundation of all our present…Dangers." "Self-Preservation" requires "Laws as will put it out of the Power of the Jesuits; and their deluded Votaries, to endanger the Peace.").

In 1751, Maryland's Committee of Grievances warned that "the Growth of Popery within this Province may…become dangerous." THE AMERICAN CATHOLIC HISTORICAL RESEARCHES 37 (Martin Griffin ed., 1908). Additionally, the "Papists Jesuits or Priests," by influencing "Germans French & other Foreigners," may "become a Dangerous intestine Enemy to Join French or Indians." *Id.*

In 1753, Maryland's lower house considered testimony "that the Papists very frequently said, they would wash their Hands in the Blood of Protestants." 50 ARCHIVES OF MARYLAND: PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, 1752–1754, at 201 (J. Hall Pleasants ed., 1933).

In 1754, Maryland's Committee of Grievances warned that "several Papists…have made great Opposition to the enlisting Men…to repel the Invasion of the French and Indians in Alliance with them." *Id.* at 487. The "Conduct and Behaviour of the Papists" required action "to secure…against our domestic…Enemies." *Id.*; *see also* Greenlee, *Disarming the Dangerous*, at Part IV.D (providing examples of alleged conduct).

A 1755 bill to prohibit "the Importation of German and French Papists, and Popish Priests and Jesuits," expressed a concern that "they will…in

Case of an Attack…turn their Force, in Conjunction with the French and their savage Allies, against his loyal Protestant Subjects." 52 ARCHIVES OF MARYLAND, at 89.

When Maryland disarmed Catholics, the act emphasized the need "to quell and Suppress any intestine Commotions Rebellions or Insurrections." *Id.* at 450.

Pennsylvania Catholics also troubled authorities. New Jersey's governor worried that "should the French appear…they would in [Pennsylvania] soon get ten or twelve thousands [of Catholics] together." CATHOLICITY IN PHILADELPHIA 55 (Joseph Kirlin ed., 1909). A Pennsylvania Lieutenant Colonel urged the militia to prevent the "Protestant Government" from being "trodden under foot by the bloody and tyrannical power of Popery." PENNSYLVANIA GAZETTE, June 13, 1754. He warned, "numberless enemies amongst us…may…rise…in rebellion." *Id.*

Pennsylvania's governor worried that "the French might march in and be strengthened by the German and Irish Catholics who are numerous here." CATHOLICITY, at 79. Justices of the peace petitioned Pennsylvania's governor for authority to disarm Catholics: "that the papists should Keep

Arms in their Houses," they argued, leaves "the Protestants…subject to a Massacre whenever the papists are ready." *Id.* at 78.

Pennsylvania's act disarming Catholics thus provided: "in this time of actual war…it is absolutely necessary…to quell and suppress any intestine commotions, rebellions or insurrections." 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 609 (Stanley Ray ed., 1898).

Like Maryland's northern neighbors in Pennsylvania, its southern neighbors in Virginia also disarmed Catholics. A historical analysis to uncover Virginia's motive is unnecessary, however, because the legislature expressly stated the reason. Its disarmament law began by declaring, "*it is dangerous at this time to permit Papists to be armed.*" 7 William Waller Hening, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 35 (1820) (emphasis added). Thus, like Maryland and Pennsylvania, Virginia disarmed Catholics to prevent danger.

### 4. Antinomians

Anne Hutchinson was convicted of sedition in 1637 Massachusetts for criticizing the Puritan government's legalistic interpretation of the Bible.

BRADLEY CHAPIN, CRIMINAL JUSTICE IN COLONIAL AMERICA, 1606–1660, at 103–04 (2010). Hutchinson and some of her supporters were banished from the colony. Of those permitted to remain, seventy-six were disarmed, while others who confessed their sins were allowed to keep their arms. *Johnson's Wonder-Working Providence 1628–1651*, *in* 7 COLLECTIONS OF THE MASSACHUSETTS HISTORICAL SOCIETY 6 (2d ser., 1818). The disarmament order explained that the authorities were concerned that her supporters might receive a revelation that inspired them to commit violence against those who opposed them:

> Whereas the opinions & revelations of…Mrs Hutchinson have seduced & led into dangerous errors many of the people heare in Newe England, insomuch as there is just cause of suspition that they, as others in Germany, in former times, may, upon some revelation, make some suddaine irruption upon those that differ from them in judgment, for p[re]vention whereof it is ordered, that all those whose names are underwritten shall…deliver…all such guns, pistols, swords, powder, shot, & match as they shalbee owners of, or have in their custody….Also, it is ordered…that no man who is to render his armes by this order shall buy or borrow any guns, swords, pistols, powder, shot, or match, untill this Court shall take further order therein.

1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 1628–1641, at 211 (Nathaniel B. Shurtleff ed., 1853).

The reference to "Germany, in former times," was likely a reference to the Peasants' War of 1524–25, in which some leaders of the revolt claimed to be inspired by divine revelations. *See, e.g.*, Norman Cohn, THE PURSUIT OF THE MILLENNIUM: REVOLUTIONARY MILLENNARIANS AND MYSTICAL ANARCHISTS OF THE MIDDLE AGES 248 (1957). Thus, as a contemporary source reported, Hutchinson's supporters were disarmed because the "new erected government . . . feared breach of peace." *Johnson's Wonder-Working Providence 1628–1651*, at 6.

## B. Revolutionary War loyalists were disarmed for being dangerous.

"During the course of the American Revolution, over one hundred different Loyalist regiments, battalions, independent companies or troops were formed to fight alongside the British Army against their rebellious countrymen." *A History of the King's American Regiment, Part 1*, THE ON-LINE INSTITUTE FOR ADVANCED LOYALIST STUDIES.[6] "[W]e may safely say that 50,000 soldiers, either regular or militia, were drawn into the service of Great Britain from her American sympathizers." Mark Boatner, ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 663 (3d ed. 1994).

---

[6] http://www.royalprovincial.com/military/rhist/kar/kar1hist.htm.

Additionally, insurrections were frequent. *See* Greenlee, *Disarming the Dangerous*, at Part V. Thus, authorities repeatedly stated that the reason for disarming loyalists was danger:[7]

- Massachusetts's Congress disarmed loyalists so they could not "join with the open and avowed enemies of America" to inflict "ruin and destruction…against these Colonies." 2 AMERICAN ARCHIVES 793 (4th Ser., Peter Force ed., 1839) (May 1775).

- General Washington to General Lee: "The Tories should be disarmed immediately though it is probable that they may have secured their arms…until called upon to use them against us." 4 *id.* at 895 (January 1776).

- "[T]o frustrate the mischievous machinations, and restrain the wicked practices of these men" who "have taken part with our oppressors," the Continental Congress "recommended" that "they ought to be disarmed." *Id.* at 1629 (January 1776).

---

[7] For more examples, *see* Greenlee, *Disarming the Dangerous*, at Part V.

- Governor Trumbull to General Schuyler: "I do sincerely congratulate you on…disarming the Tories….Suppressing such enemies…is of very great importance." *Id.* at 899 (January 1776).

- Translator James Deane informed the Six Nations that loyalists "were preparing themselves for war against us—that they had procured arms, and would attack us with the first favourable opportunity," so they were disarmed. *Id.* at 855 (January 1776).

- New York's Congress deemed it "absolutely necessary, not only for the safety of the…Province, but of the United Colonies in general, to take away the arms and accoutrements of the most dangerous among [the loyalists]." 5 *id.* at 1504 (May 1776).

- New Jersey's Congress, because "a number of disaffected persons have assembled…preparing, by force of arms…to join the British Troops for the destruction of this country," disarmed "these dangerous Insurgents." 6 *id.* at 1636 (July 1776).

- Pennsylvania noted "the folly and danger of leaving arms in the hands of Non-Associators" when it disarmed them. 2 *id.* (5th. Ser.) at 582–83 (September 1776).

15

- New Jersey empowered its Council of Safety "to deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements, and Ammunition which they own or possess." 1777 N.J. Laws 90, ch. 40 §20 (September 1777).

- Pennsylvania determined that "it is very improper and dangerous that persons disaffected to the liberty and independence of this state shall possess or have in their own keeping, or elsewhere, any firearms," so it "empowered [militia officers] to disarm any person or persons who shall not have taken any oath or affirmation of allegiance to this or any other state." THE ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA 193 (1782) (April 1779).[8]

---

[8] The *Range* panel argued that danger could not have motivated "Pennsylvania's loyalty oath law…because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups," and therefore the law must have "deprived sizable numbers of pacifists of that right" as well. 53 F.4th at 278. But the panel failed to appreciate that Pennsylvania's law allowed people to swear loyalty *on affirmation*, to accommodate anyone opposed to oath-taking. In other words, pacifists were not disarmed merely because their religion prevented them from swearing loyalty oaths.

16

Nearly a decade after the war ended, America's first Secretary of State, Thomas Jefferson, defended confiscating loyalist property (including arms) during the war to Britain's first Minister to the United States, by stating: "It cannot be denied that the state of war strictly permits a nation to seize the property of it's enemies found within it's own limits, or taken in war, and in whatever form it exists, whether in action or possession." Letter from Thomas Jefferson to George Hammond, May 29, 1792, *in* 3 THE WORKS OF THOMAS JEFFERSON 369 (H. A. Washington ed., 1884).

As Jefferson emphasized, disarmament laws were wartime measures from desperate governments on the brink of destruction—they were not models for constitutional rights. Thus, while the reason for Revolutionary War disarmament—i.e., dangerousness—is informative because it continues the justification for disarmament laws from 17th-century England[9] through 20th-century America, the breadth of the wartime laws is less relevant. A better measure of the scope the Founders intended is New Hampshire's proposed constitutional amendment,

---

[9] For an analysis of disarmament efforts in 17th-century England, *see* Greenlee, *Disarming the Dangerous*, at Part III.

17

discussed next, which was presented when individual rights were top-of-mind.

## C. Ratification proposals prove the Founders' intent to protect the arms rights of peaceable persons.

"[N]ot all history is created equal"—because "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" founding-era history is paramount. *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35) (emphasis *Bruen*'s).

Three proposals from Constitution ratifying conventions addressed who may be barred from possessing arms. Only New Hampshire's was approved by a majority. It provided, "Congress shall never disarm any Citizen, unless such as are or have been in actual Rebellion." 28 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 378 (John Kaminski et al. eds., 2017).

In Massachusetts, Samuel Adams's proposal ensured "that the said constitution be never construed…to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." 6 *id.* at 1453. In the founding era, "peaceable" meant the same as today: nonviolent. Being "peaceable" is not the same as being "law-abiding," because the law may be broken nonviolently. Samuel Johnson's

18

dictionary defined "peaceable" as "1. Free from war; free from tumult. 2. Quiet; undisturbed. 3. Not violent; not bloody. 4. Not quarrelsome; not turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773) (unpaginated). Thomas Sheridan defined "peaceable" as "Free from war, free from tumult; quiet, undisturbed; not quarrelsome, not turbulent." Thomas Sheridan, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE 438 (2d ed. 1789). According to Noah Webster, "peaceable" meant "Not violent, bloody or unnatural." 2 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated). *Heller* relied on Johnson, Sheridan, and Webster in defining the Second Amendment's text.[10]

Although not approved by a majority, many Massachusetts convention members ratified the Constitution with the understanding that Adams's amendments would follow. *See* 6 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, at 1476 (John Hancock: "I give my assent to the Constitution in full confidence that the amendments proposed will soon become a part of the system."). And Adams's

---

[10] For Johnson, *see Heller*, 554 U.S. at 581 ("arms"), 582 ("keep"), 584 ("bear"), 597 ("regulate"). For Sheridan, *see id.* at 584 ("bear"). For Webster, *see id.* at 581 ("arms"), 582 ("keep"), 584 ("bear"), 595 ("militia").

supporters later celebrated the Second Amendment as the adoption of Adams's proposal. *Id.* at 1453–54.

A third proposal came from Pennsylvania's "Dissent of the Minority." Of the 23 members of Pennsylvania's 69-member convention who voted against ratification, 21 signed the Dissent. 2 *id.* at 617. It proposed amendments, including that "no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." *Id.* at 624.

No evidence suggests that "crimes committed" included nonviolent crimes; the only discussion of what the proposal included said it covered insurrectionists.[11] Since disarmament laws traditionally focused on danger, "crimes committed" likely covered violent crimes, while "real danger of public injury" provided a catchall for violence not covered by the law.[12]

---

[11] Pennsylvania reverend Nicholas Collin, under the pseudonym "Foreign Spectator," wrote: "Insurrections against the federal government are undoubtedly real dangers of public injury, not only from individuals, but great bodies; consequently the laws of the union should be competent for the disarming of both." *No. XI*, FEDERAL GAZETTE, Nov. 28, 1788.

[12] *E.g.*, three men who raped a child confessed but avoided the death penalty because Massachusetts law in 1641 did not expressly proscribe

None of the 10 states that ratified the Constitution after the Dissent was published—including New Hampshire and Massachusetts—proposed an amendment allowing nonviolent persons to be disarmed. And Samuel Adams apparently interpreted the Dissent as protecting nonviolent persons from disarmament. According to Bostonian Jeremy Belknap, "it is supposed A[dams] had a copy" of the Dissent and based his amendments on it, because they "proposed to guard against" the "*very things*" the Dissent "objected to." 5 *id.* at 820. Adams's proposal forbade disarmament for nonviolent crimes. 6 *id.* at 1453.

Prominent Virginia Federalist Alexander White responded to the Dissent by arguing that "the rights of bearing arms for defence, or for killing game" are "clearly out of the power of Congress." 8 *id.* at 404. "These things seem to have been inserted" in the Dissent "to induce the ignorant to believe that Congress would have a power over such objects." *Id.* Surely White would have noted if his Antifederalist adversaries,

---

such conduct. 2 John Winthrop, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649, at 45–48 (James Savage ed., 1826).

instead of protecting rights as they claimed, were proposing the unprecedented measure of disarming nonviolent criminals.[13]

*All* the evidence suggests that the Dissent was not advocating for the first-ever prohibition for non-dangerous crimes. If so, that view was limited to *some* dissenters in the *minority* of *one state*'s convention.[14] But the more reasonable interpretation is that the Dissent covered only violent crimes.

In sum, "the 'debates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered "highly influential" by the Supreme Court in *Heller*…confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses.'" *Binderup v. Attorney Gen. United States*, 836

---

[13] White's understanding echoed Thomas Jefferson's proposal for Virginia's 1776 constitution (which arrived too late for consideration): "No freeman shall be debarred the use of arms [within his own lands or tenements]." 1 THE PAPERS OF THOMAS JEFFERSON 363 (Julian Boyd ed., 1950). William Rawle later expressed the same understanding as White: "No clause in the constitution could by any rule of construction be conceived to give to congress a power to disarm the people." William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 122 (1825).

[14] For more on ratification debates, *see* Greenlee, *Disarming the Dangerous*, at Part VII.

F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring) (quoting *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011)) (brackets omitted). "Hence, the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public." *Id.*

### D. Nineteenth-century bans applied to slaves and freedmen, while lesser restrictions focused on dangerous persons.

"[E]vidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605). But "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* Because the Second Amendment's "meaning is fixed according to the understandings of those who ratified it," *id.* at 2132, "to the extent later history contradicts what the text says, the text controls," *id.* at 2137; *see also Heller*, 554 U.S. at 625 (concluding with "our adoption of the *original understanding* of the Second Amendment") (emphasis added).

Nineteenth-century prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen.[15] Another targeted group starting in the latter half of the century were "tramps"—typically defined as males begging for charity outside their home county. Tramping was not a homebound activity, so this was not a prohibition on keeping arms in the home.

New Hampshire in 1878 imprisoned any tramp who "shall be found carrying any fire-arm or other dangerous weapon, or shall threaten to do any injury to any person, or to the real or personal estate of another." 1878 N.H. Laws 612, ch. 270 §2. The following year, Pennsylvania prohibited tramps from carrying a weapon "with intent unlawfully to do injury or intimidate any other person." 1 A DIGEST OF THE STATUTE LAW OF THE STATE OF PENNSYLVANIA FROM THE YEAR 1700 TO 1894, at 541 (12th ed. 1894).

Vermont, Rhode Island, Ohio, Massachusetts, Wisconsin, and Iowa enacted similar laws. 1878 Vt. Laws 30, ch. 14 §3; 1879 R.I. Laws 110, ch. 806 §3; 1880 Ohio Rev. St. 1654, ch. 8 §6995; 1880 Mass. Laws 232,

---

[15] *See, e.g.*, 1804 Miss. Laws 90; 1804 Ind. Acts 108; 1806 Md. Laws 45; 1851 Ky. Acts 296; 1860–61 N.C. Sess. Laws 68; 1863 Del. Laws 332.

ch. 257 §4; 1 ANNOTATED STATUTES OF WISCONSIN, CONTAINING THE GENERAL LAWS IN FORCE OCTOBER 1, 1889, at 940 (1889); 1897 Iowa Laws 1981, ch. 5 §5135.

Ohio's Supreme Court determined that the tramping disarmament law was constitutional because it applied to "vicious persons" who "terrorize[d] others":

> The constitutional right to bear arms is intended to guaranty to the people, in support of just government, such right, and to afford the citizen means for defense of self and property. While this secures to him a right of which he cannot be deprived, it enjoins a duty in execution of which that right is to be exercised. If he employs those arms which he ought to wield for the safety and protection of his country, his person, and his property, to the annoyance and terror and danger of its citizens, his acts find no vindication in the bill of rights. That guaranty was never intended as a warrant for vicious persons to carry weapons with which to terrorize others.

*State v. Hogan*, 63 Ohio St. 202, 218–19 (1900). Indeed, tramps were "an object of fear," who were "accused…of every conceivable crime" and "probably the most common and widespread of all nineteenth-century bogeymen." Lawrence Friedman, CRIME AND PUNISHMENT IN AMERICAN HISTORY 102 (1993). Disarmament efforts in the 19th century therefore continued the earlier tradition of targeting dangerous persons.

## III.   There is no tradition of disarming "unvirtuous" citizens.

Some scholars and courts have embraced a theory that the Second Amendment protected only "virtuous" citizens in the founding era. The following sources demonstrate how the theory developed despite lacking historical foundation.

- Don Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983). For support that "[f]elons simply did not fall within the benefits of the common law right to possess arms," Kates cited the ratifying convention proposals discussed above.

- Don Kates, *The Second Amendment: A Dialogue*, LAW & CONTEMP. PROBS. 143, 146 (1986). For support that "the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals)," *id.* at 146, Kates cited his previous article.

- Glenn Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995). For support that "felons, children, and the insane were excluded from the right to arms," Reynolds quoted Kates's *Dialogue* article.

- Saul Cornell, *"Don't Know Much about History": The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002). For support that the "right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner," Cornell cited a Pennsylvania prohibition on disaffected persons.

- David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 626–27 (2000). Yassky contended that "[t]he average citizen whom the Founders wished to see armed was a man of republican virtue," *id.* at 626, but provided no example of the right being limited to such men.

- Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 491–92 (2004). The authors said, "the Second Amendment was strongly connected to…the notion of civic virtue," *id.* at 492, but did not show that unvirtuous citizens were excluded from the right.

- *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009). In addition to Reynolds, Cornell, and the Dissent of the Minority of Pennsylvania, the court cited Robert Shalhope, *The Armed Citizen in the Early Republic,* 49 LAW & CONTEMP. PROBS. 125, 130 (1986). Shalhope, quoting a 1697 article opposing standing armies in England, argued that in "the view of late-seventeenth century republicanism…[t]he right to arms was to be limited to virtuous citizens only. Arms were 'never lodg'd in the hand of any who had not an Interest in preserving the publick Peace.'" *Id.* This quote—referring to dangerous persons—was not about colonial America but about the ancient "Israelites, Athenians, Corinthians, Achaians, Lacedemonians, Thebans, Samnites, and Romans." J. Trenchard & W. Moyle, *An Argument Shewing, That a Standing Army Is Inconsistent with a Free Government, And Absolutely Destructive to the Constitution of the English Monarchy* 7 (1697).

- *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010). *Vongxay* cited Kates's *Dialogue* and Reynolds.

28

- *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010). *Yancey* cited *Vongxay*, Reynolds, and Kates, then Thomas Cooley "explaining that constitutions protect rights for 'the People' excluding, among others, 'the idiot, the lunatic, and the felon.'" *Id.* at 685 (citing Thomas Cooley, A TREATISE ON CONSTITUTIONAL LIMITATIONS 29 (1868)). "The…discussion in Cooley, however, concerns classes excluded from voting. These included women and the property-less—both being citizens and protected by arms rights." Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 709–10 (2009).

- *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011). *Bena* cited Kates's *Dialogue* article.

- *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012). *Carpio-Leon* cited *Yancey*, *Vongxay*, Reynolds, Kates, Yassky, Cornell, Cornell and DeDino, the ratifying conventions, and noted the English tradition of "disarm[ing] those…considered disloyal or dangerous." *Id.* The court also cited Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 140–41 (1994), discussing how "Indians

29

and black slaves…were barred from owning firearms." *Id.* at 140. Discriminatory bans on noncitizens, however, say little about unvirtuous citizens.

- *Binderup*, 836 F.3d at 348–49 (Ambro, J., opinion). Judge Ambro's opinion cited each of the above sources.

- *Medina v. Whitaker*, 913 F.3d 152, 158–59 (D.C. Cir. 2019). The court cited the Dissent of the Minority of Pennsylvania, Reynolds, Cornell and DeDino, *Carpio-Leon*, *Yancey*, *Vongxay*, *Binderup*, *Rene E.*, and referenced Massachusetts and Pennsylvania prohibitions on disaffected persons.

None of these sources provided any colonial or founding-era law disarming "unvirtuous" citizens—or anyone, for that matter, who was not perceived as dangerous.[16]

*Bruen* demonstrated that establishing a tradition of regulation is extremely difficult. *Bruen* held that "the historical record compiled by

---

[16] For a more thorough refutation of the virtuous citizen theory, *see Kanter v. Barr*, 919 F.3d 437, 462–64 (7th Cir. 2019) (Barrett, J., dissenting); *Folajtar v. Attorney Gen. United States*, 980 F.3d 897, 915–20 (3d Cir. 2020) (Bibas, J., dissenting); Joseph Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO L. REV. 249, 275–83 (2020).

respondents does not demonstrate a tradition" of handgun carry restrictions, 142 S. Ct. at 2138, where the respondents produced two colonial statutes against the carrying of dangerous and unusual weapons, *id.* at 2142–43 (1692 Massachusetts, 1699 New Hampshire), one colonial law restricting concealed carry for everyone and handgun carry for "planters," a/k/a frontiersmen, *id.* at 2143 (1686 East Jersey), three late-18th-century and early-nineteenth-century state laws that "parallel[] the colonial statutes," *id.* at 2144–45 (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), two nineteenth-century common-law offenses for going armed for a wicked or terrifying purpose, *id.* at 2145–46 (1843 North Carolina, 1849 Alabama), four statutory prohibitions on handgun carry, *id.* at 2147, 2153 (1821 Tennessee, 1870 Tennessee, 1871 Texas (without reasonable cause), 1887 West Virginia (without good cause)), one state statute against going armed to the terror of the public, *id.* at 2152 (1870 South Carolina), eleven nineteenth-century surety statutes, requiring that a person found by a court to have threatened to breach the peace must post a bond in order to continue carrying, *id.* at 2148–50, 2152–53 (1836 Massachusetts, 1870 West Virginia, and "nine other jurisdictions"), two Western territory laws banning handgun carry, *id.* at 2154 (1869

New Mexico, 1881 Arizona), two Western territory laws banning the
carry of any arms in towns, cities, and villages, *id.* (1875 Wyoming, 1889
Idaho), one Western territory law banning all handgun carry and most
long-gun carry (1890 Oklahoma), *id.*, and one Western State law
instructing large cities to ban all carry (1881 Kansas), *id.* at 2155–56.

In striking contrast to the historical record held insufficient in *Bruen*,
there are *zero* historical laws disarming individuals based on virtue—or,
as the next section demonstrates, based on their status as felons.

## IV.    There is no tradition of disarming individuals because the law they violated was classified as a felony.

Historically, no one in America was disarmed because the law they
violated was classified as a felony. Felons were never disarmed based on
their status as felons.

Upon completing their sentence, people convicted of a crime not only
had full Second Amendment rights, but able-bodied males were required
to keep and bear arms under the state and federal militia acts. *See* 2
BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE
AMERICAN TRADITION, Parts 1–14 (Arthur Vollmer ed., 1947) (compiling
militia acts from the colonial and founding eras); David Kopel & Joseph
Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill.

32

U.L.J. 495, 533–89 (2019) (covering the militia laws of the 13 original States and their colonial predecessors, plus Vermont, New Haven Colony, and Plymouth Colony). While militia laws occasionally provided exemptions for people employed in certain professions, *see, e.g.*, 1 Stat. 271, §2 (1792) (federal Uniform Militia Act providing exemptions for elected officials, post officers, stage-drivers, ferrymen, inspectors, pilots, and mariners), no militia law in the colonial or founding periods ever provided an exemption based on prior incarceration or crimes committed.[17] Thus, freemen previously convicted of crimes virtually always possessed arms in the colonial and founding eras.

---

[17] To be sure, felons were not always executed, and regularly reentered society—and thus, resumed militia duty. "At the common law, few felonies, indeed, were punished with death," James Wilson explained soon after his appointment to the first United States Supreme Court. 2 THE WORKS OF JAMES WILSON 348 (James DeWitt Andrews ed., 1896). For example, larceny—"the felonious and fraudulent taking and carrying away of the personal goods of another," *id.* at 379—was not a capital offense under the laws of the United States or Pennsylvania, *id.* at 383. The First Congress made larceny punishable by a "fine" and a "public[] whipp[ing], not exceeding thirty-nine stripes." 1 THE PUBLIC STATUTES AT LARGE OF THE UNITED STATES OF AMERICA 116 (Richard Peters ed., 1845). Under Pennsylvania's 1790 law, anyone who shall "feloniously steal, take and carry away any goods or chattels, under the value of twenty shillings" could be "sentenced to undergo a servitude for a term not exceeding one year." 2 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE TWENTIETH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND TEN 532

Additionally, several colonial and founding era laws expressly protected the arms of criminals. In 1786 Massachusetts, estate sales were held to recover funds stolen by corrupt tax collectors and sheriffs. But it was forbidden to include firearms in the sales: "in no case whatever, any distress shall be made or taken from any person, of his arms or household utensils, necessary for upholding life." 1786 Mass. Laws 265. Under this law, which existed when Samuel Adams proposed his amendment at Massachusetts's ratifying convention, even unvirtuous citizens who were convicted of stealing tax money, imprisoned, and had nearly all their belongings confiscated retained the right to keep arms.

Laws exempting arms from civil action recoveries existed since at least 1650. Connecticut's 1650 law allowed officers, upon "execution of Civill Actions.…to breake open the dore of any howse, chest or place" where goods liable to execution were, except that "it shall not bee lawfull for [an] officer to [levy] any mans…armes" or any other implements "which are for the necessary upholding of his life." THE PUBLIC RECORDS OF THE

---

(1810). Someone convicted of "larceny to the value of twenty shillings and upwards" could be "confined [and] kept to hard labour" for three years. *Id.*

COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY 1665, at 537 (J. Hammond Trumbull ed., 1850).

The federal Uniform Militia Act in 1792 exempted militia arms "from all suits, distresses, executions or sales, for debt or for the payment of taxes." 1 Stat. 271, §1 (1792). Maryland and Virginia had similar exemptions. 13 ARCHIVES OF MARYLAND, at 557 (1692 Maryland); 3 Hening, STATUTES AT LARGE, at 339 (1705 Virginia); 4 *id.* at 121 (1723 Virginia).

## CONCLUSION

The government failed to prove that disarmament based on a DUI or marijuana possession is consistent with America's tradition of firearm regulation, which allows only dangerous persons to be disarmed. The ban on Mr. Alvarado is therefore unconstitutional and the decision below should be reversed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel of Record*

35

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,487 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

> /s/ *Joseph G.S. Greenlee*
> *Counsel of Record*

## CERTIFICATE OF SERVICE

I certify that on April 18, 2023, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*