**Case No. 22-5459**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**RICARDO ALVARADO,**

**Defendant-Appellant.**

---

On appeal from the United States District Court
for the Eastern District of Tennessee

---

**BRIEF OF THE UNITED STATES**

---

Francis M. Hamilton III
United States Attorney
Eastern District of Tennessee

Samuel R. Fitzpatrick
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee  37902
865.545.4167

# Table of Contents

Table of Authorities ......................................................................... iv

Statement Regarding Oral Argument ............................................. 1

Statement of the Issues .................................................................. 1

Statement of the Case..................................................................... 2

Summary of the Argument ............................................................. 8

Argument ...................................................................................... 10

    I.    No plain error occurred when Alvarado was convicted under 18 U.S.C. § 922(g)(1), because that conviction is not clearly contrary to well-settled law............................................ 10

        A.    The Supreme Court and this Court have repeatedly confirmed that the Second Amendment permits laws—like § 922(g)(1)—that prohibit felons from possessing firearms. ............................................................ 10

            1.    The Supreme Court's recent decision in *Bruen* confirmed—once again—that the Second Amendment permits laws that prohibit the possession of firearms by felons. .................................. 13

            2.    This Court has likewise confirmed that the Second Amendment permits laws that disarm felons....................................................................... 19

            3.    Section 922(g)(1) cannot be "presumptively lawful" and—at the same time—clearly or obviously unlawful. ................................................... 20

B. The Second Amendment permits laws—like § 922(g)(1)—that prohibit felons from possessing a firearm. ............................................................ 24

    1. The Second Amendment's plain text—as interpreted by the Supreme Court—does not give felons the right to possess a firearm. .................... 25

    2. The Nation's historical tradition confirms that the Second Amendment permits laws that disarm felons ............................................................ 28

        a. The Nation has a historical tradition of categorically disarming people who have shown disloyalty to the rule of law. ............ 29

        b. The Nation has a historical tradition of punishing felony offenses with severe sanctions—*i.e.*, forfeiture and death—that necessarily disarmed felons ................................ 36

C. In all events, Alvarado's challenge to § 922(g)(1) fails on its own terms, because his status as a felon, his prior convictions, and his recent conduct show that he is dangerous. ................................................... 39

    1. Felons are categorically more dangerous than non-felons. ................................................. 40

    2. Alvarado's felony convictions and recent conduct show that he is dangerous. ............................ 44

II. No clear error occurred when the district court found that Alvarado had placed his wife and his neighbors in imminent danger, because ample evidence showed that they were close by when he recklessly fired an assault rifle. .................................... 47

Conclusion ............................................................... 54

Certificate of Service ................................................................ 55

Certification Pursuant to Rule 32(a)(7)(B) .................................................. 56

Designation of Relevant District Court Documents ...................................... 57

# Table of Authorities

Cases

*Barrett v. United States*, 423 U.S. 212 (1976) .................................................. 41

*Baze v. Rees*, 553 U.S. 35 (2008) .................................................................. 37

*Begay v. United States*, 553 U.S. 137 (2008) .................................................. 44

*Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336
   (3d Cir. 2016)................................................................................35, 40

*Birchfield v. North Dakota*, 579 U.S. 438 (2016)........................................43, 44

*Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103 (1983) ................................ 41

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................................*passim*

*Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897
   (3d Cir. 2020)...........................................................................*passim*

*Greer v. United States*, 141 S. Ct. 2090 (2021) ............................................... 10

*Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir. 2017) ......................................... 26

*Hatfield v. Barr*, 925 F.3d 950 (7th Cir. 2019)................................................ 43

*Holloway v. Att'y Gen. United States*, 948 F.3d 164 (3d Cir. 2020)................... 44

*Johnson v. United States*, 520 U.S. 461 (1997) ............................................... 21

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) .................................. 40

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ....................................... 40, 42, 43

*Lewis v. United States*, 445 U.S. 55 (1980) .................................................... 40

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................................*passim*

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ...................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ...............................................................*passim*

iv

*Puckett v. United States*, 556 U.S. 129 (2009) ..........................................10, 21

*Range v. Att'y Gen. United States of Am.*, 69 F.4th 96
(3d Cir. 2023) (*en banc*) ..........................................................*passim*

*Richardson v. Ramirez*, 418 U.S. 24 (1974)......................................................26

*Ross v. Duggan*, 402 F.3d 575 (6th Cir. 2004) ................................................46

*State v. Fox*, 947 S.W.2d 865 (Tenn. Crim. App. 1996) ................................53

*State v. Goodwin*, 143 S.W.3d 771 (Tenn. 2004) ......................................52, 53

*State v. Payne*, 7 S.W.3d 25 (Tenn. 1999) ................................................52, 53

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678
(6th Cir. 2016) (*en banc*) ........................................................*passim*

*United States v. Adams*, 914 F.3d 602 (8th Cir. 2019) ....................................46

*United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309
(S.D. Miss. June 28, 2023)........................................................................22

*United States v. Carey*, 602 F.3d 738 (6th Cir. 2010) ..........................11, 18, 20

*United States v. Carrero*, No. 2:22-CR-30, 2022 WL 9348792
(D. Utah Oct. 14, 2022)............................................................................21

*United States v. Carter*, 750 F.3d 462 (4th Cir. 2014) ....................................46

*United States v. Choice*, 201 F.3d 837 (6th Cir. 2000) ....................................26

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)..................................26

*United States v. Collette*, No. MO:22-CR-141,
2022 WL 4476790 (W.D. Tex. Sept. 25, 2022) ........................................22

*United States v. Corbin*, 76 F. App'x 58 (6th Cir. 2003)..................................49

*United States v. Frazier*, 314 F. App'x 801 (6th Cir. 2008)........................11, 18

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997) ......................................40

*United States v. Garza*, No. 22-51021, 2023 WL 4044442
 (5th Cir. June 15, 2023) ............................................................. 22

*United States v. Goolsby*, No. 21-3087, 2022 WL 670137
 (6th Cir. Mar. 7, 2022) ............................................................. 13

*United States v. Grant*, 15 F.4th 452 (6th Cir. 2021) ........................................ 48

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012), *abrogated
 by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 142 S. Ct. 2111 (2022) ............................................................ 17, 18

*United States v. Hill*, No. 22-2400, 2023 WL 2810289
 (7th Cir. Apr. 6, 2023) ............................................................. 22

*United States v. Hyler*, 308 F. App'x 962 (6th Cir. 2009) ................................ 49

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) ............................. *passim*

*United States v. Khami*, 362 F. App'x 501 (6th Cir. 2010) ........................ 12, 18

*United States v. Lester*, 238 F. App'x 80 (6th Cir. 2007) ................................ 49

*United States v. Lopez-Galvez*, 429 F. App'x 567 (6th Cir. 2011) ...................... 44

*United States v. Maliszewski*, 161 F.3d 992 (6th Cir. 1998) ............................ 45

*United States v. Marlow*, 278 F.3d 581 (6th Cir. 2002) .................................. 18

*United States v. Maxon*, 250 F. App'x 129 (6th Cir. 2007).................. 49, 53, 54

*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) .................................... 26

*United States v. Mukes*, 980 F.3d 526 (6th Cir. 2020).................... 48, 49, 52, 53

*United States v. Olano*, 507 U.S. 725 (1993) ............................................ 10, 21

*United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) .................................... 26

*United States v. Ray*, 803 F.3d 244 (6th Cir. 2015) ........................................ 23

*United States v. Riley*, No. 1:22-CR-163, 2022 WL 7610264
 (E.D. Va. Oct. 13, 2022)............................................................ 22

*United States v. Ruiz-Lopez*, 53 F.4th 400 (6th Cir. 2022) ..................... 47, 48, 50

*United States v. Swaggerty*, No. 16-6677, 2017 WL 11622737
 (6th Cir. Oct. 18, 2017).............................................................................. 12

*United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011) ........................... 45

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) ................................. 26

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) (*en banc*)........................ 10

*United States v. Ward*, 190 F.3d 483 (6th Cir. 1999) ....................................... 10

*United States v. Whisnant*, 391 F. App'x 426 (6th Cir. 2010)......................12, 18

*Warshak v. United States*, 532 F.3d 521 (6th Cir. 2008) (*en banc*) ..................... 40

Statutes and Sentencing Guidelines

18 U.S.C. § 922...............................................................................*passim*

Tenn. Code Ann. § 39-13-103 ................................................................. 5, 48

U.S.S.G. § 2K2.1 .............................................................................*passim*

Constitutions

Mass. Const. of 1780, in *The Complete Bill of Rights: The Drafts, Debates,
Sources, And Origins* (Neil Cogan ed., Oxford University Press 2d ed.,
2014) ............................................................................................ 31

N.C. Declaration of Rights of 1776, in *The Complete Bill of Rights:
The Drafts, Debates, Sources, And Origins* (Neil Cogan ed., Oxford
University Press 2d ed., 2014)..................................................................... 31

Pa. Declaration of Rights of 1776, in *The Complete Bill of Rights:
The Drafts, Debates, Sources, And Origins* (Neil Cogan ed., Oxford
University Press 2d ed., 2014)..................................................................... 31

U.S. Const. amend II ........................................................................*passim*

## Historical Regulations

1 An Act for the Punishment of Certain Crimes Against the United States, *The Public Statutes at Larg[e] of the United States of America, from the Organization of the Government in 1789, to March 3, 1845* (Richard Peters, Esq., ed. 1848) .................................................................. 38

1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* (1811) ........................................................................... 37

1 *The Public Acts of the General Assembly of North-Carolina* (1804) ..................... 31

1 W. & M., Sess. 1, 2 in 6 *The Statutes of the Realm* (1688) ............................. 29

2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* (1886) ....................................................................... 38

2 *Records of the Court of Assistants of the Colony of the Massachusetts Bay 1630-1692* (1904) .......................................................................... 37

2 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1896) ....................... 37

4 *Journals of the Continental Congress 1774-1789* (Worthington Chauncey Ford ed., 1906) ................................................................ 30, 33

5 *The Acts and Resolves, Public and Private, Province of the Massachusetts Bay* (1886) ................................................................. 31

7 *Records of the Colony of Rhode Island and Providence Plantations in New England* (John Russell Bartlett ed., 1862) ......................................... 31

9 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1903) ....................... 31

9 William Waller Hening, *The Statutes at Large; Being A Collection of all the Laws of Virginia* (1821) ............................................................ 31, 32

*Acts and Laws, of His Majesty's colony of Rhode-Island, and Providence-Plantations, in New-England, in America* (1744) ................................ 37

*Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776* (1777) .......................................... 31

*The Public Records of the Colony of Connecticut* (1890) ....................................... 30

<u>Other Authorities</u>

4 William Blackstone, *Commentaries on the Laws of England* 95
  (1st ed. 1769) ....................................................................................... 36

Akhil Reed Amar, *The Bill of Rights* (1998)..................................................... 25

Beth A. Colgan, *Reviving the Excessive Fines Clause*,
  102 Cal. L. Rev. 277 (2014) ...................................................................... 37

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations
  and Criminological Considerations*, 60 Hastings L.J. 1339 (2009).................. 36

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of
  the Second Amendment*, 82 Mich. L. Rev. 204 (1983) .................................. 37

Raymond M. Kethledge, *Hayek and the Rule of Law: Implications
  For Unenumerated Rights and the Administrative State*, 13 N.Y.U.
  Journal of Law & Liberty 193 (2020) ...................................................33, 34

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right
  to Keep Arms in Early America: The Legal Context of the Second
  Amendment*, 25 Law & Hist. Rev. 139 (2007) ............................................ 30

Stephen P. Halbrook, *The Founder's Second Amendment: Origins of
  the Right to Bear Arms* (2008).................................................................. 35

Thomas M. Cooley, *A Treatise on the Constitutional Limitations
  Which Rest Upon the Legislative Power of the States of the American
  Union* (1868) ........................................................................................ 25

U.S. Department of Justice, *Bureau of Justice Statistics, Recidivism
  of Prisoners Released in 34 States in 2012* (July 2021) ................................ 41

## Statement Regarding Oral Argument

The United States requests oral argument, because this case presents a question of first impression for the Court: whether 18 U.S.C. § 922(g)(1) remains constitutionally valid following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

## Statement of the Issues

Defendant Ricardo Alvarado—a convicted felon—fired an assault rifle in a residential neighborhood during an argument with his wife. A jury thereafter convicted him of possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). At sentencing, the district court found that Alvarado's gunfire had placed his wife and his neighbors in imminent danger. Accordingly, the court applied a sentencing enhancement—U.S.S.G. § 2K2.1(b)(6)(B)—to account for Alvarado's use of a firearm in connection with another felony offense, namely, reckless endangerment. Alvarado's appeal presents two questions:

1. On plain-error review, does the Second Amendment clearly or obviously bar Alvarado's conviction under 18 U.S.C. § 922(g)(1)?

2. Did the district court clearly err when it found that Alvarado's gunfire had placed his wife and his neighbors in imminent danger?

## Statement of the Case

In April 2020, Alvarado got into an argument with his common-law wife. (R. 78, Transcript at 899, 902-03; Exhibit 1 at 2:45–3:20 (copies of Exhibits 1, 2, 3, 9, and 11 were previously provided to the Court by Alvarado).) She was holding their infant son, and the three of them were inside a mobile home where they lived. (Exhibit 1 at 2:18–2:31, 3:10–3:20; R. 107, Transcript at 1298.) During the argument, Alvarado—a twice-convicted felon—grabbed a loaded AR-15 assault rifle and fired at least two shots near the mobile home's back door. (Exhibit 1 at 3:00–3:20, Exhibit 2 at 1:04–1:45, Exhibit 3 at 0:10–0:45.)

Alvarado's wife turned her head away from the gunfire, shielded the baby, and tried to cover the baby's ears. (Exhibit 1 at 3:10–3:20; R. 112, Transcript at 1615.) She was so close to the shots that her ears rang with a sound that she later described as "beeeee." (Exhibit 1 at 3:11–3:25.) She was scared that Alvarado would hurt her and was "praying so hard." (*Id.* at 2:45–3:20.)

The neighbors were scared too. (R. 108, Transcript at 1374, 1427.) In the mobile home next to Alvarado's, one neighbor heard the gunshots and initially thought they had "come through [her] house." (*Id.* at 1396-97, 1422.) Then she thought that someone had shot her dog, so she opened her back door and tried

to bring the dog in. (*Id.* at 1396, 1424.) She saw Alvarado carrying a rifle while he ran through the mobile-home park, so she called the police. (*Id.* at 1396-1400, 1425.) Shortly after the gunfire had ended, another neighbor saw Alvarado walk through the mobile-home park while armed with a rifle. (*Id.* at 1368-73.)

Meanwhile, a deputy sheriff received a call from dispatch that "a male with a rifle" was "breaking and entering" at the mobile-home park. (R. 107, Transcript at 1284.) The deputy arrived a few minutes later and spotted Alvarado carrying a rifle. (*Id.* at 1285-91.) The deputy pulled out his handgun, ordering Alvarado "to drop the weapon and get on the ground." (*Id.* at 1286-87, 1288.) Alvarado complied, and deputies put him in handcuffs. (*Id.* at 1309.) A few moments later, a deputy asked, "whose gun?"—Alvarado answered, "mine." (R. 78, Transcript at 974; Gov't Trial Exhibit 20 at 00:04–00:10 (copies of this Exhibit provided to the Court by the United States).)

Deputies searched the mobile home where Alvarado and his wife had argued. (R. 107, Transcript 1298-99; Exhibit 3 at 0:15–0:45.) On the mobile home's back patio, deputies found a shell casing from a round that had been fired. (*Id.*) Inside the mobile home, they found another shell casing and two live rounds. (*Id.*)

3

A deputy questioned Alvarado's wife, who said that Alvarado had accused her of hiding things, had broken her phone, and had told her "don't say anything." (Exhibit 1 at 02:30–2:35, 3:35–3:48.) She also showed the deputy how she had reacted when Alvarado fired the rifle, turning her head away, "shield[ing] her child," and "cover[ing] his ears." (*Id.* at 3:10–3:20; R. 112, Transcript at 1615.) Her statements were recorded by a deputy's body camera. (Exhibit 1 at 00:20–04:35.)

Alvarado was thereafter charged with reckless endangerment, among other offenses, in Tennessee's state court. (R. 86, Presentence Report at 1026.) The state court dismissed those charges, however, after a federal grand jury indicted Alvarado for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). (*Id.*; R. 1, Indictment at 1.) Alvarado went to trial, and five witnesses testified. (R. 78, Transcript at 881; R. 107, Transcript at 1239; R. 108, Transcripts at 1349.) Three of them testified for the United States: the deputy who ordered Alvarado to drop the rifle, the neighbor who heard the gunshots in her mobile home and saw Alvarado running with the rifle, and the neighbor who saw Alvarado carrying the rifle through the neighborhood. (R. 107, Transcript at 1280-1345; R. 108, Transcript at 1366-87, 1393-1428.)

Two witnesses testified for the defense: Alvarado's wife and Alvarado himself. (R. 78, Transcript at 884-938, 939-980.) Alvarado's wife disavowed

4

the statements that she made to the deputy on the day of the shooting, saying that she had "made all that up." (*Id.* at 902-04.) Alvarado denied that he possessed or fired the rifle, asserting that the deputy had mistaken him for someone else. (*Id.* at 948-49, 954.) Alvarado acknowledged, however, that he had two prior felony convictions: one for driving while intoxicated with a child under the age of 15, and one for possessing marijuana. (*Id.* at 952-53.) The jury convicted Alvarado. (R. 60, Verdict at 372.)

The presentence report recommended application of Sentencing Guideline § 2K2.1(b)(6)(B), which increases the offense level for defendants who "used or possessed any firearm or ammunition in connection with another felony offense[.]" (R. 86, Presentence Report at 1027.) Alvarado objected, arguing that the evidence did not establish that he had fired the rifle or had placed anyone in danger. (R. 66, Objections at 823; R. 112, Transcript at 1610-11.)

At sentencing, the United States presented evidence to show that Alvarado had fired the rifle, had placed others in imminent danger, and had thus committed the felony offense of reckless endangerment in violation of Tennessee Code § 39-13-103(b)(2). (R. 112, Transcript at 1600-10.) That evidence included three video recordings that had been made immediately after the shooting: one of a deputy's conversation with Alvarado's wife, one of

5

a deputy's conversation with Alvarado's neighbors, and one of a deputy's

discovery of two shell casings at Alvarado's mobile-home. (*Id.*; *see also* Exhibits

1, 2, and 3.) Also, that evidence included Alvarado's state-court indictment for

reckless endangerment, photographs of the mobile-home park where he fired

the rifle, and photographs of the shell casings that deputies found in his mobile

home and on its patio.  (R. 112, Transcript at 1604-06; *see also* Exhibits 9 and

11.)

      The court found by a preponderance of the evidence that Alvarado had

"fir[ed] a Ruger AR rifle from a trailer that he was inhabiting in a residential

trailer complex with other trailers and individuals in close proximity." (R. 112,

Transcript at 1613.) Given that proximity, the court found that Alvarado's

reckless gunfire had placed his wife and his neighbors in "imminent danger of

serious bodily harm." (*Id.* at 1613-15.) Accordingly, the court determined that

Alvarado had used his assault rifle in connection with the felony offense of

reckless endangerment and that Guideline § 2K2.1(b)(6)(B) therefore applied.

(*Id.* at 1615.)

      That determination rested in large part on the court's assessment of

Alvarado's wife's credibility. (*Id.*) The court found that the statements she had

made to the deputy—*i.e.*, the ones recorded by the deputy's body-cam—were

"truthful." (*Id.* at 1615; Exhibit 1 at 00:20–04:35.) The court explained that

6

Alvarado's wife had made those statements "immediately after the incident where there was not time to fabricate or shade her perception[.]" (R. 112, Transcript at 1615.) In contrast, the court found incredible her trial testimony denying those statements. (*Id.*) The court explained that it "saw [her] testimony live and had the opportunity to assess her demeanor and credibility [and] has serious doubts about [her] veracity under oath[.]" (*Id.* at 1615, 1623.) The court concluded that she had likely "perjured herself" at trial. (*Id.* at 1623.) In addition, the court determined that Alvarado committed perjury when he "falsely testified" that someone else had possessed the rifle. (*Id.* at 1622-23.)

In the end, the court concluded that Alvarado had shown a "complete disrespect for the rule of law." (*Id.* at 1635-36.) Alvarado needed a lengthy sentence, the court concluded, based on "the sheer dangerousness of his offense": he not only "possess[ed] the AR-15, but he had fired it" and had thereby "placed his wife, child, and residents" of the mobile-home park "in risk of imminent danger." (*Id.* at 1634-36.) Alvarado's Guidelines range was 92 to 115 months in prison, and the court sentenced him to 104 months. (*Id.* at 1624, 1638; R. 89, Judgment at 1043.)

This appeal followed. (R. 91, Notice at 1053.)

## Summary of the Argument

No plain error occurred when Alvarado was convicted under 18 U.S.C. § 922(g)(1) for possessing a firearm as a felon. No binding precedent—not a single case from the Supreme Court or this Court—has declared § 922(g)(1) unconstitutional. Rather, binding precedent points in the opposite direction. This Court has affirmed the constitutionality of § 922(g)(1) again and again. And the Supreme Court has repeatedly stated that its decisions cast no doubt on laws—like § 922(g)(1)—that disarm felons. The Supreme Court's recent decision in *Bruen* does not suggest a different result. Rather, *Bruen* reaffirmed that the Second Amendment protects the rights of people who are law-abiding.

Felons are not among the people whose rights are protected by the Second Amendment. Those rights belong solely to law-abiding members of the political community. And two types of historical regulations confirm that the Second Amendment permits laws that disarm felons: regulations that disarmed people who had shown disloyalty to the rule of law, and regulations that punished felony offenses by forfeiture and death.

In all events, Alvarado's challenge to § 922(g)(1) fails on its own terms. The sources that he relies on agree: the Second Amendment permits firearm regulations that prohibit dangerous people from possessing firearms. Felons as a class, however, are more likely to commit violent crimes and therefore more

dangerous than law-abiding citizens. Further, Alvarado's conduct shows that he—in particular—is dangerous. He previously committed two dangerous felonies—namely, drunk driving with two children in the car, and a serious drug offense. And his actions here were dangerous: he fired two rounds from an assault rifle in a residential neighborhood while his neighbors, wife, and infant son were in the immediate vicinity. Alvarado's conviction under § 922(g)(1) is not clearly or obviously barred by the Second Amendment. No plain error occurred.

Nor did the district court clearly err when it found that Alvarado's gunfire had placed his wife and his neighbors in imminent danger. Ample evidence supported that finding, including trial testimony, photographs, and video recordings that were made immediately after the shooting. In particular, the video of Alvarado's wife established that Alvarado's gunfire placed her in imminent danger: she was so close to the shots that she ducked her head away, heard ringing in her ears, shielded her baby, and tried to cover the baby's ears. The district court credited those statements as truthful.

This Court should affirm.

## Argument

**I.    No plain error occurred when Alvarado was convicted under 18 U.S.C. § 922(g)(1), because that conviction is not clearly contrary to well-settled law.**

In the district court, Alvarado did not argue that § 922(g)(1) violates the Second Amendment. (*See* Alvarado's Brief at 10-11.) Therefore this Court reviews for plain error whether the Second Amendment permits his conviction under § 922(g)(1). *See Greer v. United States*, 141 S. Ct. 2090, 2096 (2021). An error is plain when it is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993). In fact, plain errors are so clear and so obvious that they are not "subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009). This Court finds plain error "[o]nly in exceptional circumstances"—for instance, when the error is so "well-settled in the law" that a judge would be "derelict" to permit it. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (*en banc*); *United States v. Ward*, 190 F.3d 483, 492 (6th Cir. 1999). Here, no plain error occurred.

A.    <u>The Supreme Court and this Court have repeatedly confirmed that the Second Amendment permits laws—like § 922(g)(1)—that prohibit felons from possessing firearms.</u>

Alvarado's conviction is not clearly or obviously unconstitutional. The Supreme Court has repeatedly stated that the Second Amendment permits laws that prohibit felons from possessing firearms. *District of Columbia v. Heller*,

554 U.S. 570, 626-27 n.26 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). In *Heller*, the Court explained that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful regulatory measures." 554 U.S. at 626 n.26. The Court stated that its decision should not "be taken to cast doubt" on the constitutionality of those prohibitions. *Id.* at 626. Then in *McDonald*, the Court "repeat[ed]" the same "assurances" that it had made in *Heller*. 561 U.S. at 786. The Court flatly rejected the idea that its decision would "imperil every law regulating firearms." *Id.* And the Court explained—again—that its decision cast no doubt on "longstanding regulatory measures" that prohibit "the possession of firearms by felons." *Id.*

This Court has consistently taken the Supreme Court at its word, determining at least six times that § 922(g)(1) does not violate the Second Amendment.

1.  *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010): "*Heller* states that the Second Amendment right is not unlimited, and, in fact, it is specifically *limited* in the case of felon prohibitions." *Id.* at 741. Therefore "Congress's prohibition on felon possession of firearms is constitutional[.]" *Id.*

2.  *United States v. Frazier*, 314 F. App'x 801 (6th Cir. 2008): "The Supreme Court clarified that 'the right secured by the Second

11

Amendment is not unlimited'" and that "nothing in [*Heller*] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 807. Therefore a conviction under § 922(g)(1) for possessing a firearm as a felon "is not in violation of the Second Amendment." *Id.*

3.  *United States v. Whisnant*, 391 F. App'x 426 (6th Cir. 2010): In *Heller*, the Supreme Court "held that 'the right secured by the Second Amendment is not unlimited'" and "that 'nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *Id.* at 430. As a result, "this Court has held that § 922(g)(1) comports with the Second Amendment, stating that 'prohibitions on felon possession of firearms do not violate the Second Amendment[.]'" *Id.*

4.  *United States v. Khami*, 362 F. App'x 501 (6th Cir. 2010): "*Heller* indicates that its holding does not bring into question the constitutionality of § 922(g)(1), and this Court has not been presented with any convincing argument that its dicta should not be very persuasive in this case[.]" *Id.* at 508.

5.  *United States v. Swaggerty*, No. 16-6677, 2017 WL 11622737 (6th Cir. Oct. 18, 2017): The Court has "repeatedly rejected Second

12

Amendment challenges to § 922(g)(1) by convicted felons." *Id.* at

*1. The Court has "also concluded that the United States Supreme

Court's decision in [*Heller*] confirms the constitutionality of

prohibiting convicted felons from possessing firearms." *Id.*

6.    *United States v. Goolsby*, No. 21-3087, 2022 WL 670137 (6th Cir.

Mar. 7, 2022): *Heller* "declined to 'cast doubt on longstanding

prohibitions on the possession of firearms by felons' [and] …

consider[ed] these prohibitions 'presumptively lawful.'" *Id.* at *2.

"Pointing to this language, [the Court has] repeatedly found that

'prohibitions on felon possession of firearms do not violate the

Second Amendment.'" *Id.*

Binding authority on this issue is therefore one-sided: the Second

Amendment permits § 922(g)(1) and other laws that prohibit felons from

possessing firearms.

*1.    The Supreme Court's recent decision in Bruen confirmed—once again—that the
Second Amendment permits laws that prohibit the possession of firearms by
felons.*

Alvarado suggests that the Supreme Court's decision in *New York State

Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), "changed the Second

Amendment landscape" that had been established by *Heller*. (Alvarado's Brief

at 11-12.) But *Bruen* itself rejected that suggestion. According to the Supreme

Court, *Bruen* "keep[s] with *Heller*," "follow[s] the course charted by *Heller*," and is entirely "consistent with *Heller*[.]" 142 S. Ct. at 2122, 2126, 2127, 2131. And in fact, *Bruen* echoed *Heller*'s conclusion: the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at 2131 (quoting *Heller*, 554 U.S. at 635); *accord McDonald*, 561 U.S. at 791.

    *Bruen* hammered that point home, repeating again and again and again—14 times total—that the Second Amendment guarantees the rights of "law-abiding" people. 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2135 n.8, 2138 n.9, 2150, 2156. Two examples from *Bruen* stand out as especially emphatic. First, *Bruen* instructs that courts should assess the constitutionality of firearm regulations by asking "how and why the regulations burden *a law-abiding citizen*'s right to armed self-defense." *Id.* at 2133 (emphasis added). And second, *Bruen* instructs that the Second Amendment bars firearm regulations that "prevent *law-abiding* citizens" from carrying arms. *Id.* at 2150 (emphasis added). The very tests that *Bruen* established thus reinforce rather than refute *Heller*'s conclusion: Second Amendment rights belong solely to people who are "law-abiding."

    *Bruen* also agreed with *Heller* about who does not hold those rights. In *Heller*, the Court instructed that "the District must permit [petitioner] to register his handgun and must issue him a license to carry it in the home"—

14

"[a]ssuming that [he] is not disqualified from the exercise of his Second Amendment rights[.]" 554 U.S. at 635. As *Heller* makes clear, disqualification of Second Amendment rights applies to "felon[s]." *Id.* at 631.

*Bruen* followed the same approach as *Heller*. In *Bruen*, the Court rejected a "may-issue" firearm licensing law that required applicants to show "proper cause" to obtain a license to carry a firearm outside the home. 142 S. Ct. at 2124. But *Bruen* also made clear that the Second Amendment is "subject to certain reasonable, well-defined restrictions." *Id.* at 2156. As *Bruen* explained, those permissible restrictions include "shall-issue" licensing laws that condition the right to carry a firearm on the applicant's ability to meet "certain threshold requirements" including "a background check" for prior convictions. *Id.* at 2123-24, 2138 n.9. *Bruen* thus expressly approved a variety of "shall issue" licensing laws that bar felons from possessing firearms. *Id.* at 2138 n.9, 2123 n.1 (citing state statutes). Those shall-issue licensing laws are valid, the Court explained, because the Second Amendment permits restrictions "designed to ensure only that those bearing arms in the jurisdiction are, in fact, '*law-abiding, responsible citizens*.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635) (emphasis added).

In two of *Bruen*'s concurring opinions, three justices made that same point more directly. *Id.* at 2156-61 (Alito, J., concurring), 2161-62 (Kavanaugh,

15

J., concurring). Those opinions emphasized—seven times between them—that Second Amendment rights belong to people who are "*law-abiding.*" *Id.* at 2157-62 (emphasis added). Justice Alito explained that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* … about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157. Likewise, Justice Kavanaugh (joined by Chief Justice Roberts) explained that "the Second Amendment allows a variety of gun regulations," and quoted the Court's previous assurances (from *Heller* and *McDonald*) that "longstanding prohibitions on the possession of firearms by felons" remain "presumptively lawful regulatory measures[.]" *Id.* at 2162.

On that point, the Supreme Court in *Bruen* appears to be unanimous or nearly so. Six justices held that the Second Amendment protects the rights of "law abiding" people and that "shall-issue" licensing laws—which restrict felons from possessing firearms—do not violate the Second Amendment. *Id.* at 2122, 2125, 2131, 2133, 2135 n.8, 2138 n.9, 2150, 2156. Three of those justices concurred, reiterating that the majority's opinion cast no doubt on the constitutionality of laws that prohibit firearm ownership by felons. *Id.* at 2157 (Alito, J., concurring), 2161-62 (Kavanaugh, J., concurring). And the three dissenting justices likewise agreed that "the Court's opinion … cast no doubt" on laws that prohibit firearm ownership by felons. *Id.* at 2189 (Breyer, J.,

dissenting). Thus every Supreme Court justice seems to agree: the Second Amendment protects the rights of people who are law-abiding rather than law-breaking.

*Bruen* therefore did not reject *Heller*'s assurance that the Second Amendment allows laws that prohibit felons from possessing firearms. (*Contra* Alvarado's Brief at 11-15.) *Bruen* did, however, reject the "two-step framework" that this Court (and many others) had developed after *Heller*. *Bruen*, 142 S. Ct. at 2125. Under the first step of that framework, courts asked "whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. 2111. Under the second step, courts considered "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id. Bruen* explained that the second step is "one step too many" and that courts may not assess Second-Amendment claims on the basis of an "interest-balancing inquiry" that requires "empirical judgments" about "the costs and benefits of firearms restrictions[.]" 142 S. Ct. at 2127, 2129.

Alvarado is therefore mistaken when he contends that *Bruen* "abrogated this Court's prior precedents upholding the constitutionality of § 922(g)(1)." (Alvarado's Brief at 11 (capitalization removed).) For sure, *Bruen* abrogated

17

some of them—like *Greeno*, which relied on the second step that *Bruen* forbade. *Bruen*, 142 S. Ct. at 2126-27. But *Bruen* had no effect on this Court's other decisions—*i.e.*, *Carey*, *Frazier*, *Whisnant*, and *Khami*—that never reached the second step and that instead relied on *Heller*'s assurance that it cast no "doubt on longstanding prohibitions on the possession of firearms by felons[.]" *E.g.*, *Carey*, 602 F.3d at 741 (emphasis omitted). That reliance was justified, because the Court is "obligated to follow Supreme Court dicta, particularly when there is no substantial reason for disregarding it, such as age or subsequent statements undermining its rationale." *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002).

If *Bruen* had clearly or obviously declared § 922(g)(1) unconstitutional, the Court would likely have mentioned that statute somewhere in the opinion. But *Bruen* did not mention § 922(g)(1)—not once. 142 S. Ct. at 2122-56. *Bruen* was not asked to decide whether the Second Amendment allows Congress to disarm felons under § 922(g)(1) and therefore did not decide that question. *Bruen* did, however, strongly suggest the answer to it. And that suggestion confirms rather than contradicts the Court's assurances in *Heller* and *McDonald*.

2.    *This Court has likewise confirmed that the Second Amendment permits laws that disarm felons.*

This Court should therefore continue to follow the Supreme Court's repeated assurances that its decisions cast no doubt on laws that prohibit felons from possessing firearms. Alvarado is mistaken when he asserts that the Court's decision in *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) (*en banc*), departed from those assurances. (*Contra* Alvarado's Brief at 12-15.) True, *Tyler* departed from "*Heller*'s precautionary language" regarding firearm possession by people who are  "mentally ill." 837 F.3d at 688. But *Tyler* approved the Court's reliance on "*Heller*'s precautionary language" regarding "§ 922(g)(1)'s bar on the possession of firearms by felons." *Id.*

And *Tyler* did more than rely on *Heller*'s precautionary language regarding § 922(g)(1)—*Tyler* also explained why that reliance was justified. For one thing, a "felony conviction, unlike an adjudication of incompetence or involuntary commitment, trigger[s] a number of disabilities, many of which impact fundamental constitutional rights." *Id.* at 688 n.9. And for another, Congress has the "power to regulate categorically" to restrict firearm possession by "presumptively risky people" like felons. *Id.* at 698, 693. Or as now-Chief Judge Sutton's concurring opinion put it, "[l]egislatures have

authority … to impose lifetime gun-possession bans on felons as a safety measure and as a legitimate consequence of a felony conviction[.]" *Id.* at 708.

Thus *Tyler* contradicts Alvarado's argument in two ways. First, *Tyler* confirmed that the Court should continue to rely on *Heller*'s assurances about the legality of laws that prohibit felons from possessing firearms. *Id.* at 688. Second, *Tyler* reaffirmed the Court's prior decisions—*i.e.*, *United States v. Carey*—that determined § 922(g)(1) does not violate the Second Amendment. *Id.* (citing *Carey*, 602 F.3d at 740-41).

3.  *Section 922(g)(1) cannot be "presumptively lawful" and—at the same time— clearly or obviously unlawful.*

Not only did *Tyler* deal with a different statute (*i.e.*, § 922(g)(4)) than the one at issue here (*i.e.*, § 922(g)(1)), *Tyler* also dealt with a different standard of review. *Tyler* reviewed *de novo*; here, the Court reviews for plain error. 837 F.3d at 685. Alvarado, however, largely ignores that standard of review. Although he recites the plain-error standard at the outset, he never mentions it again throughout his argument. (*See* Alvarado's Brief at 10-26.) Rather, he encourages the Court to consider his argument "with fresh eyes" in light of *Bruen*. (*Id.* at 11.)

But the plain-error standard requires something else entirely. When the law changes between trial and appeal, this Court finds plain error only when

20

the law applied by the trial court is "clearly contrary" to law that is "now settled" at the time of "appellate consideration." *Johnson v. United States*, 520 U.S. 461, 468 (1997). Neither of those requirements are met here, because Alvarado's conviction under § 922(g)(1) is not "clearly contrary" to law that is "now settled" by *Bruen*.

Alvarado himself recognizes that neither of those requirements are met. He seems to agree that § 922(g)(1) remains presumptively lawful under the framework established by *Heller*. (*See* Alvarado's Brief at 14-15.) But § 922(g)(1) cannot be presumptively lawful and—at the same time—"clear[ly] or obvious[ly]" unlawful. *See Olano*, 507 U.S. at 734. In addition, Alvarado points out that he is raising "unresolved legal issues," stating that "[t]his Court … has never determined whether" § 922(g)(1) meets *Bruen*'s standard and has "never considered an as-applied challenge to [§] 922(g)(1) by a nonviolent felon[.]" (Alvarado's Brief at vi, 14.) But whether § 922(g)(1) complies with *Bruen* cannot be an unresolved legal issue and—at the same time—a legal issue that is "now settled." *Puckett*, 556 U.S. at 135.

That said, the law is beginning to settle—but not in a way that helps Alvarado. Since the *Bruen* decision, more than 170 district courts have rejected constitutional challenges to § 922(g)(1). *E.g.*, *United States v. Carrero*, No. 2:22-CR-30, 2022 WL 9348792, at *2-4 (D. Utah Oct. 14, 2022); *United States v.*

21

*Riley*, No. 1:22-CR-163, 2022 WL 7610264, at *9-10 (E.D. Va. Oct. 13, 2022); *United States v. Collette*, No. MO:22-CR-141, 2022 WL 4476790, at *3-8 (W.D. Tex. Sept. 25, 2022). The United States is aware of only one district court that has found § 922(g)(1) unconstitutional. *United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023). That decision is an extreme outlier.

Three circuit courts have likewise rejected claims that § 922(g)(1) is unconstitutional. The Fifth Circuit and the Seventh Circuit have rejected claims under the plain-error standard. *See, e.g.*, *United States v. Garza*, No. 22-51021, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023); *United States v. Hill*, No. 22-2400, 2023 WL 2810289, at *2 (7th Cir. Apr. 6, 2023). And the Eighth Circuit rejected a claim under the *de novo* standard. *United States v. Jackson*, 69 F.4th 495, 501 (8th Cir. 2023).

*Jackson* rejected a "non-violent" felon's challenge to § 922(g)(1) for two reasons. First, the defendant "is not a law-abiding citizen, and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Id.* at 504. And second, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed"—with "no requirement for an

22

individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* As a result, the court found "no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Id.* at 502.

To be sure, the Third Circuit recently decided that § 922(g)(1) is unconstitutional as applied to a defendant who had committed a misdemeanor under state law. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 98 (3d Cir. 2023) (*en banc*). But that decision does not apply to Alvarado, who is not a misdemeanant but a twice-convicted felon. Nor is that decision binding. Nor, for the reasons described below, is that decision persuasive.

For his part, Alvarado points to no case—not a single case from any court anywhere—holding that the Second Amendment protects the right of felons to possess firearms. (*See* Alvarado's Brief at 1-26.) Instead, he relies primarily on dissenting opinions. (Alvarado's Brief at 17, 18, 19, 21, 22, 25 n.13.) But dissenting opinions bind no one. *See, e.g.*, *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015). So they cannot establish that any error exists, much less that any error is plain.

Both before *Bruen* and after it, federal courts have achieved remarkable agreement. They have concluded that the Second Amendment permits laws, like § 922(g)(1), that bar felons from possessing firearms. *E.g.*, *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019). Given the weight of that

authority, § 922(g)(1) cannot be clearly or obviously unconstitutional. At minimum, the constitutionality of § 922(g)(1) is subject to reasonable dispute. Therefore no plain error occurred. On this basis alone, the Court should affirm.

B.    The Second Amendment permits laws—like § 922(g)(1)—that prohibit felons from possessing a firearm.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. To determine whether a firearm regulation complies with the Second Amendment, courts start with the Amendment's "plain text." *Bruen*, 142 S. Ct. at 2129-30. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* The United States then bears the burden to "justify [the] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Alvarado's claim fails under both parts of that standard. First, the Second Amendment's text does not cover the possession of firearms by felons. And second, the Nation has a historical tradition of disarming people—like felons—who have shown disloyalty to the rule of law.

24

*1.    The Second Amendment's plain text—as interpreted by the Supreme Court—
does not give felons the right to possess a firearm.*

The Second Amendment's text does not cover the possession of firearms
by felons. As the Supreme Court has explained again and again, "law-abiding,
responsible citizens" comprise the people covered by the Second Amendment.
*Heller*, 554 U.S. at 635; *see also Bruen*, 142 S. Ct. at 2131, 2134. More
specifically, "'the people' … unambiguously refers to all members of the
political community, not an unidentified subset." *Heller*, 554 U.S. at 580.
The political community has "almost universally" excluded "certain classes"—
including "the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on
the Constitutional Limitations Which Rest Upon the Legislative Power of the States of
the American Union* 28-29 (1868). Throughout our Nation's history, only
members of the political community have enjoyed "political rights," including
the right to "hold public office," to "serve on juries," and "the right to bear
arms." *See* Akhil Reed Amar, *The Bill of Rights* 48 (1998).

To this day, felons remain outside the political community. In modern
America, a felony conviction "often results in the lifelong forfeiture of a
number of rights." *Medina*, 913 F.3d at 160; *Tyler*, 837 F.3d at 688 n.9. And
those rights include "fundamental constitutional rights." *Folajtar v. Att'y Gen. of
the United States*, 980 F.3d 897, 902 (3d Cir. 2020). For instance, felons have no

constitutional right to vote, to serve on a jury, or to hold public office.

*Richardson v. Ramirez*, 418 U.S. 24, 54-56 (1974) (vote); *Medina*, 913 F.3d at 160

(jury); *United States v. Choice*, 201 F.3d 837, 839 (6th Cir. 2000) (public office).

Since felons are outside the "political community," they are also outside

"the people" who hold the right to keep and bear arms. *Heller*, 554 U.S. at 580.

Other circuits have reached that same or similar conclusions about "the

people" who hold rights under the Second Amendment:

- "[F]elons are categorically different from the individuals who have

  a fundamental right to bear arms[.]" *United States v. Vongxay*, 594

  F.3d 1111, 1115 (9th Cir. 2010); *accord United States v. Chovan*, 735

  F.3d 1127, 1144-45 (9th Cir. 2013) (Bea, J., concurring).

- "[F]elons are not among the law-abiding, responsible citizens

  entitled to the protections of the Second Amendment[.]" *Medina*,

  913 F.3d at 160.

- "[C]onviction of a felony necessarily removes one from the class of

  'law-abiding, responsible citizens' for the purposes of the Second

  Amendment, absent the narrow exceptions mentioned below."

  *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017); *accord*

  *United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012); *United*

  *States v. Pruess*, 703 F.3d 242, 246 (4th Cir. 2012).

- The Supreme Court has "general[ly] exclu[ded] … all felons from the scope of the Second Amendment right." *Folajtar*, 980 F.3d at 907.

The term "the people" need not bear the exact same meaning in the First, Second, and Fourth Amendments. Each of those Amendments uses the phrase "the people," which leads to "a strong presumption" that the right described in each is "exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581. But like other words in the Constitution—*i.e.*, "state"—that presumption can be overcome by the context in which the term is used. *See id.* at 597. Although all three Amendments deal with individual rights, a key distinction sets the Second Amendment apart from the others. The Second Amendment covers a right that is also a responsibility: the right to "keep and bear arms" and the responsibility to use those arms "to oppose an oppressive military force if the constitutional order broke down." *Id.* at 599.

That distinction explains why "the people" who hold the right to keep and bear arms includes only those who can be trusted to keep and bear arms in a manner that respects lawful "federal control over the militia" and at the same time stands ready to "safeguard against tyrann[ical]" attempts to subvert the rule of law. *Id.* at 597-98, 600. That distinction also explains why children, undocumented immigrants, and felons are among "the people" who hold the

right to peaceably assemble (under the First Amendment) and to be free from unreasonable searches and seizures (under the Fourth Amendment) but not the right to keep and bear arms (under the Second Amendment).

As the Supreme Court has clearly explained, the Second Amendment's text protects the rights of "law-abiding, responsible citizens"—not felons.

2.    *The Nation's historical tradition confirms that the Second Amendment permits laws that disarm felons.*

To show that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation, the United States bears the burden to identify a historical regulation that is "relevantly similar" to the modern one. *Bruen*, 142 S. Ct. at 2132. To meet that burden, the United States must "identify a well-established and representative historical *analogue*[.]" *Id.* at 2133 (emphasis original). "*Bruen* observed," however, "that historical analogies must be more flexible when a contemporary regulation implicates 'unprecedented societal concerns or dramatic technological changes[.]'" *Range*, 69 F.4th at 120 (Krause, J., dissenting). "Section 922(g)(1) is such a regulation, as the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel were unknown at the Founding." *Id.* Two "central considerations" determine whether a modern-day regulation is sufficiently analogous: "whether [both] regulations impose a

28

comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]" *Bruen*, 142 S. Ct. at 2133.

Although history does not reveal a regulation that is identical to § 922(g)(1), history does show two types of regulations that are relevantly similar: laws that categorically disarmed people who had shown disloyalty to the rule of law, and laws that punished felony offenses with complete forfeiture of all assets or with death. Both types of historical regulations impose burdens that are comparable to those imposed by § 922(g)(1). And those burdens are comparably justified.

    a.   *The Nation has a historical tradition of categorically disarming people who have shown disloyalty to the rule of law.*

"History shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people." *Jackson*, 69 F.4th at 502. To begin, "[t]he English Bill of Rights established Parliament's authority to determine which citizens could 'have arms … by Law.'" *Id.*; App'x at 1 (1688 English law at 143). The English government used that authority to disarm people—*i.e.*, Catholics—believed to be disobedient to the Crown and English law. App'x at 2-4 (1688 English law at 71-73). Those disarmament provisions were intended to ensure "undivided allegiance to the sovereign that" defined "membership in the English body

politic[.]" Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007).

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as outside the political community and thus outside the rule of law. Colonial legislatures used that authority to disarm Native Americans, slaves, and Catholics— "categorical prohibitions" that are repugnant and "of course … impermissible today under other constitutional provisions." *Jackson*, 69 F.4th at 503. In addition, legislatures disarmed "full-fledged members of the political community as it then existed," *i.e.*, "free, Christian, white men[.]" *Range*, 69 F.4th at 122 (Krause, J. dissenting). For instance, in 1775, Connecticut provided that any person who "shall libel or defame" any acts of the Continental Congress or the Connecticut General Assembly "made for the defence or security" of the colonies "shall be disarmed and not allowed to have or keep any arms[.]" App'x at 5 (1775 Connecticut law at 193).

In 1776, the Continental Congress recommended that state governments disarm people who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the war effort. App'x at 6 (1776 Congressional resolution at 205). At least six states—Massachusetts, Rhode

30

Island, North Carolina, New Jersey, Pennsylvania, and Virginia—enacted Congress's recommendation, disarming anyone "who refused to declare an oath of loyalty." *Jackson*, 69 F.4th at 503; *see also* App'x at 7 (1776 Massachusetts law at 479-84); App'x at 8 (1776 Rhode Island law at 567); App'x at 9 (1777 North Carolina law at 231); App'x at 10 (1777 New Jersey law at 90); App'x at 11-12 (1777 Pennsylvania law at 112-13); App'x at 23 (1779 Pennsylvania law at 348); App'x at 13 (1777 Virginia law at 282).

At the time those disarmament laws were enacted, Pennsylvania and North Carolina had constitutional provisions that were "analogues to the Federal Second Amendment." *Heller*, 554 U.S. at 601; *see also* App'x at 15 (Pennsylvania Declaration of Rights of 1776 § XIII); App'x at 14-15 (North Carolina Declaration of Rights of 1776 § XVII). Also, Massachusetts added a similar constitutional provision four years later. App'x at 14 (Massachusetts Const. of 1780, pt. I, art. XVII). Thus these states had constitutional provisions that guaranteed the people's right to firearms. And at the same time, these states categorically disarmed people who refused to show respect and allegiance to the rule of law.

None of these state's disarmament laws "narrowly target[ed] citizens who committed inherently violent or dangerous" acts. *Folajtar*, 980 F.3d at 909. Instead, they targeted people who had shown disrespect, disobedience, or

31

disloyalty to the law and the civic community—regardless of their dangerousness. For instance, Pennsylvania's law disarmed "sizable numbers of pacifists"—including "Quakers, Moravians, Mennonites, and other groups"— who refused to take oaths that "violated th[eir] religious convictions[.]" *Range*, 69 F.4th at 125 (Krause, J., dissenting). And Virginia's law required those who were disarmed to nonetheless attend militia trainings and to perform drills without weapons. App'x at 13 (1777 Virginia law at 282).

Thus "[n]ot all persons disarmed under historical precedents … were violent or dangerous persons." *Jackson*, 69 F.4th at 504. Although some of them surely were dangerous, many others were simply "early Americans who declined to swear an oath of loyalty"—including pacifists, members of the militia, and others who posed no danger to the community. *Id.* These disarmament laws therefore did not "disarm certain individuals *on the basis* [of] dangerousness." (*Contra* Alvarado's Brief at 18 (emphasis added); *see also* Amicus Brief at 5-35.) Rather, they disarmed individuals on the basis of disloyalty to the community and to the rule of law.

These historical disarmament regulations are "relevantly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2132. Both the historical regulations and § 922(g)(1) burden the right to possess firearms by people who have in some way rejected the rule of law. And both of them are comparably justified:

32

people who have shown disloyalty and disrespect for the rule of law cannot be trusted to keep and bear arms in a manner that upholds the "security of a free State." U.S. Const. amend II.

And in at least one way, § 922(g)(1) is *more* justified than the historical disarmament regulations. Those regulations disarmed classes of people after a single branch of government—*i.e.*, the legislature—determined them to be outside the rule of law. *E.g.*, App'x at 6 (1776 Congressional resolution at 205). In contrast, § 922(g)(1) disarms a class of people who have received a felony conviction that requires the "concurrence of [all] three branches." Raymond M. Kethledge, *Hayek and the Rule of Law: Implications For Unenumerated Rights and the Administrative State*, 13 N.Y.U. Journal of Law & Liberty 193, 212 (2020). "The legislature must prescribe a rule of conduct that authorizes" the conviction; the executive "must choose to enforce that rule; and the judiciary must conclude that the executive's [enforcement] falls within the rule's limits." *Id.*

Alvarado misses the point of *Bruen*'s historical inquiry. He says that § 922(g)(1) violates the Second Amendment because "[t]here is no record of a founding-era law prohibiting firearm possession due to a felony conviction, much less for a conviction for a nonviolent crime." (Alvarado's Brief at 18; *see also* Amicus Brief at 32.) But *Bruen*'s historical inquiry is not a "regulatory

33

straightjacket" that forbids any modern regulation without an identical historical analogue. *Bruen*, 142 S. Ct. at 2133. *Bruen* requires a "historical *analogue*, not a historical *twin*." *Id.* (emphasis original). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* And here, § 922(g)(1) passes muster, because it is relevantly similar to historical laws that disarmed people who had shown disloyalty to the rule of law.

Moreover, Alvarado loses sight of the purpose for a historical analogue. The search for a historical analogue is not a scavenger hunt for its own sake; rather, it is a search for evidence of the "original public meaning" of the Second Amendment—*i.e.*, "the meaning that the citizens bound by the [Amendment] would have ascribed to it at the time it was approved." *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring); Kethledge, *Hayek and the Rule of Law*, 13 N.Y.U. Journal of Law & Liberty at 197. And here, the historical analogues demonstrate the meaning that Americans would have ascribed to the Second Amendment at the time it was approved: that it protected an individual right to keep and bear arms, but that the legislature retained authority to categorically disarm people who refused to show allegiance to the rule of law.

34

Alvarado points to the ratification debates as evidence that "the Founders rejected proposals to prevent persons that had committed crimes from bearing arms." (Alvarado's Brief at 20; *see also* Amicus Brief at 18-23.) But those proposals could also support the opposite conclusion. *E.g., Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 349 (3d Cir. 2016); *Jackson*, 69 F.4th at 503; *Range*, 69 F.4th at 126 (Krause, J., dissenting). For instance, one "highly influential" proposal provided for a right to bear arms "unless for crimes committed, or real danger of public injury from individuals." *Heller*, 554 U.S. at 604; *Jackson*, 69 F.4th at 503. Although that proposal was not adopted into the Second Amendment, the founders may not have "object[ed] to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" because that limitation "was understood" as self-evident. Stephen P. Halbrook, *The Founder's Second Amendment: Origins of the Right to Bear Arms* at 273 (2008). In any event, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590.

In sum, historical firearm regulations show that Continental Congress and state legislatures disarmed people who had shown disloyalty to the rule of law. And those regulations existed side-by-side with state constitutions that guaranteed the people's right to keep and bear arms. Those regulations thus

35

establish that § 922(g)(1) fits within the Nation's historical tradition of firearm regulation.

b.    *The Nation has a historical tradition of punishing felony offenses with severe sanctions—i.e., forfeiture and death—that necessarily disarmed felons.*

"[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to bear arms." *Medina*, 913 F.3d at 158. Felonies have long been considered "the most serious category of crime" that warrant the most serious of sanctions. *Id*. Under the common law, "felony" meant "an offense which occasions a total forfeiture of either lands, or goods, or both … and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). To that definition, Blackstone added that "the true criterion of felony is forfeiture," and that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

"At common law, felons were essentially stripped of property and other rights: A felon who had broken the social contract no longer had any right to social advantages" and "could not own any property himself[.]" Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360-61 (2009). And "felons simply did

36

not fall within the benefits of the common law right to possess arms." Don B.

Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*,

82 Mich. L. Rev. 204, 266 (1983).

Colonial statutes mirrored the common law, punishing a variety of

felonies—violent and nonviolent alike—with forfeiture, death, or both. During

the colonial era, capital punishment was "ubiquit[ous]" and the "standard

penalty for all serious crimes." *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J.,

concurring) (quoting S. Banner, *The Death Penalty: An American History* 23

(2002)). Likewise, many colonies authorized forfeiture of a felon's estate for

violent and nonviolent offenses alike. *See* Beth A. Colgan, *Reviving the Excessive*

*Fines Clause*, 102 Cal. L. Rev. 277, 332 & n.275 (2014) (citing statutes). For

instance, Massachusetts, Pennsylvania, Maryland, and Rhode Island

authorized estate forfeiture for the following felonies: theft, arson, rape,

"corruptly … altering any will or record," and counterfeiting. App'x at 16

(1633 Massachusetts records at 32 (theft)); App'x at 17-18 (1700, 1705

Pennsylvania laws at 12, 178 (arson and rape)); App'x at 19 (1715 Maryland

law at 79 (altering a will or record)); App'x at 20 (1717 Maryland law at 139

(counterfeiting a government seal)); App'x at 21 (1743 Rhode Island law at 259

(counterfeiting)). "Early legislatures also ordered forfeiture of firearms by

persons who committed non-violent hunting offenses." *Jackson*, 69 F.4th at 503.

Around the time the U.S. Constitution was ratified, legislatures continued to impose forfeiture and capital punishment for a variety of violent and nonviolent felonies. In 1777, Virginia provided that anyone convicted of felony forgery, counterfeiting, or presenting a forged document "shall forfeit his whole estate, real and personal." App'x at 22 (1777 Virginia law at 302). In 1786, New York provided that anyone convicted of felony counterfeiting "shall forfeit all his or her estate both real and personal[.]" App'x at 24-25 (1786 New York law at 260-61). In 1788, New York provided the death penalty for several felonies, including counterfeiting (along with burglary, robbery, arson, and malicious maiming or wounding). App'x at 26-28 (1788 New York law at 664-65). That law also required anyone convicted of one of those offenses to "forfeit to the people of this State, all his[] or her goods and chattels" and entire estate. *Id.* at 666. For a felony not mentioned in the statute, New York's law provided the death penalty for "any second offense." *Id.* at 665. In 1790, the First Congress (which drafted and proposed the Second Amendment) made many felonies punishable by death, including treason, murder on federal land, piracy, and forging or counterfeiting a public security. App'x at 29-32 (1790 Congressional act at 112-15).

These historical regulations are not identical to § 922(g)(1), but they are "relevantly similar" in three respects. *Bruen*, 142 S. Ct. at 2132. First, the historical regulations and § 922(g)(1) impose "comparable" burdens on any "*law-abiding* citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). Second, the historical regulations and § 922(g)(1) are "comparably justified." *Id.* Whether violent or nonviolent, whether historical or modern, a felony offense violates the social compact, rejects the rule of law, and thus justifies the "legitimate consequence" of disarmament. *Tyler*, 837 F.3d at 708 (Sutton, J., concurring). And third, the historical regulations show that the founding generation "would … have accepted" § 922(g)(1). *Bruen*, 142 S. Ct. at 2133. After all, the founding generation imposed severe sanctions for felony offenses—including complete forfeiture of property and capital punishment, both of which necessarily disarmed felons—and thus would have accepted the relatively lenient sanction of disarmament through forfeiture of firearm rights.

The historical regulations for felony offenses thus show that § 922(g)(1) fits within the Nation's historical tradition.

C.    <u>In all events, Alvarado's challenge to § 922(g)(1) fails on its own terms, because his status as a felon, his prior convictions, and his recent conduct show that he is dangerous.</u>

Although at one point Alvarado says that he raises a "facial challenge" to § 922(g)(1), he primarily argues that § 922(g)(1) is unconstitutional "as

applied to" him. (*Compare* Alvarado's Brief at 15 *with id.* at 11, 14, 15, 17, 25.) To establish a facial challenge, Alvarado must show "no set of circumstances exists under which" § 922(g)(1) could be constitutionally applied. *Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (*en banc*). But Alvarado himself suggests that § 922(g)(1) can be constitutionally applied to "violent" felons. (Alvarado's Brief at 10-25.) That leaves only Alvarado's applied challenge. To establish an applied challenge, Alvarado needs to show that § 922(g)(1) is unconstitutional as applied to his "particular circumstances." *United States v. Frost*, 125 F.3d 346, 370 (6th Cir. 1997)*.* Alvarado has not made that showing.

1.    *Felons are categorically more dangerous than non-felons.*

"[T]here is good reason not to trust felons, even nonviolent ones, with firearms." *Folajtar*, 980 F.3d at 909. "[N]onviolent offenders are at higher propensity for committing violent crimes." *Id.*; *see generally Binderup*, 836 F.3d at 354, 377. "[N]onviolent offenders … have a higher recidivism rate than the general population … and a large percentage of the crimes nonviolent recidivists later commit are violent." *Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008). And felons—violent and nonviolent alike—are more likely "to engage in illegal and violent gun use." *Kanter v. Barr*, 919 F.3d 437, 448 (7th Cir. 2019).

One study conducted by the Department of Justice showed that felons—those convicted of both violent and nonviolent offenses—had similar rearrest rates for violent crimes. U.S. Department of Justice, *Bureau of Justice Statistics, Recidivism of Prisoners Released in 34 States in 2012*, at 11 (July 2021), *available at* https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/rpr34s12 5yfup1217.pdf (accessed July 21, 2023). Specifically, 32 percent of felons who had been convicted of a violent offense, 29 percent who had been convicted of a property offense, 28 percent who had been convicted of a public-order offense, and 22 percent who had been convicted of a drug offense were rearrested for a violent crime within five years following their release. *Id.*

Congress reached a similar conclusion—namely, that felons are categorically more dangerous than non-felons. And that conclusion explains why Congress enacted § 922(g)(1). The "very structure of the Gun Control Act demonstrates that Congress ... sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). To that end, the Act prohibits "categories of presumptively dangerous persons from" possessing firearms. *Lewis v. United States*, 445 U.S. 55, 64 (1980). People in those categories—including felons—"pose[] an unacceptable risk of dangerousness." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 120 (1983). "Congress obviously

41

determined that firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them." *Id.* at 119. Those determinations led Congress to a common-sense conclusion: since felons cannot be trusted to follow the law, they should not be trusted with firearms.

For three reasons, the Court should reject Alvarado's argument that the Second Amendment protects the right of "nonviolent felons" to possess a firearm. (*Contra* Alvarado's Brief at 10-26.)

First, his argument fails to account for the data showing that felons—whether convicted of violent or nonviolent offenses—are rearrested at nearly the same rates for violent crimes. *E.g.*, DOJ, *Bureau of Justice Statistics, Recidivism of Prisoners*, at 11 (July 2021).

Second, his argument is contradicted by the sources he relies on. To support his view that the Second Amendment protects the rights of felons who are "nonviolent," he cites two dissenting opinions—one from Justice Barrett in *Kanter* and one from Judge Bibas in *Folajtar*. (Alvarado's Brief at 17, 18, 19, 21, 22, 25 n.13 (citing *Kanter*, 919 F.3d 437 (Barrett, J. dissenting) and *Folajtar*, 980 F.3d 897 (Bibas, J., dissenting)).) But both Justice Barrett and Judge Bibas agree that "legislatures have the power to prohibit *dangerous* people from possessing guns," *Kanter*, 919 F.3d at 451 (Barrett, J. dissenting), and

"historical limits on the Second Amendment … protect us from felons, but only if they are *dangerous*," *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). And a person can be *dangerous* whether or not he has been convicted of a *violent* felony. For instance, drunk driving is an extremely dangerous offense though not always a violent one. *See Birchfield v. North Dakota*, 579 U.S. 438, 465 (2016). In fact, drunk driving is so dangerous that it caused 9,967 fatalities in a single year, "on average, one death every 53 minutes." *Id.*

Third, courts lack the ability to accurately assess the future dangerousness of a felon. To assess the dangerousness of individual felons "would require the government to make case-by-case predictive judgments" under an "amorphous" standard. *Medina*, 913 F.3d at 159-60. And many courts have concluded that they cannot accurately make those predictions— whether a felon is convicted of a violent or a nonviolent offense. *E.g.*, *Hatfield v. Barr*, 925 F.3d 950, 952-53 (7th Cir. 2019). In fact, Congress attempted and "abandoned" that sort of "case-by-case approach" because predicting a felon's dangerousness is "very difficult" and because "too many of these felons … went on to commit violent crimes with firearms." *Kanter*, 919 F.3d at 439, 450. That reality had led courts to conclude that it "is not possible to declare that any particular felon could be entrusted with firearms." *Hatfield*, 925 F.3d at 952.

This Court has reached that same conclusion. Whether a felon "is likely to act in a manner dangerous to public safety presupposes an inquiry into [his] background—a function best performed by the Executive[.]" *Tyler*, 837 F.3d at 698 n.18. Courts lack "institutional capacity … to engage in such determinations." *Id.* For good reason, then, "history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons" when "the category as a whole presented an unacceptable risk of danger if armed." *Jackson*, 69 F.4th at 504. And here, felons (violent and nonviolent alike) present an unacceptable risk of danger if armed.

2.    *Alvarado's felony convictions and recent conduct show that he is dangerous.*

Alvarado's previous convictions show that he—in particular—is dangerous. *See Holloway v. Att'y Gen. United States*, 948 F.3d 164, 173-77 (3d Cir. 2020). "Drunk driving is an extremely dangerous crime." *Begay v. United States*, 553 U.S. 137, 141 (2008). In fact, "[d]riving while intoxicated presents a fundamental threat, perhaps more dangerous than the threat presented by other crimes of violence." *United States v. Lopez-Galvez*, 429 F. App'x 567, 574 (6th Cir. 2011). And among drunk drivers, "the most dangerous offenders" are "those who drive with a BAC significantly above the current limit of 0.08" percent and those who are "recidivists." *Birchfield*, 579 U.S. at 465.

Here, Alvarado's drunk driving convictions place him squarely within the most dangerous subset of an already dangerous group of felons. He is a recidivist, amassing three prior convictions—and two pending charges—for driving while intoxicated. (R. 86, Presentence Report at 1028-30.) During the incident that led to his felony drunk-driving conviction, he drove significantly above the legal limit—more than 50 percent above it. (*Id.* at 1029.) And he not only risked his life and the lives of other people on the road, he also risked the lives of two small children—1 year old and 5 years old—who were in the car with him. (*Id.*) Alvarado's felony drunk-driving conviction thus shows that he is dangerous, whether behind the wheel of a car or behind the trigger of an assault rifle.

Alvarado's drug conviction also shows that he is dangerous. He possessed 50 pounds of marijuana, which is more—far more—than he could have intended for personal use. *See United States v. Maliszewski*, 161 F.3d 992, 1019 (6th Cir. 1998). Possession of marijuana for distribution is dangerous, because "drug dealing is notoriously linked to violence." *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). And possession of marijuana for personal consumption (R. 86, Presentence Report at 1034) can also be dangerous, because research "demonstrate[s] a connection between marijuana

use specifically and violence." *United States v. Carter*, 750 F.3d 462, 467 (4th Cir. 2014).

Further, Alvarado's recent conduct shows that he is dangerous. During an argument with his wife, he fired at least two shots from an assault rifle in a residential neighborhood. (Exhibit 1 at 3:10–3:20; R. 112, Transcript at 1614-15.) When he fired the rifle, his wife, baby, and neighbors were nearby. (R. 112, Transcript at 1614-15.) He scared his wife, who was "praying so hard" and was "afraid that … Alvarado would hurt her." (Exhibit 1 at 2:45–2:58; R. 112, Transcript at 1614-15.) And he also scared his neighbors, one of whom initially thought Alvarado's gunfire had "come through [her] house" or had hit her dog. (R. 108, Transcript at 1396-97, 1374; R. 112, Transcript at 1614.)

In a footnote, Alvarado asserts that the Court should ignore the fact that he fired an assault rifle in a residential neighborhood. (Alvarado's Brief at 26.) To assess an "as-applied" challenge, however, the Court considers the "application of the statute in the particular context in which [the person challenging the statute] has acted[.]" *Ross v. Duggan*, 402 F.3d 575, 582 n.3 (6th Cir. 2004). "Of course, the felon-in-possession statute does not require the government to prove the manner in which the defendant possessed a firearm." *United States v. Adams*, 914 F.3d 602, 607 (8th Cir. 2019). "But a party who raises an as-applied constitutional challenge to a statute must show that the

46

statute as applied in the particular circumstances of his case infringed on conduct that was constitutionally protected." *Id.*

Alvarado's conduct was not constitutionally protected. The Second Amendment does not cover the right to "bear[] arms in a way that spreads 'fear' or 'terror' among the people." *See Bruen*, 142 S. Ct. at 2145. And here, Alvarado recklessly used his firearm in a way that terrorized his wife and his neighbors. The particular context in which Alvarado acted, therefore, shows that the Second Amendment permits his conviction under § 922(g)(1).

Alvarado's past and present conduct shows a "complete disrespect for the rule of law." (R. 112, Transcript at 1635.) Felons in general—and Alvarado in particular—cannot be trusted to keep and bear arms in a manner that upholds "the security of a free State." U.S. Const. amend II. This Court should reject Alvarado's challenge to the constitutionality of 18 U.S.C. § 922(g)(1).

## II.    No clear error occurred when the district court found that Alvarado had placed his wife and his neighbors in imminent danger, because ample evidence showed that they were close by when he recklessly fired an assault rifle.

This Court reviews for clear error the district court's factual finding that Alvarado's gunfire placed other people in imminent danger. *United States v. Ruiz-Lopez*, 53 F.4th 400, 402 (6th Cir. 2022). Factual findings are not clearly erroneous so long as they are "plausible in light of the record viewed in its

47

entirety[.]" *United States v. Grant*, 15 F.4th 452, 457 (6th Cir. 2021). Here, the evidence shows that the district court's findings meet that standard.

Sentencing Guideline § 2K2.1(b)(6)(B) increases the offense level for a defendant who "used or possessed any firearm or ammunition in connection with another felony offense[.]" U.S.S.G. § 2K2.1(b)(6)(B). Under Tennessee law, reckless endangerment is a felony offense when a defendant uses a "deadly weapon" to "recklessly engage[] in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tennessee Code § 39-13-103(a), (b)(2). A defendant cannot commit reckless endangerment merely by "firing a gun when no one [is] around." *Ruiz-Lopez*, 53 F.4th at 403. But a defendant can commit reckless endangerment by firing a gun when other people are "*in the vicinity*." *United States v. Mukes*, 980 F.3d 526, 534-35 (6th Cir. 2020) (emphasis added).

Case after case after case explain what common sense suggests: gunfire in close proximity to other people can place them in imminent danger. For instance, this Court has determined that the following circumstances permit a factfinder to conclude that the defendant committed reckless endangerment:

- "children were in close proximity to [the defendant] when he fired the gun," *United States v. Lester*, 238 F. App'x 80, 86 (6th Cir. 2007);

- the defendant "sho[t] the gun into the air while others stood in the immediate vicinity," *United States v. Maxon*, 250 F. App'x 129, 133 (6th Cir. 2007);

- "people were present on the … property when the shooting occurred," *United States v. Corbin*, 76 F. App'x 58, 61 (6th Cir. 2003);

- the defendant shot at a car while there was a driver in the car and there were "other individuals in the vicinity," *United States v. Hyler*, 308 F. App'x 962, 966 (6th Cir. 2009); and

- "officers, passersby, or children were in the vicinity when the defendants fired their weapons into the air," *Mukes*, 980 F.3d at 535.

Here, evidence showed that Alvarado's wife and baby were in close proximity to Alvarado's reckless gunfire. In a recorded statement made after the shooting, Alvarado's wife said (and demonstrated) that she was so close to the gunfire that she ducked her head away, heard ringing in her ears, instinctively shielded the baby, and tried to cover the baby's ears to protect him from the noise. (Exhibit 1 at 3:10–3:25.)

Those statements gave the court good reason to conclude that Alvarado's gunfire placed his wife in imminent danger. (R. 112, Transcript at

1615.) Alvarado ignores his wife's statements (Alvarado's Brief at 26-32), but the district court found them "truthful." (R. 112, Transcript at 1614-15.) "When a witness's testimony is coherent, facially plausible, and not contradicted by extrinsic evidence, a judge's decision to credit that witness 'can virtually never be clear error.'" *Ruiz-Lopez*, 53 F.4th at 403.

Here, Alvarado's wife's statements to the deputy are coherent, plausible, and contradicted by nothing except her own trial testimony. (*Compare* Exhibit 1 at 0:25–4:25 *with* R. 78, Transcript at 898-909.) And the court explained why it rejected her trial testimony: her demeanor and the evidence at trial left the court with "serious doubts about [her] veracity under oath" and "suggest[ed] that [she] perjured herself[.]" (R. 112, Transcript at 1615, 1623.) In contrast, the court explained that her statements to the deputy "immediately after the incident" were made "where there was not time to fabricate or shade her perception[.]" (*Id.* at 1615.) The court's decision to credit those statements therefore cannot be clear error.

The evidence also showed that Alvarado's neighbors were in the vicinity of his reckless gunfire. At trial, a neighbor—who lived in the mobile home next to Alvarado's—testified that the sound of the gunfire was so loud that she thought a bullet had "come through [her] home." (R. 108, Transcript at 1396-97.) She also testified that the sound was so close that she thought someone

had shot her dog, which was outside her home. (*Id.*) Also, photographs and video showed that the place where Alvarado fired the rifle—*i.e.*, near the back door of his mobile home—was near other homes in the neighborhood. (Exhibit 2 at 0:45–1:40, Exhibit 3 at 0:00–0:23; Exhibit 11.) That evidence gave the court good reason to conclude that Alvarado's gunfire placed his neighbors in imminent danger.

Additional evidence corroborated the statements from Alvarado's wife and from his neighbors. Deputies found two spent shell casings—one inside Alvarado's mobile home and one on its patio. (R. 107, Transcript 1298-99; Exhibit 3 at 0:15–0:37.) Another neighbor testified that he saw Alvarado carry an assault rifle through the neighborhood shortly after the gunfire. (R. 107, Transcript at 1368-69, 1373.) A deputy testified that he spotted Alvarado carrying a rifle, and footage from a body-cam confirmed that testimony. (*Id.* at 1284-91.) And another body-cam captured Alvarado telling deputies that the rifle belonged to him. (Gov't Trial Exhibit 20 at 00:04–00:10.)

This Court's decision in *Mukes* weakens Alvarado's argument. (*Contra* Alvarado's Brief at 28-29.) *Mukes* confirms that reckless endangerment can occur when a defendant fires a gun while people are "in the vicinity." 980 F.3d at 534-35. In fact, *Mukes* makes that point three times. First, *Mukes* agreed that reckless endangerment can occur if "officers, passersby, or children [are] *in the*

*vicinity* when the defendants fired their weapons into the air." *Id.* at 535 (emphasis added). Second, *Mukes* explained that no reckless endangerment can occur without "evidence that anyone was *in the vicinity* when [the defendant] allegedly discharged the gun[.]" *Id.* (emphasis added). And third, *Mukes* held that no reckless endangerment had occurred, because "[t]here is no evidence in the record that anyone was *in the vicinity* when [the defendant] allegedly fired four shots into the air[.]" *Id.* (emphasis added). Here, several people were in the vicinity of Alvarado when he fired his assault rifle.

Alvarado's other cases likewise weaken his argument, because they confirm *Mukes*'s common-sense conclusion: reckless endangerment depends on "the proximity of the victim to the danger." *State v. Goodwin*, 143 S.W.3d 771, 778 (Tenn. 2004). For instance, a defendant recklessly endangers children who "came into [an] area" where he had left a loaded shotgun. *Id.* Or during a car chase, a defendant recklessly endangers people "present on the sidewalks in close proximity to the chase." *State v. Payne*, 7 S.W.3d 25, 29 (Tenn. 1999). Or reckless endangerment could occur if "anyone was … in the immediate vicinity" when a defendant shoots a firearm into the air. *State v. Fox*, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996).

A common thread thus runs through all of those cases: a factfinder can reasonably conclude that gunfire places people nearby in imminent danger.

(*Contra* Alvarado's Brief at 27-32.) Like the defendants in *Goodwin* and *Payne*, Alvarado carried out recklessly dangerous conduct in close proximity to other people—his wife, his son, and his neighbors. And like *Mukes* and *Fox* suggested, the factfinder was entitled to conclude that those people were placed in imminent danger based on evidence that they were in the "immediate vicinity" of his gunfire.

Alvarado contends that *Maxon* does not apply here, but he neglects to mention a key part of that decision. (Alvarado's Brief at 32.) True, the Court noted that there—unlike here—the defendant had fired "in the general direction of [police] officers." *Maxon*, 250 F. App'x at 133. But the Court also said that "[e]ven if Defendant fired the bullet into the air, basic principles of gravity dictate that what comes up generally must come down." *Id.* "By shooting the gun into the air while others stood in the 'immediate vicinity,' Defendant placed those individuals in a 'reasonable probability of danger.'" *Id.* And here, Alvarado's gunfire placed his wife, son, and neighbors in a reasonable probability of danger because—like in *Maxon*—they were in the immediate vicinity when he fired.

The district court did not clearly err when it found that Alvarado's gunfire placed his wife and his neighbors in imminent danger. Sentencing Guideline § 2K1.1(b)(6)(B) therefore properly applied to Alvarado.

53

## Conclusion

This Court should affirm Alvarado's conviction and sentence.

Respectfully submitted,

Francis M. Hamilton III
United States Attorney

By:   _s/Samuel R. Fitzpatrick_
Samuel R. Fitzpatrick
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee  37902
865.545.4167

## Certificate of Service

I certify that this brief was filed electronically on July 21, 2023. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

> *s/Samuel R. Fitzpatrick*
> Samuel R. Fitzpatrick
> Assistant United States Attorney

## Certification Pursuant to Rule 32(a)(7)(B)

I certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, in that it contains 11,755 words, excluding the cover, table of contents, table of authorities, statement regarding oral argument, the certificates of counsel, and the designation of relevant district court documents. This certification is based upon the word count of the word-processing program used by the United States, Microsoft Word 2016.

*s/ Samuel R. Fitzpatrick*
Samuel R. Fitzpatrick
Assistant United States Attorney

### Designation of Relevant District Court Documents

UNITED STATES OF AMERICA,
       Plaintiff-Appellee,
   v.

RICARDO ALVARADO,
       Defendant-Appellant.

On appeal from the United
States District Court for the
Eastern District of Tennessee
No. 3:20-cr-114

| ENTRY NO. | DESCRIPTION OF ENTRY | PAGE ID# RANGE |
|:---:|:---|:---:|
| 1 | Indictment | 1-2 |
| 60 | Verdict | 372 |
| 66 | Objections | 822-825 |
| 78 | Transcript | 881-982 |
| 86 | Presentence Report | 1023-1039 |
| 89 | Judgment | 1042-1048 |
| 91 | Notice of Appeal | 1053 |
| 107 | Transcript | 1239-1348 |
| 108 | Transcript | 1349-1453 |
| 112 | Transcript | 1585-1643 |

               *s/Samuel R. Fitzpatrick*
               Samuel R. Fitzpatrick
               Assistant United States Attorney