**Case No. 22-5459**

**United States Court Of Appeals
FOR THE SIXTH CIRCUIT**

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**RICARDO ALVARADO,**

Defendant-Appellant.

**On Appeal from the United States District Court
for the Eastern District of Tennessee, 3:20-cr-00114-1**

**DEFENDANT-APPELLANT'S REPLY BRIEF**

Nathan L. Colvin
THE SIXTH CIRCUIT CLINIC
AT THE UNIVERSITY OF
 CINCINNATI
COLLEGE OF LAW
2540 Clifton Ave
Cincinnati, Ohio 45221
Tel: (513) 313-7344
nathan.colvin@gmail.com

Colter L. Paulson
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Tel: (513) 361-1200
colter.paulson@squirepb.com

*Attorneys for Ricardo Alvarado,
Defendant-Appellant*

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ......................................................................................1

ARGUMENT ............................................................................................2

    I.     Plain Error Cannot Solve the Government's Problems with
          Bruen ...............................................................................................2

         A.     Plain Error Review Must Take Intervening Changes to
              Law into Account.......................................................................2

         B.     The Government Inappropriately Relies on pre-*Bruen*
              Precedent...................................................................................4

    II.    The Application of § 922(g)(1) to Mr. Alvarado is Plain Error
          Following *Bruen* ............................................................................7

         A.     "The People" Protected by the Second Amendment
              Includes Mr. Alvarado.. ...........................................................12

         B.     The Government's Formulation of "the People" is Both
              Too Narrow and Too Vague. ...................................................13

    III.   The Government Has Failed To Cite Any Founding-Era
          Regulations Supporting a Tradition of Disarming Non-Violent
          Felons. ...........................................................................................11

         A.     The Government Agrees that No Historical Regulation is
              Distinctly Similar to § 922(g)(1) ............................................12

          B.     The Government's Historical Analogues were Intended
              to Prevent Violent Revolt and Insurrection. ...........................13

             1.     Founding-era disarming regulations were not
                   aimed at preventing rebellion, not crime .....................14

             2.     Laws that could result in death or estate forfeiture
                   are not analogous to  § 922(g)(1) .................................17

         C.     Drunk Driving and Marijuana Possession Are not Crimes
              of Violence...............................................................................19

IV.    Reversal of the Four-point Sentencing Enhancement for Reckless Endangerment with a Firearm is Required. ...................... 22

    A.    Like the District Court, the Government Misinterprets the "Imminent Danger" Requirement under Tennessee law. ........22

    B.    There Was No Evidence that Any Person Was Actually Endangered by the Gunshots. ...................................................25

CONCLUSION .........................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Borden v. United States,*
    141 S. Ct. 1817 (2021)................................................................3

*Folajtar v. Attorney General*,
    980 F.3d 897 (3d Cir. 2020) ...............................................10, 14, 19

*Henderson v. United States*,
    568 U.S. 266 (2013)................................................................6

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ..................................................14, 17

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)................................................................20

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)................................................................9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)..........................................................*passim*

*Range v. Attorney General*,
    69 F.4th 96 (3d Cir. 2023) .......................................................*passim*

*State v. Alder*,
    71. S.W.3d 299 (Tenn. Crim. App. 2001) ........................................23

*State v. Baldwin*,
    No. 01-9612-CR-00530, 1998 WL 426199 (Tenn. Crim. App.
    1998) ........................................................................25, 27

*State v. Fox*,
    947 S.W.2d 865 (Tenn. Crim. App. 1996) ...............................23, 26, 27

*State v. Goodwin*,
    143 S.W.3 771, 778 (Tenn. 2004) ...............................................23

*State v. Payne*,
    7 S.W.3d 25 (Tenn. 1999)....................................................23, 25, 27

*Tyler v. Hillsdale Cnty. Sheriff's Dept.*,
   837 F.3d 678 (6th Cir. 2016) ................................................................5

*United States v. Barnett*,
   398 F.3d 516 (6th Cir. 2005) ................................................................4

*United States v. Carey,*
   602 F.3d 738 (6th Cir. 2010) ................................................................6

*United States v. Cavazos*,
   950 F.3d 329 (6th Cir. 2020) ................................................................3

*United States v. Daniels*,
   77 F.4th 337 (5th Cir. 2023) ..............................................................21

*United States v. Frazier,*
   314 F. App'x 801 (6th Cir. 2008) ........................................................6

*United States v. Goolsby*,
   No. 21-3087, 2022 WL 670137 (6th Cir. May 7, 2022) ....................6

*United States v. Hyler,*
   308 F. App'x 962 (6th Cir. 2009) ......................................................24

*United States v. Khami,*
   362 F. App'x 501 (6th Cir. 2010) ........................................................6

*United States v. Lester,*
   238 F. App'x 80 (6th Cir. 2007) ........................................................24

*United States v. Maxon,*
   250 F. App'x 129 (6th Cir. 2007) ......................................................24

*United States v. Mukes,*
   980 F.3d 526 (6th Cir. 2020) ....................................................*passim*

*United States v. Ruiz-Lopez,*
   53 F.4th 400 (2022) ............................................................................24

*United States v. Swaggerty,*
   No. 16-6677, 2017 WL 11622737 (6th Cir. Oct. 18, 2017) ................6

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990)...................................................................7

*United States v. Whisnant*,
    391 F. App'x 426 (6th Cir. 2010) ...............................................6

*United States v. White*,
    58 F.4th 889 (6th Cir. 2023) ......................................................3

**Statutes**

18 U.S.C. § 16...............................................................................20

18 U.S.C. § 922(g) ..................................................................*passim*

**Other Authorities**

2 American Archives, 793 (4th Ser., Peter Force ed., 1839)...................15

2 Jonathan Elliot, *The Debates in the Several State Conventions on the
    Adoption of the Federal Constitution* 202 (2d ed. 1891)....................8

Dale H. Gieringer, *The Origins of Cannabis Prohibition in California*
    (1999) (the first state to ban marijuana was in 1913) ........................20

Joseph Greenlee, *The Historical Justification for Prohibiting
    Dangerous Persons from Possessing Arms*, 20 Wy. L. Rev. 249,
    264 (2020) ...........................................................................15, 16

Lewis A. Grossman, *Life, Liberty, [and the Pursuit of Happiness]:
    Medical Marijuana Regulation in Historical Context*, 74 Food &
    Drug L.J. 280, 288 (2019)...........................................................20

Maryland Gazette, Oct. 10, 1754 .........................................................15

Maryland Gazette, Oct. 17, 1754 .........................................................16

Merriam-Webster Dictionary, https://www.merriam-
    webster.com/dictionary/people ......................................................8

National Center of Drug Abuse Statistics, *Marijuana Addiction: Rates
    & Usage Statistics* (2023) ..........................................................20

Nicholas Johnson et al., *Firearms Law And The Second Amendment* 440 (3d ed. 2021) ................................................................. 15

Reuters, *Factbox: U.S. states where recreational marijuana is legal* (2023) ................................................................................... 21

Samuel Johnson, *People*, *A Dictionary of the English Language* (6th ed. 1785) ................................................................................ 8

Thomas Dyche & William Pardon, *People*, *A New General English Dictionary* (14th ed. 1771) ............................................................. 8

**INTRODUCTION**

Mr. Alvarado's conviction under § 922(g)(1) cannot survive plain error review following the Supreme Court's decision in *Bruen*. In Second Amendment challenges, the Court must: (1) presume that "the Constitution ... protects such conduct"; (2) place the burden on the Government to defeat that presumption; and (3) decide whether comparable founding-era regulations rebut the presumption. *N.Y. State Rifle & Pistol Assn. v. Bruen*, 142 S. Ct. 2111, 2129-30 (2022). The Government cannot evade this Court's substantive review of Mr. Alvarado's conviction under *Bruen*.

The Government claims that plain error requires this Court to defer to pre-*Bruen* cases that did not apply any historical analysis, much less the analysis mandated by *Bruen*. But Mr. Alvarado is entitled to make an as-applied argument that § 922(g)(1) is plainly unconstitutional under the new standard. The Government also contends that convicted felons are not among "the people" protected by the Second Amendment—yet the Supreme Court has held that "the people" is a term of art in the Constitution and includes all "free citizens." The Government's "law-abiding, responsible citizen" definition of "the people" has no limiting principle and would allow Congress to redefine who is included among "the people."

The Government fails to provide even one example of a founding-era regulation that would permanently disarm a non-violent felon like Mr. Alvarado.

Indeed, the federal government only started banning possession of firearms by non-violent felons in 1961. The founding generation certainly dealt with crime. The (patently discriminatory) regulations identified by the Government do not address crime at all; they disarm groups to prevent them from engaging in armed revolt. Mr. Alvarado does not fit in that category, and so his conviction must be vacated.

Setting aside the conviction, the district court's four-point sentencing enhancement for reckless endangerment with a firearm must also be reversed. The district court misinterpreted Tennessee law, which requires proof that someone was actually at risk of imminent danger of death or serious bodily injury. Instead, the district court found it sufficient that some people were scared by Mr. Alvarado's behavior. The enhancement cannot stand under Tennessee law because the Government has no evidence that Mr. Alvarado pointed the weapon at anyone, or fired anywhere in the direction of other people.

## ARGUMENT

### I. Plain Error Cannot Solve the Government's Problems with *Bruen*.

### A. Plain Error Review Must Take Intervening Changes to Law into Account.

Given the change to Second Amendment standards under *Bruen*, this Court must consider the merits of Mr. Alvarado's argument that his conviction violates the Second Amendment.

The Government identifies the typical formulation of plain error review, Gov't Br. 10, but never wrestles with how plain error review is impacted by an intervening change in case law.  Instead, it argues that because *Bruen* did not declare § 922(g)(1) unconstitutional, the Court should not consider Mr. Alvarado's arguments on the merits.  Gov't Br. 28, 34.  But "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal, it is enough that an error be 'plain' at the time of appellate consideration." *United States v. Cavazos*, 950 F.3d 329, 337 (6th Cir. 2020) (citation omitted; cleaned up).

The Court's decision in *United States v. White* illustrates how this works.  58 F.4th 889 (6th Cir. 2023).  Mr. White was sentenced as an "armed career criminal" under a federal statute based on a prior aggravated robbery conviction under Ohio law. *Id.* at 892-93. After conviction, *Borden v. United States* held that the statute "covers purposeful and knowing acts, but excludes reckless conduct."  141 S. Ct. 1817, 1825-26 (2021).   Mr. White argued that cases supporting his conviction needed to be reconsidered because they "did not consider, as *Borden* now requires, whether the offense's force element has a mens rea greater than recklessness—either expressly or as interpreted by the Ohio courts." *White*, 58 F.4th at 896.  This Court "agree[d]" that even though *Borden* did not analyze the underlying Ohio statute or overturn binding Sixth Circuit precedent, reconsideration of those precedents was necessary because *Borden* invalidated the *method* used by the Court.  It then

proceeded to engage in extensive effectively *de novo* analysis before finding that the convictions no longer satisfy the ACCA "applying the law as it exists at the time of our review." *Id.* at 899; *see also United States v. Barnett*, 398 F.3d 516, 525-26 (6th Cir. 2005) (it was plain error to apply mandatory interpretation of Sentencing Guidelines after a supervening decision held them advisory).

At a minimum, Mr. Alvarado must be permitted to argue that the application of § 922(g)(1) to him is plainly erroneous under the standard articulated in *Bruen*. As the cases outlined by the Government show, it would have been patently frivolous for Mr. Alvarado to raise this issue at trial. Gov't Br. 11-13. *Bruen* changed that, and Mr. Alvarado should not be penalized due to the timing of the decision.

### B.    The Government Inappropriately Relies on pre-*Bruen* Precedent.

The rest of the Government's plain error argument is misplaced because it incorrectly relies on cases that do not undertake the analysis required by *Bruen*.

First, a word on *Bruen*. As the Government concedes, *Bruen* overturned the framework that this and other courts employed to evaluate whether a statute infringes on an individual's Second Amendment rights. Gov't Br. 17. *Bruen* now requires a reviewing court to (1) presume "the Constitution ... protects such conduct"; (2) place the burden of defeating that presumption on the Government; and (3) consider comparable founding-era regulations. *Bruen*, 142 S. Ct. at 2129-30.

The Government's cases are inapposite because neither the Supreme Court nor this Court have ever applied anything approaching *Bruen*'s standard in considering § 922(g)(1). The Government cites *Heller* as establishing an apparently irrebuttable presumption that the statute is constitutional, but that is dicta as the litigant in *Heller* was not a felon, was not challenging the prohibition, and the Supreme Court undertook no analysis, historical or otherwise, on the issue. *See Tyler v. Hillsdale Cnty. Sheriff's Dept.*, 837 F.3d 678, 687 (6th Cir. 2016) (en banc) (*Heller* is better understood to mean "'that the matters have been left open'") (citation omitted). *Heller* "did not invite courts onto an analytical off-ramp to avoid constitutional analysis." *Id*. Foreclosing challenges to § 922(g)(1) on the basis of dicta would run contrary to *Bruen*'s presumption that statutes that infringe on Second Amendment rights are unconstitutional. *See* 142 S. Ct. at 2129-30.

Notably, the Third Circuit questioned the rationale behind the dicta. *Heller* characterized the felon prohibition as "longstanding," but the statute that was applied to Mr. Alvarado was enacted in <u>1961</u>. *See Range v. Attorney General*, 69 F.4th 96, 104 (3d Cir. 2023) (en banc). The prior version of the statute, which was enacted in 1938, applied only to "a limited set of violent crimes such as murder, rape, kidnapping, and burglary." *Id*. (citation omitted). Given *Bruen*'s emphasis on founding-era sources, it would be "dubious" at best to characterize such a law as

"'longstanding' for purposes of demarcating the scope of a constitutional right." *Id*. at 104.

The Sixth Circuit cases cited by the Government illustrate why this analytical off-ramp should be avoided. For example, *United States v. Frazier* affirmed without any historical analysis simply because *Heller* did not question § 922(g)(1). 314 F. App'x 801, 807 (6th Cir. 2008). The same is true for *United States v. Carey*, which involved expungement and did not engage in *any* historical analysis. 602 F.3d 738, 741 (6th Cir. 2010). The remaining cases merely relied on decisions like *Frazier* and *Carey*. *See United States v. Whisnant*, 391 F. App'x 426, 430 (6th Cir. 2010); *United States v. Khami*, 362 F. App'x 501, 508 (6th Cir. 2010); *United States v. Swaggerty*, No. 16-6677, 2017 WL 11622737 (6th Cir. Oct. 18, 2017); *United States v. Goolsby*, No. 21-3087, 2022 WL 670137 (6th Cir. May 7, 2022).

Plain error review allows this Court to consider whether "the application of a new rule of law to cases on appeal will meet the demands of fairness and judicial integrity." *Henderson v. United States*, 568 U.S. 266, 278 (2013). Thus, Mr. Alvarado is entitled to apply *Bruen*. The question is then straightforward: would it clearly be an error, in the new light of *Bruen*, to imprison Mr. Alvarado? The Government's request that the Court rely on precedents applying the wrong standard would reduce plain error review to no review at all.

## II.    The Application of § 922(g)(1) to Mr. Alvarado is Plain Error Following *Bruen*.

### A.    "The People" Protected by the Second Amendment Includes Mr. Alvarado.

Mr. Alvarado is protected by the plain text of the Second Amendment because, at the founding, the ratifying public understood "the people" to include *all free citizens*.  The Government's argument that "the people" includes only "law-abiding, responsible citizens" is contrary to the text of the Second Amendment and binding precedent.

Starting with the text, the same phrase "the people" appears throughout the Constitution, including in the First Amendment's Assembly and Petition Clause and the Fourth Amendment's Search and Seizure Clause.  *District of Columbia v. Heller*, 554 U.S. 570, 579 (2008).  The Supreme Court has therefore explained that "the people" should be understood to be "a term of art" that includes "persons who are part of a national community."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).  Thus, according to *Heller*, this use of "the people" means "the Second Amendment right is exercised individually and belongs to *all Americans*."  554 U.S. at 581 (emphasis added); *see also Bruen*, 142 S. Ct. at 2156 (the "Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public") (emphasis added).

This understanding of "the people" is consistent with sources from the founding.  The original public meaning of "the people" included "every person, or the whole collection of inhabitants in a nation or kingdom." Thomas Dyche & William Pardon, *People*, in *A New General English Dictionary* (14th ed. 1771); Samuel Johnson, *People*, in *A Dictionary of the English Language* (6th ed. 1785) (defining a "people" as a "nation; these who compose a community."); 2 Jonathan Elliot*, The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 202 (2d ed. 1891) (cleaned up) (explaining that "the people" was understood to include all free citizens). Even today, "the people" still means "the mass of a community as distinguished from a special class."[1] Because Mr. Alvarado is a citizen of our national community, he is among "the people" protected by the Second Amendment.

## B.    The Government's Formulation of "the People" is Both Too Narrow and Too Vague.

The Government advocates a reading of "the people" in the Second Amendment to include only "law-abiding, responsible citizens."  To be sure, *Heller* and *Bruen* do utilize that phrasing.  But the Government gives too much weight to that phrasing for several reasons.

---

[1] https://www.merriam-webster.com/dictionary/people

First, the Government surely would not argue that "the people" mentioned elsewhere in the Constitution includes only law-abiding, responsible citizens, else Congress could strip convicted felons of First Amendment rights. This means the Government advances a "meaning of the phrase 'the people' [that] varies from provision to provision" of the Constitution. *Range*, 69 F.4th at 102. This contravenes the Supreme Court's holding that "the people" is a term of art, and it would render the Second Amendment "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago,* 561 U.S. 742, 780 (2010).

Second, the Government ignores the fact that *Heller* defined "the people" to include "all Americans" rather than only "law abiding, responsible citizens." 554 U.S. at 579-581. And because "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases," the other references to law abiding, responsible citizens are better understood as dicta. *Range*, 69 F.4th at 101.

Third, the Government's definition of "the people" is another way of characterizing the Second Amendment as a "civic right." Indeed, the Government also argues that the Second Amendment is different because it creates a "responsibility." Gov't Br. 27. But, as Judge Bibas explained, a formulation of the Second Amendment that rests on civic virtue (*i.e.*, belonging to those who are virtuous) is essentially the other side of the same coin as the collective rights theory

9

that was rejected in *Heller*. *See Folajtar v. Attorney General*, 980 F.3d 897, 916-918 (3d Cir. 2020) (Bibas, J. dissenting).

Fourth, as the Third Circuit recognized, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102. It would exclude Americans who get traffic or parking tickets. *See id.* The inclusion of the modifier "responsible" only makes matters worse, as "Americans have widely divergent ideas about what is required for one to be considered a 'responsible citizen.'" *Id.* And leaving Congress to define who is included among the "law-abiding, responsible citizens" would give it the "'power to manipulate the Second Amendment by choosing a label.'" *Id.* at 102-03 (quoting *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting)). The Second Amendment precludes this type of sweeping deference to policy choice. *See Heller* 554 U.S. at 636; *see also Bruen*, 142 S. Ct. at 2131 (It is not legislative interest balancing, but "[a] balance—struck by the traditions of the American people—that demand our unqualified deference."). The Government has no answer to these problems.

And fifth, the Government does not cite to any founding-era sources in support of its definition of "the people." At best, it cites to Thomas Cooley for the notion that felons were excluded from the political community. Gov't Br. 25 (citing Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868)). But with

due respect to Justice Cooley, he was two generations removed from the Second Amendment's ratification and, therefore, "do[es] not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S. Ct. at 2136.

## III.    The Government Has Failed to Cite Any Founding-Era Regulations Supporting a Tradition of Disarming Non-Violent Felons.

Because Mr. Alvarado is within "the people" protected by the Second Amendment, the Government can justify § 922(g)(1) only "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30.  The Government fails to meet this burden.  Firearms, violence, and crime all existed at the time of the founding.  Yet the Government does not identify a single founding-era regulation that permanently disarmed non-violent felons like Mr. Alvarado.  The regulations the Government does point to are not "distinctly similar" to § 922(g)(1) as required by *Bruen*.  142 S. Ct. at 2131; *Range*, 69 F.4th at 103 (a regulation "targeting longstanding problems," like violent persons owning guns, "must be distinctly similar to a historical analogue").  Most are rooted in racism or religious bigotry and were intended to disarm groups perceived as violent and disloyal during a time of political upheaval.  The Government identifies nothing suggesting they were intended to deal with general criminality.  Because the Government cannot meet its burden (indeed the Government only argues that they are "relevantly similar").  Mr. Alvarado's conviction is plain error.

11

**A.     The Government Agrees that No Historical Regulation is Distinctly Similar to § 922(g)(1).**

At the outset, the Government concedes that there is "no regulation that is identical to § 922(g)(1)." Gov't Br. 39.  This is with good reason.  Section 922(g)(1) is the first regulation to broadly prohibit non-violent felons from possessing firearms and it was only enacted in 1961.  *See Range*, 69 F.4th at 104.  And before that, the United States only began prohibited certain felons from possessing firearms starting in 1938.  *See id*.  Though not dispositive, this makes the Government's task even more difficult under *Bruen* because "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  142 S. Ct. at 2131 (emphasis added).

The Government tries to sidestep this issue by arguing that § 922(g)(1) was enacted to address "unprecedented societal concerns or dramatic technological changes" posed by modern gun violence.  Gov't Br. 28 (quoting *Bruen*, 142 S. Ct. at 2132).  The Government hopes this Court will search for "relevantly similar" rather than the more appropriate "distinctly similar" historical analogues to § 922(g)(1).  But this argument ignores that the "general societal problem" posed by firearms, violence, criminality, and recidivism certainly all existed at the time of the founding.  Indeed, "[t]he District in *Heller* addressed a perceived societal problem—

12

firearm violence in densely populated communities—and it employed a regulation—a flat ban on the possession of handguns in the home—that the Founders themselves could have adopted to confront that problem." *Bruen*, 142 S. Ct. at 2131. Thus, *Bruen* counsels against allowing the Government a broad view of historical analogues when considering an issue that existed at the founding. *Id*. at 2134 (historical regulations prohibiting firearms in "sensitive places" cannot be broadly analogized to allow for the legislature to ban firearms in any place it deems "sensitive").

Nor should the historical discussion below distract this Court from the Government's argument that Congress can disarm anyone that has shown "disloyalty to the rule of law," "disloyalty to the community," or even those who "in some way rejected the rule of law." Gov't Br. 8, 31, 32. The Government even implies it could disarm those who have "refused to show respect and allegiance to the rule of law." *Id*. at 31. Such standards would not only relegate the Second Amendment to second-class status, but could justify disarming someone for any reason at all. Denying Mr. Alvarado's Second Amendment rights based on the Government's proposed standards would be clear error under *Bruen*.

### B.     The Government's Historical Analogues were Intended to Prevent Violent Revolt and Insurrection.

The Government's argument that founding-era regulations categorically disarmed "people who had shown disloyalty to the rule of law" misstates the content

and purpose of the statutes. These regulations were not intended to address general criminality. Setting aside their origins in bigotry, they were enacted to prevent violent uprisings or, during a time of war, to ensure victory over a common enemy. They are clearly neither distinctly nor even relevantly similar to § 922(g)(1).

### 1. Founding-era disarming regulations were aimed at preventing rebellion, not crime.

The Government acknowledges, as it must, that most of the historic disarming regulations—those disarming Native Americans, enslaved people, and Catholics— were rooted in discriminatory views on those classes that would render them unconstitutional for other reasons. *See* Gov't Br. 30. *Bruen* cautioned against relying on laws that targeted classes of citizens through "selective or pretextual enforcement." 142 S. Ct. at 2149. But these statutes and § 922(g)(1) are also not "relevantly similar" because they do not "impose a comparable burden on the right" and they are not "comparably justified." *Bruen*, 142 S. Ct. at 2133. "Why" and "how" each burden the right to self-defense are not similar. *Id*.

The historical record demonstrates that these statutes were enacted to prevent violent rebellion. *See Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting) (noting the Founders "disarmed people who posed a danger to others. Violence was one ground for fearing danger, as were disloyalty and rebellion."); *see also Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, C.J., dissenting) ("The historical evidence ... [shows] that the legislature may disarm those who have demonstrated a proclivity

14

for violence or whose possession of guns would otherwise threaten the public safety.").

Laws that disarmed Black Americans and American Indians were enacted to prevent slave revolts and attacks. *See* FPC Amicus Br., Doc. 41, at 6-8; *see also* Nicholas Johnson et al., *Firearms Law And The Second Amendment* 440 (3d ed. 2021). Similarly, Loyalists were disarmed so they could not "join with the open and avowed enemies of America." 2 American Archives, 793 (4th Ser., Peter Force ed., 1839); Joseph Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wy. L. Rev. 249, 264 (2020) (listing examples) [hereinafter "Greenlee"].

The Government points to the disarmament of Catholics following the Glorious Revolution and revolutionary-era "loyalty oath" statutes to claim the right to disarm any person who "in some way rejected the rule of law." Gov't Br. 32. But Catholics were disarmed in America because of fears they would fight for Catholic France against the Protestant Colonials. *See* Maryland Gazette, Oct. 10, 1754 ("Popery" is "a persecuting, blood shedding Religion. ... we have to dread and guard

against these our Enemies");[2] *id.* at Oct. 17, 1754 ("Popery is the Foundation of all our present Distractions, Divisions and Dangers" which "endanger the Peace.").[3]

Catholics in England were disarmed not because they were *disobedient* to the law, but to prevent sedition and insurrection.  Greenlee at 259.  This was particularly true following the Glorious Revolution, where the Catholic King James II was exiled, and armed Catholics threatened the Protestant King William III.  *Id.*  English traditions that predate the founding by a century tell us little about the Colonials' "distinct arms culture."  *Id.* at 257.

The Government mischaracterizes "loyalty oath" laws as disarming people who "refused to show respect and allegiance to the rule of law."  Gov't Br. at 31. But Connecticut's 1775 law was enacted to disarm potential enemy combatants. Greenlee at 263-64.  Likewise, Massachusetts disarmed people "notoriously disaffected to the cause of America" to provide confiscated weapons to the Continental Army to help the war effort.  *Id.* at 264.  Laws disarming Loyalists and Quakers targeted persons believed to support England in the war effort—but they could retain their weapons if they swore a loyalty oath.  Greenlee at 265.  Such

---

[2] https://msa.maryland.gov/megafile/msa/speccol/sc4800/sc4872/001279/html/m1279-0582.html

[3] https://msa.maryland.gov/megafile/msa/speccol/sc4800/sc4872/001279/html/m1279-0586.html

statutes have little in common with § 922(g)(1), at least as applied to a non-violent felon like Mr. Alvarado.

The Government also ignores the historical context: the colonies were at war with a world-spanning power. If the colonies were concerned with disarming people that show "disrespect" for "the rule of law," then the Government would have found a regulation disarms such criminal. But instead, the colonies took aim at those perceived to threaten the nascent Union. In any case, desperate wartime measures are not good models for defining constitutional rights. *See Bruen*, 142 S. Ct. at n.26.

### 2. Laws that could result in death or estate forfeiture are not analogous to § 922(g)(1).

The Government's analogies to the narrow set of founding-era felonies that were punishable by forfeiture or death are even farther afield. At English common law, felonies were "the most serious category of crimes" and were punishable by forfeiture or death. And the Founders considered few felonies as punishable by death, and none by "total" forfeiture. *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). And for the Colonials, felons' rights were "suspended but not destroyed" and a felony conviction and the loss of one's rights "did not necessarily go hand-in-hand." *Id*. Many felonies that were capital offenses (such as forgery and horse theft) are no longer punishable by death. But "felony" today can include fraudulent food-stamp applications and drunk driving—nothing like the crimes considered felonious at English common law. *See Range*, 69 F.4th at 102 ("But

today, felonies include a wide swath of crimes, some of which seem minor" when compared with crimes considered felonies at English common law).

Confiscating loyalist property, including their arms, was justified during the Revolutionary War, as Thomas Jefferson stated "the state of war strictly permits a nation to seize the property of its enemies found within its own limits." Letter from Thomas Jefferson, May 29, 1792, *The Works of Thomas Jefferson* 369 (H.A. Washington ed., 1884). But Mr. Alvarado is not an enemy of the United States. In this way, the Government's analogizing to the disarmament of Loyalists fails the "why" prong from *Bruen*'s relevantly similar test.

Moreover, § 922(g)(1) does not actually mention "felons." It applies to those convicted of "a crime punishable by imprisonment for a term exceeding one year." *Id*. Death or forfeiture imposed for egregious founding-era crime are not analogous to the permanent prohibition that § 922(g)(1) imposes on a significantly more expansive (and less egregious) set of crimes. Nor do offenses punishable by death at the founding inform whether § 922(g)(1)'s "particular punishment—lifetime disarmament—is rooted in our Nation's history." *Range*, 69 F.4th at 105. To hold otherwise, "risks endorsing outliers that our ancestors would never have accepted" through broad redefinition of what is criminal. *Bruen*, 142 S. Ct. at 2133.

Even at the founding, felons were not permanently stripped of their right to bear arms. *Range*, 69 F.4th at 105. In fact, a felon could "repurchase arms" after

completing his sentence. *Id.*; *see also Folajtar,* 980 F.3d at 912 ("Most punishments were temporary. We punished the crime, not the criminal. The colonists did not treat ex-cons as a permanently exiled underclass."). Further, while founding-era governments could confiscate particular weapons used in a particular crime, this did not "affect[] the perpetrator's right to keep and bear arms generally." *Range*, 69 F.4th at 105. In this way, § 922(g)(1)—which provides no opportunity for a felon to get his guns back—does not analogously burden the right to keep and bear arms since felons at the founding *could* get their guns back. In this way, the Government's analogizing to founding-era laws that could result in forfeiture or capital punishment fails the "how" test from *Bruen*.

### C.    Drunk Driving and Marijuana Possession Are Not Crimes of Violence.

The two felonies on which Mr. Alvarado's conviction was based, drunk driving and marijuana possession, are not violent crimes and would not have justified permanent disarmament at the time of the founding.

The Government argues that Mr. Alvarado's conviction should be upheld because he is "dangerous" and "courts lack the ability to accurately assess the future dangerousness of a felon." Gov't Br. 43. But Mr. Alvarado's conviction under § 922(g)(1) was not based on an assessment of his future dangerousness; it was based on two specific acts, drunk driving and marijuana possession. This Court should not evaluate "dangerousness," but whether those two acts would have justified

permanent disarmament at the time of the founding. *See Bruen*, 142 S. Ct. at 2126. Because history supports the disarmament of only *violent* felons, the sole question is whether drunk driving and marijuana possession are violent felonies. They are not.

Drunk driving is a serious offense, but not a crime of violence. The Supreme Court recognized this fact in *Leocal v. Ashcroft*, 543 U.S. 1, 4 (2004), when it held a defendant's "DUI conviction is not a crime of violence under 18 U.S.C. § 16." Nor does drunk driving involve abuse of a weapon.

The Government also argues that possession of marijuana is dangerous because drug dealing is "linked to violence." Gov't Br. 45. But Mr. Alvarado was not convicted of drug dealing or drug-related violence. If the Government is right that possession of marijuana justifies permanently disarming a citizen, then <u>half</u> of Americans must be too dangerous to ever possess a firearm.[4] *See* National Center of Drug Abuse Statistics, *Marijuana Addiction: Rates & Usage Statistics* (2023).[5]

---

[4] The Founders would have been surprised to learn that possession of marijuana would result in permanent disarmament. *See* Dale Gieringer, *The Origins of Cannabis Prohibition in California*, at 2 (1999) (the first state to ban marijuana was in 1913). Presidents Washington and Jefferson possessed fields of marijuana for commercial hemp production. *See* Lewis A. Grossman, *Life, Liberty, [and the Pursuit of Happiness]: Medical Marijuana Regulation in Historical Context*, 74 Food & Drug L.J. 280, 288 (2019).

[5] https://drugabusestatistics.org/marijuana-addiction/

Twenty-three states have now legalized recreational possession of marijuana. *See* Reuters, *Factbox: U.S. states where recreational marijuana is legal* (2023).[6]

Significantly, the Fifth Circuit in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), recently sustained an as-applied challenge to § 922(g)(3), which bars an individual from possessing a firearm if they are an "unlawful user" of a controlled substance. *Daniels* explained that "Marihuana users are not a class of political traitors…. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the founding, [the defendant] is not like the minorities who the Founders thought threatened violent revolt." *Id.* at 354. Moreover, these statutes are "not limited to those with a history of violent behavior—not all members of the set of 'drug users' are violent." *Id.*

Finally, the Government's proffered data regarding violent and nonviolent felons does not justify a blanket felon-in-possession ban post-*Bruen*. Gov't Br. 41-42. *Bruen* does not ask if the Government's statistics were "substantial enough" or the law "sufficiently tailored." *See Daniels*, 77 F.4th at 353. Similarly, Mr. Alvarado's conduct in this case is not relevant because that conduct is not the reason

---

[6] https://www.reuters.com/world/us/us-states-where-recreational-marijuana-is-legal-2023-05-31/.

Congress has permanently disarmed him.  It is irrelevant to the question of his

conviction under § 922(g)(1).

## IV.    Reversal of the Four-point Sentencing Enhancement for Reckless Endangerment with a Firearm is Required.

Tennessee law requires that gunshots put people in actual danger.  The district

court misinterpreted Tennessee law by holding that Mr. Alvarado committed

reckless endangerment because people were nearby, heard gunshots, or felt scared.

The Government's brief doubles down on this error, arguing that it was sufficient

that people be in the area to rise to reckless endangerment.  Because there was no

evidence about what direction Mr. Alvarado fired the gun, much less any evidence

of another person in that direction, the district court wrongly concluded that any

person was in imminent danger from the gunfire.

### A.    Like the District Court, the Government Misinterprets the "Imminent Danger" Requirement under Tennessee law.

Following the court below, R.112, PageID 1614, the Government wrongly

argues that reckless endangerment under Tennessee law occurs when a firearm is

discharged in the vicinity of other people, without regard to the direction of the shot.

A review of the case law, including cases cited by the Government, shows this is

incorrect.

Tennessee courts hold that the underlying statute's "requirement of imminent

danger mandates that an individual or class of individuals be present in the zone of

danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). The "zone of danger" is "that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or are." *Id*. The Government "must show that a class of person were in an area in which a reasonable probability of danger existed." *Id.*

To illustrate the "zone of danger" concept, the Tennessee Supreme Court has contrasted a situation where the "victim was in the line of fire of the defendant" with one "where the defendant merely fired his gun into the air or up into a tree top." *State v. Goodwin*, 143 S.W.3d 771, 778 (Tenn. 2004) (comparing *State v. Alder*, 71. S.W.3d 299 (Tenn. Crim. App. 2001) with *State v. Fox*, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996). The latter cannot constitute reckless endangerment, because it would lead to the "potentially absurd and unreasonable results that may arise from permitting prosecution of one discharging a weapon under *any* circumstances where *any* other human being *might possibly be* present or where a stray bullet *might possibly* strike another person." *Fox*, 947 S.W.2d at 866 (cleaned up; emphasis in original). This is true even when the defendant fired shots outside an apartment building. *Id*.

The Government, like the district court before it, never once mentions "zone of danger" and fails to recognize this key requirement of Tennessee law. This Court's precedents, however, focus on this requirement.

The Government cites *United States v. Mukes*, 980 F.3d 526, 534-35 (6th Cir. 2020), to claim that merely firing a gun when others are "in the vicinity" is sufficient. Gov't Br. 48. This is a misreading of *Mukes*, which makes clear that the critical question is not whether others are in the vicinity of the gun, but rather *in the vicinity of the direction of the bullet*. *See Mukes*, 980 F.3d at 535-36 (finding no evidence that anyone was in the zone of danger where the defendant fired shots into the air outside the victim's home as the victim remained inside).

The remaining cases cited by the Government show that the key question is the direction of the shot in relation to others. The Government's chief case, *United States v. Maxon*, 250 F. App'x 129, 131 (6th Cir. 2007), found reckless endangerment where officers saw the muzzle flashes and heard bullets "go over [their] heads before hitting the wall." Similarly, *United States v. Hyler*, 308 F. App'x 962, 966 (6th Cir. 2009), involved a defendant firing a weapon *at the driver of a car*, leaving bullet-holes in the rear window, and where other "bystanders were present." The defendant in *United States v. Ruiz-Lopez*, 53 F.4th 400, 403-04 (2022), pointed a loaded gun at the victim's head before accidentally firing.

Finally, *United States v. Lester*, 238 F. App'x 80, 85 (6th Cir. 2007), there was sufficient evidence to support the enhancement where children from the neighborhood were playing less than twenty feet away," and the "*children '[fell] on the sidewalk'* in response to Lester firing the gun" (emphasis added). In contrast,

there was insufficient evidence to support a conviction for reckless endangerment "against a customer in a restaurant who was sitting directly behind the defendant at the time the defendant discharged the firearm." *Id*. (quoting *State v. Baldwin,* No. 01-9612-CR-00530, 1998 WL 426199, at *4 (Tenn. Crim. App. 1998)).

The district court concluded that Mr. Alvarado placed others in imminent danger because "residents of the trailer park heard the shots, were nearby, and feared for their safety and property." R.112, PageID 1614. This conclusion is contrary to Tennessee law and leads to "potentially absurd and unreasonable results." *Payne*, 7 S.W.3d at 28. It criminalizes otherwise lawful firearm discharges where no one was "in imminent danger of death or serious bodily injury." *Id*.

### B.    There Was No Evidence that Any Person Was Actually Endangered by the Gunshots.

The Government's consideration of the evidence supporting the enhancement is untethered from the binding standard of what constitutes reckless endangerment. There is no dispute that the Government has the burden of establishing the enhancement. *See Mukes*, 980 F.3d at 538. Yet even on appeal, the Government still does not attempt to define the zone of danger, nor has it taken a position on exactly who was in the zone of danger or even how they were in actual danger. This is likely because the Government has no bullet holes or other evidence concerning the direction any shots were fired, no evidence that anyone was present in that direction, and no evidence that Mr. Alvarado ever pointed the weapon at anyone.

25

To overcome these problems, the Government, like the district court, focuses on the evidence that Ms. Martinez shielded her baby's ears from the sound, and neighbors heard the gunshots and "feared for their safety and property." Gov't Br. 49-51; Sentencing Tr., R.112, PageID 1614. This is insufficient under Tennessee law for several reasons.

First, by arguing that multiple people in different directions were in imminent danger, the Government and district court would permit prosecution "under *any* circumstances where *any* other human being *might possibly be* present or where a stray bullet *might possibly* strike another person." *Fox*, 947 S.W.2d at 866.

Second, the Government presented no evidence that any of these individuals were outside when the shots were fired. *See* Trial Tr., R. 108, PageID 1396 (neighbor testifying she was inside watching TV when she heard a shot). When directly asked if she saw Mr. Alvarado "point" the rifle "at you," Ms. Martinez responded: "I guess he was outside, I don't know where he was." Video Exhibit, Deputy Patrick York, 6th Cir. Dkt #37 (at 3:30-3:33 on the video). The witnesses on the other videos only stated that they "just heard the shots," and "didn't hear any screams," and that they did not see who fired the shots. Sentencing Exhibit 2 at 0:03-0:12, 0:23-0:26. When asked whether Mr. Alvarado pointed the weapon at anybody, a witness responded in the negative: "He came down and just set it down on the trailer." *Id.* at 1:15-1:22.

26

This puts this case squarely in the category of *Mukes* where the defendant merely fired the shot outside an occupied house and *Fox* where the defendant fired the shot outside of an apartment building. *See Mukes*, 980 F.3d at 535 ("This case is not distinguishable from *Fox*. It is *Fox*. There is no evidence in the record that anyone was in the vicinity when Mukes allegedly fired four shots into the air between two and three a.m. In the government's version of events, Davis remained inside the home.") (citing *Fox*, 947 S.W.2d at 865).

 Third, the Government's argument ignores that, at least as to Mr. Alvarado's wife, any shots were not fired the direction of the house given that there was no evidence of bullet holes. This too makes the Government's evidence insufficient to meet its burden. *Baldwin*, 1998 WL 426199, at *4 (reversing conviction because other person was behind defendant who fired gun was not in imminent danger of death or serious bodily harm).

And fourth, the Government and district court's focus on the fear and stress that others experienced by this episode is misplaced. R.112, Sent. Tr., PageID 1614-15; Gov't Br. 49-51. Indeed, the district court even found the enhancement was warranted simply because the neighbors "fear[ed] death or serious bodily injury from Mr. Alvarado's shots." *Id*. But the question is whether there was a "reasonable probability" that a person was in "imminent danger of death." *Payne*, 7 S.W.3d at 28. This focus on fear, rather than probability of harm, transforms the statute into

27

something that could criminalize the discharge of firearms whenever someone else merely hears the shots.

The evidence established, at most, that two shots were discharged somewhere outside Mr. Alvarado's trailer. This is insufficient under *Mukes*, 980 F.3d at 533 ("[S]imply discharging a gun into the air absent a showing that someone was threatened did not constitute reckless endangerment."). Because "the government did not present evidence that there was anybody within the zone of danger that faced a reasonable probability of imminent danger of death," the enhancement was erroneous and Mr. Alvarado's sentence must be vacated. *Id*. at 535.

## CONCLUSION

This Court should vacate Mr. Alvarado's conviction under the Second Amendment or, alternatively, vacate and remand for resentencing.

Respectfully submitted,

/s/ Colter L. Paulson
Colter L. Paulson
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 361-1200
Facsimile: (513) 361-1201
colter.paulson@squirepb.com

Nathan L. Colvin
THE SIXTH CIRCUIT CLINIC
AT THE UNIVERSITY OF CINCINNATI
COLLEGE OF LAW
2540 Clifton Ave

Cincinnati, Ohio 45221
Tel: (513) 313-7344
nathan.colvin@gmail.com

*Attorneys for Appellant Ricardo Alvarado*

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief is written in a proportionately spaced, 14-point Times New Roman font, and contains 6,427 words, exclusive of the material not counted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

/s/ Colter L. Paulson
Colter L. Paulson

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that on September 19, 2023, the foregoing was electronically filed with the Clerk of the Court via the Court's ECF system. Counsel for Plaintiffs will be served by the ECF system.

/s/ Colter L. Paulson
Colter L. Paulson
